# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN E. BERKHEIMER, | |
| Plaintiff, | Case No. 1:12-cv-09023 |
| v. | Judge John Z. Lee |
| HEWLETT-PACKARD COMPANY, | |
| Defendant. | |

**EXPERT REPORT OF DR. DAN SCHONFELD REGARDING
<u>INVALIDITY OF THE ASSERTED CLAIMS OF U.S. PATENT NO. 7,477,713</u>**

**Exhibit List**

| Number | Description |
|---|---|
| Appendix 1 | Curriculum vitae of Dan Schonfeld |
| Appendix 2 | Publications List of Dan Schonfeld |
| Appendix 3 | Case List for Dan Schonfeld |
| Appendix 4 | Materials Considered by Dan Schonfeld in Preparing Expert Report |
| Appendix 5A | Invalidity Chart of the '713 Patent over US. Patent No 5,623,679 to Kevin G. Rivette, et al. |
| Appendix 5B | Invalidity Chart of the '713 Patent over U.S. Patent No 5,893,131 to William Kornfield |
| Appendix 5C | Invalidity Chart of the '713 Patent over U.S. Patent No. 7,178,105 to David Ferrucci, et al. |
| Appendix 5D | Invalidity Chart of the '713 Patent over WIPO Publication No. 97/34240 (PCT/US97/04574) to Buford |
| Appendix 5E | Invalidity Chart of the '713 Patent over "Personalized & Database Printing," by David Broady & Frank Romano |
| Appendix 5F | Invalidity Chart of the '713 Patent over the Exstream Version 1 System (as confirmed by the Exstream Learning Guide, the Exstream version 1 demo software, and the corresponding source code) |
| Appendix 6 | Select pages from Dictionary of the Internet (2001) |
| Appendix 7 | Select pages from Microsoft Computer Dictionary, 5th ed. (2002) |
| Appendix 8 | Merriam-Webster Online Dictionary |

## TABLE OF CONTENTS

I.    QUALIFICATIONS ...........................................................................................................1

II.   SCOPE OF EXPECTED TESTIMONY ......................................................................3

III.  MATERIALS REVIEWED ............................................................................................5

IV.   LEGAL BACKGROUND ............................................................................................10

      A.   Priority Date ..............................................................................................10

      B.   Patent-Eligible Subject Matter .................................................................10

      C.   Prior Art.....................................................................................................11

      D.   Anticipation ..............................................................................................12

      E.   Obviousness ..............................................................................................13

      F.   The Level of Ordinary Skill in the Art .....................................................16

      G.   Scope and Content of the Prior Art ...........................................................17

      H.   Differences Between the Claimed Invention and the Prior Art................17

      I.   Objective Evidence of Obviousness and/or Non-Obviousness .......................18

      J.   Written Description ...................................................................................19

      K.   Enablement ................................................................................................20

      L.   Indefiniteness.............................................................................................21

V.    OVERVIEW OF THE '713 PATENT.........................................................................23

VI.   FILE HISTORY THE '713 PATENT .........................................................................25

VII.  SUMMARY DESCRIPTION OF PERTINENT PRIOR ART ...........................................27

      A.   U.S. Patent No 5,623,679 to Kevin G. Rivette, et al. (the "'679 Patent"): ...................27

      B.   U.S. Patent No 5,893,131 to William Kornfield (the "'131 Patent"):..........................27

C.  U.S. Patent No. 7,178,105 to David Ferrucci, et al. ("the "'105 Patent").......................28

D.  U.S. Patent No. 5,652,884 to Jack Palevich (the "'884 Patent")....................................28

E.  WIPO Publication No. 97/34240 (PCT/US97/04574) ("Buford").................................28

F.  "Personalized & Database Printing," by David Broady & Frank Romano (the "Romano-PDP")....................................................................................................................................28

G.  Exstream Version 1 System (the "Exstream Learning Guide") .....................................28

H.  Additional Secondary References ...................................................................................28

VIII. OPINIONS AND BASES FOR OPINIONS REGARDING THE '713 PATENT ..............29

A.  The Asserted Claims of the '713 Patent are Invalid as Being Directed To Unpatentable Subject Matter ................................................................................................................29

    1.  The Claims Are Drawn To An Abstract Idea .......................................................29

    2.  The Claims Merely Recite Conventional Components Used In Conventional Ways ...............................................................................................30

B.  The Claims Fail To Recite Anything Novel ...................................................................35

C.  The Asserted Claims of the '713 Patent are Anticipated by, or Rendered Obvious in light of, the following Prior Art...................................................................................38

    1.  Appendix 5A – U.S. Patent No 5,623,679 to Kevin G. Rivette, et al. (the "'679 Patent") .............................................................................................40

    2.  Appendix 5B – U.S. Patent No 5,893,131 to William Kornfield (the "'131 Patent) ................................................................................................46

    3.  Appendix 5C – U.S. Patent No. 7,178,105 to David Ferrucci, et al. (the "'105 Patent") .............................................................................................50

    4.  Appendix 5D - WIPO Publication No. 97/34240 (PCT/US97/04574) (the "'240 Publication to Buford")....................................................................56

    5.  Appendix 5E – "Personalized & Database Printing," by David Broady & Frank Romano (the "Romano-PDP").............................................................61

    6.  Appendix 5F - Exstream Version 1 System (the "Exstream Learning Guide") ....67

D.  Enablement and/or Written Description under 35 U.S.C. § 112, ¶ 1 .............................72

E.  Secondary Considerations of Non-Obviousness .........................................................75

IX.  CONCLUSION....................................................................................................................77

## I.    <u>QUALIFICATIONS</u>

1. My name is Dan Schonfeld.  I am currently a Professor in the Department of Electrical and Computer Engineering at the University of Illinois at Chicago.  I have been elected Fellow of the Institute of Electrical and Electronics Engineers ("IEEE") as well as Fellow of the International Society for Optics and Photonics ("SPIE").  I have also been elected University Scholar of the University of Illinois.  A complete list of my publications, professional activities, and honors that I have received is fully set forth in my curriculum vitae, attached hereto as Appendix 1.

2. I received my B.S. degree in Electrical Engineering and Computer Science from the University of California, Berkeley, California, and my M.S. and Ph.D. degrees in Electrical and Computer Engineering from The Johns Hopkins University, Baltimore, Maryland, in 1986, 1988, and 1990, respectively.

3. In August 1990, I joined the Department of Electrical Engineering and Computer Science at the University of Illinois, Chicago, Illinois, where I am currently a Professor in the Departments of Electrical and Computer Engineering, Computer Science, and Bioengineering.  I serve as Co-Director of the Multimedia Communications Laboratory ("MCL") and member of the Signal and Image Research Laboratory ("SIRL").  I have also served as Director of the University-Industry Engineering Research Center ("UIERC"), formerly known as the Manufacturing Research Center ("MRC"), in the College of Engineering.

4. I currently serve as Editor-in-Chief of the IEEE Transactions on Circuits and Systems for Video Technology.  I have previously served as Deputy Editor-in-Chief of the IEEE Transactions on Circuits and Systems for Video Technology and Area Editor for special

issues of the IEEE Signal Processing Magazine. I have also served as Associate Editor of the IEEE Transactions on Circuits and Systems for Video Technology, IEEE Transactions on Image Processing, and IEEE Transactions on Signal Processing. I also served on the editorial board of the IEEE Signal Processing Magazine, EURASIP Journal of Image and Video Processing, and Research Letters in Signal Processing. I have served as guest editor of numerous special issues in various journals in the area of multimedia systems.

5. I currently serve as Technical Program Chair of the IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP) 2018. I have served as General Co-Chair of the IEEE International Conference on Multimedia and Expo (ICME) 2012. I have also served as Chair of the IEEE Workshop on Video Mining 2008 and the SPIE Conference on Visual Communication and Image Processing 2007. I have also served on the organizing committees of various conferences including the IEEE International Conference on Image Processing 1998 and 2012.

6. I have authored and co-authored over 200 technical papers for various journals and conferences. I was co-author (with Carlo Giulietti and Rashid Ansari) of a paper that won the Best Paper Award at the ACM Multimedia Workshop on Advanced Video Streaming Techniques for Peer-to-Peer Networks and Social Networking 2010. I was also co-author (with Junlan Yang) of a paper that won the Best Student Paper Award at the IEEE International Conference on Image Processing 2007. I was also co-author (with Wei Qu) of a paper that won the Best Student Paper Award at the IEEE International Conference on Image Processing 2006. I was also co-author (with Nidhal Bouaynaya) of a paper that won the Best Student Paper Award in Visual Communication and Image Processing 2006. My publications in the area of image and video processing and communications date back to

1988.  A list of my publications within the past ten years is included in Appendix 2 of this Declaration.

7.  I was invited as a Plenary Speaker and Keynote Speaker to the International Conference on Intelligent Control and Information Processing (ICICIP) 2013 and International Conference on Brain Inspired Cognitive Systems (BICS) 2013, IEEE/EIT International Conference on Audio, Language, and Image Processing 2010, the IEEE International Conference on Advanced Video and Signal-Based Surveillance 2009, and the ASME International Conference on Communications, Signals and Systems 1995 and 2001.

8.  I have served as Region 1-6 (North America) representative on the Chapters Committee of the IEEE Signal Processing Society.  I have also served as Chairman of the IEEE Signal Processing Chicago Chapter.  I have also served on the IEEE Image, Video and Multidimensional Signal Processing Technical Committee as well as the IEEE Multimedia Communications Technical Committee.  I also serve on the American National Standards Institute ("ANSI")/Underwriters Laboratory ("UL") Standards Technical Panel ("STP") on Multimedia Systems.

9.  Additional details of my education and work experience, awards and honors, and publications that may be relevant to the opinions I have formed are set forth in my curriculum vitae (*see* Appendix 1).  Additionally, I have consulted for several companies in the area of multimedia systems.  A list of cases in which I have testified as an expert at trial or by deposition within the preceding four years is attached hereto as Appendix 3.

## II.    SCOPE OF EXPECTED TESTIMONY

10. I have been retained to testify as an expert in this action on behalf of defendant Hewlett-Packard Company ("HP") to serve as an expert in this case.  I am being

3

compensated for my work on this case at my standard consulting rate of $500 per hour. I am also being reimbursed for all incurred expenses. No part of my compensation is contingent upon the outcome of this litigation. I have no other interests in this litigation or with any of the parties.

11. I have been asked to testify as an expert about the technology allegedly described and claimed in the U.S. Patent No. 7,447,713 (the "'713 Patent"), currently asserted against HP, including the scope and content of the prior art and the level of skill in the art at the time the respective application for the '713 Patent were filed. I expect to testify about my understanding of the claims, specification, and prosecution history of the '713 Patent, to the extent necessary to support my opinions regarding the scope and validity of the claims asserted by Plaintiff. Specifically, I understand that Plaintiff currently asserts claims 1-7 and 9 of the '713 Patent (the "Asserted Claims").[1]

12. I expect to be called to provide expert testimony regarding opinions formed based on my analysis of the issues considered in this Report. I may also discuss my own work and publications in the field, and knowledge of the state of the art in the relevant time period. I may rely on handbooks, textbooks, technical literature, and the like to demonstrate the state of the art in the relevant time period and the evolution of relevant technologies. I reserve the right to modify or supplement my opinions, as well as the basis for my opinions, based on the nature and content of the documentation, data, proof, and other evidence or testimony that

---

[1] I understand that Plaintiff also previously asserted claims 10-19 of the '713 Patent. However, the Court's August 21, 2015 Markman Order found independent claim 10 indefinite. Accordingly, this Report does not provide any invalidity opinion as to indefinite independent claim 10 or its dependent claims 11-19. If asked, I am prepared to supplement this Report with an analysis of these indefinite claims.

Plaintiff or its experts may present, or based on any additional discovery or other information provided to me or found by me in this matter.

13. I also expect to testify also about matters raised on cross-examination, matters necessary to rebut the testimony of Plaintiff's experts, and matters otherwise raised at trial.

14. I understand that claim construction is a question of law and that the Court's August 21, 2015 Markman Order sets out the construction of the disputed terms in this action.

15. In formulating my opinions in the Report, I have considered the Court's Markman Order, the '713 Patent and file history, as well as the materials described in Section III, *infra* and Appendix 4. My opinions are also based upon my education, training, research, knowledge, and personal and professional experience.

16. It is my understanding that Plaintiff may submit an expert report responding to this Report. I reserve the right to rebut any positions taken in that declaration. I also reserve the right to amend or supplement this Report based on, among other things, new evidence presented and/or new positions set forth by Plaintiff on its behalf, including but not limited to Plaintiff's opening infringement report.

## III.   MATERIALS REVIEWED

17. In reaching the conclusions described herein, I have considered the documents and materials identified in Appendix 4 attached to this Report, including:

    a.   The '713 Patent;

    b.   The '713 File History;

    c.   Provisional Application No. 60/240,179, filed 10/13/2000;

    d.   The parties' Proposed Claim Terms to Be Construed and corresponding claim construction positions submitted pursuant to the local patent rules;

5

e.  My Declaration executed July 03, 2014 and filed connection with HP's Opening Claim Construction Brief, as well as the materials relied upon therein (Dkt. 73, Dx 4);

f.  Plaintiff's Preliminary and Final Infringement Contentions;

g.  HP's Preliminary and Final Invalidity Contentions and the prior art cited therein;

h.  The Deposition Transcripts of the September 26, 2014 Deposition of Steven E. Berkheimer (the "Berkheimer Deposition");

i.  US. Patent No 5,623,679 to Kevin G. Rivette, et al.;

j.  U.S. Patent No 5,893,131 to William Kornfield;

k.  U.S. Patent No. 7,178,105 to David Ferrucci, et al.;

l.  U.S. Patent No. 5,652,884 to Jack Palevich;

m.  WIPO Publication No. 97/34240 (PCT/US97/04574);

n.  "Personalized & Database Printing," by David Broady & Frank Romano;

o.  "Exstream Learning Guide," Release 1.0 dated September 1, 1999, and the corresponding Exstream executable system;

p.  "Intelligent Offices: Object-Oriented Multi-Media Information Management in Client/Server Architectures," ISBN-13: 978-0471547006 by Wiley Professional Computing;

q.  "Acrobat PDF and Workflow In Detail" by Frank Romano; and

r.  Appendices 1 through 8 to this report.

18. I have also reviewed the Court's Markman Order dated May 19, 2015 (the "Order") and understand that the Court made certain rulings concerning indefiniteness. I have also re-reviewed my Declarations dated July 3, 2014 and August 14, 2014. I maintain the opinions set forth in my prior Declarations.

19. Based on the Court's Claim Construction Order as it relates to the '713 Patent, I understand the Court's construction of the disputed claim terms as follows:

| Term | Court's Construction |
|------|----------------------|
| "Archive" | No construction required. |
| "Parser" | "A program that dissects and converts source code into object code". |
| "Parsing [the item into a plurality of multi-part object structures]" | "Using a program that dissects and converts source code into object code to dissect and convert". |
| "Evaluating" | "Analyzing and comparing". |
| "Converting" | No construction required. |
| "Evaluating the object structures" | "Analyzing the plurality of multi-part object structures obtained by parsing and comparing it with object structures previously stored in the archive to determine if there is variance between the object and at least one of a predetermined standard and a user defined rule". |
| "Presenting an evaluated object structure for manual reconciliation" | No construction required. |
| "Archive exhibits minimal redundancy" | The term is indefinite. |
| "Object oriented" and "some of the instructions, in response to a selected editing command, alter at least one element common to and linked to a selected plurality of other elements to thereby effect a one-to-many editing process" | No construction required, given that the term "archive exhibits minimal redundancy" is deemed to be indefinite. |
| "Order of steps" | Claim steps must follow the order they are recited, but there can be preceding, intervening or additional steps. |

20. In reviewing the Court's claim construction order, I understand that the Court held that the term "archive" requires no further construction. (Order at 4-5.) I also understand that HP identified the plain and ordinary meaning of the term "archive" as "a collection of stored data." This understanding is consistent with the understanding of those skilled in the art. In

7

the context of the '713 Patent, the "archive" is a collection of stored documents or graphical items.

21. In reviewing the Court's claim construction order, I understand that the Court held that the term "converting" requires no further construction. (Order at 10-11.) "Convert" is used expressly in claim 3 and by construction in claim 1 through the definition of "parser" and "parsing." In the context of claim 3, "converting" relates to translating some data from one form to a standardized format for input to the parser. In the context of claim 1, one of skill in the art would recognize that "convert" is used to translate source code into object code, consistent with what is known in the field as a "compiler."[2] I understand that Plaintiff presented this definition to the Patent Office during prosecution. '713 File History, March 17, 2008 Opening Appeal Brief, at 14 (the "Berkheimer Appeal Brief").

22. In reviewing the Court's claim construction order, I understand that the Court held that the term "evaluating the object structures in accordance with object structures previously stored in an archive" means "analyzing the plurality of multi-part object structures obtained by parsing and comparing it with object structures previously stored in the archive to determine if there is variance between the object and at least one of a predetermined standard and a user defined rule." (Order at 12-14.) I also understand that the Court stated that "[t]here is no suggestion in the Claim 1 language that some of the object structures are left out of the evaluation process." (Order at 13.)

---

[2] The understanding of the term "compiler" to one of skill in the art in computer processing systems is distinct from the plain meaning of the term "compiling" as used in dependent claims 6 and 7 to generate an item to be output. *See* Appendix 8, Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/compile (defining "compile" as "to compose out of materials from other documents.").

23. In reviewing the Court's claim construction order, I understand that the Court held that the term "archive exhibits minimal redundancy" was indefinite under 35 U.S.C. § 112, ¶ 2. Further, because this claim term was found indefinite, the court declined to construe, as unnecessary, the terms "object oriented" and "some of the instructions, in response to a selected editing command, alter at least one element common to and linked to a selected plurality of other elements to thereby effect a one-to-many editing process other presenting an evaluated object structure for manual reconciliation." (Order at 20-21.)

24. Based on the Court's reasoning and finding regarding the term "minimal redundancy" in claim 10, it is my opinion that the term "without substantial redundancy" in claim 5 suffers from the same fundamental indefiniteness shortcomings.[3] Consistent with the Court's findings with respect to the term "minimal redundancy," "the '713 Patent's specification and prosecution history do little to clarify the meaning of [the term 'without substantial redundancy']." In my opinion, a person of ordinary skill in the art related to the '713 Patent would not be informed about the meaning of the term "without substantial redundancy" from the disclosure of the '713 Patent. The '713 Patent provides no explanation of what "without substantial redundancy" means, which I equate to also mean "[having] minimal redundancy." The '713 Patent does not explain whether insubstantial redundancy exists if 1%, 5%, 10%, or 15% of the items in the archive are redundant. Based on the wording of claim 5, one of skill in the art would not be reasonably informed about the scope of the invention and would not have reasonable certainty about where infringement begins and ends.

---

[3] In the file history, both the examiner and Applicant treated "substantial" and "minimal" identically with respect to the Examiner's indefiniteness rejection. *See* '713 Patent File History, May 18, 2005 Response to Non-Final Office Action, at 2-3. In the same way, here, the use of "substantial" in claim 5 renders claim 5 indefinite for the same reasons that "minimal" rendered claim 10 indefinite.

## IV.    LEGAL BACKGROUND

25. As a technical expert assisting the Court and the jury in determining issues in this case, I am
obliged to follow existing law.  To provide context for my analysis, counsel for Defendants
have discussed with me the applicable law to the opinions rendered in this Report.  I provide
the following summary of some of the legal principles I have relied upon in this Report.

### A.    Priority Date

26. I understand that the '713 Patent has a filing date of October 15, 2001 and claim priority to a
provisional application, 60/240,179, filed on October 13, 2000.  I also understand that for an
asserted claim to be entitled to the priority date of a provisional application, the provisional
application must contain adequate support for the subject matter of the asserted claim.  I also
understand that if an asserted claim is not entitled to the priority date of a provisional
application, additional prior art may exist.

### B.    Patent-Eligible Subject Matter

27. I understand that 35 U.S.C. § 101 sets forth four categories of patentable eligible subject
matter: any new and useful process, machine, manufacture, or composition of matter.  I also
understand that the law specifically recognizes three exceptions to patent eligibility:  (1) laws
of nature, (2) physical phenomena, and (3) abstract ideas.

28. I have been informed by counsel that determining whether a patent claim is impermissibly
directed to patent ineligible subject matter involves two steps.  First, one must determine
whether the claims at issue are directed to one of the three patent-ineligible categories, such
as an abstract idea.  I understand that this can be done by looking to the claims to determine
whether an abstract idea is at the heart of claims.  I have been informed by counsel that
examples of abstract include fundamental economic practices long prevalent in the industry,

certain methods of organizing human activity, certain applications of mathematical relationships and formulas, and mental processes that can be performed in the human mind or by a human using a pen and paper.

29. Second, if the claims are determined to be directed to an abstract, then one must consider the elements of the claims both individually and as an ordered combination to determine whether the additional elements recited in the claims transform the nature of the claim into a patent-eligible application of the idea. I have been informed by counsel that this second step has been referred to as a search for an "inventive concept" — i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to "significantly more" than a patent upon the ineligible concept itself. I have also been informed that well-understood, routine, conventional activity or technology — such as implementing the abstract idea with a general-purpose computer — does not constitute an "inventive concept."

### C. Prior Art

30. I understand that a reference must meet any one of the provisions of 35 U.S.C. § 102 to be deemed as prior art. I understand that, according to § 102, a person shall be entitled to a patent unless:

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in - (1) an application for patent, published under section

122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language; or

(f) he did not himself invent the subject matter sought to be patented, or

(g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed, or (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

### D.     Anticipation

31. It is my understanding that a patent claim is anticipated (and therefore invalid) when a single item of prior art discloses or includes, either expressly or inherently, all of the limitations of that claim.  When a claim covers several structures or compositions, either generically or as alternatives, the claim is deemed anticipated if a single item of prior art discloses or includes any of the structures or compositions within the scope of the claim.  Matter that is not expressly disclosed in a reference may be deemed inherently disclosed if it is "necessarily present" in the prior art reference; therefore, if a single reference discloses all of the limitations of that claim in combination with additional structures or methods that those of ordinary skill in the applicable art would find to be inherently necessary from review of the information disclosed in that reference, that combination will also invalidate the claim for anticipation.

32. The burden of proof for establishing anticipation is clear and convincing evidence, as opposed to for example preponderance of the evidence.

E.   **Obviousness**

33. I understand that a patent claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field of the invention at the time of the invention (usually taken as the date the application was filed).  It is my understanding that a claim is invalid for obviousness if "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).  This means that even if all the requirements of the claim cannot be found in a single item of prior art that would anticipate the claim, it would have been obvious for a person of ordinary skill in the field of the invention who knew about all of the prior art to have come up with the claimed invention.  Thus, in determining obviousness, one can consider more than one item of prior art.

34. Counsel has explained to me that the ultimate conclusion of whether a claim is obvious is based on upon the consideration of several factors (which I have been told are commonly known as the "Graham factors").  I understand that these Graham factors are as follows:

- the level of ordinary skill in the art that someone would have had at the time the claimed invention was made;
- the scope and content of the prior art;
- what difference, if any, existed between the claimed invention and the prior art; and
- any secondary indicia of obviousness or non-obviousness

35. In considering the final Graham factor, counsel has explained to me that secondary indicia of obviousness or non-obviousness can include the following categories of information:

(1)   commercial success of a product due to the merits of the claimed invention;

    (2)    a long-felt need for the solution provided by the claimed invention;

    (3)    unsuccessful attempts by others to find the solution provided by the claimed invention;

    (4)    copying of the claimed invention by others;

    (5)    unexpected and superior results from the claimed invention;

    (6)    acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention; and

    (7)    independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it.

36. Counsel has further explained to me that a patent claim composed of several elements is not proven obvious merely by demonstrating that each of its elements was independently known in the prior art. In evaluating whether such a claim would have been obvious, I understand that it is relevant to consider if there would have been a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention. For example, market forces or other design incentives may be what produced a change, rather than true inventiveness. I understand that it is also appropriate to consider:

- whether the change was merely the predictable result of using prior art elements according to their known functions, or whether it was the result of true inventiveness;

- whether there is some teaching or suggestion in the prior art to make the modification or combination of elements claimed in the patent;

- whether the innovation applies a known technique that had been used to improve a similar device or method in a similar way; or

- whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art.

14

37. I have been informed and understand that a single reference can alone render a patent claim obvious, if any differences between that reference and the claims would have been obvious to a person of ordinary skill in the art at the time of the alleged invention — that is, if the person of ordinary skill could readily adapt the reference to meet the claims of the patent by applying known concepts to achieve expected results in the adaptation of the reference. In considering whether a patent claim is obvious, however, I understand that it is important to be careful not to determine obviousness using the benefit of hindsight.

38. Further, I understand that a combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I have also been advised that the common sense of one skilled in the art can be relevant to obviousness and that a person of ordinary skill is a person of ordinary creativity.

39. I understand that, as an example, if one of ordinary skill in the art can implement a predictable variation prompted by market forces or design incentives, such a variation is obvious. I also understand that if a technique has been used to improve one device, and one of ordinary skill in the art would have recognized that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond ordinary skill.

40. I also understand that a patent claim may be proved obvious by showing that a combination of known elements was obvious to try. When there is a need or market pressure to solve a problem and there is a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within that person's technical grasp. If this leads to the anticipated success, it is likely the result of ordinary skill and common sense, not innovation.

15

41. I also understand that contemporaneous development of similar variations of a device or method by other parties is indicative of obviousness.

42. I also understand that it is improper to use the patent at issue as a blueprint for piecing together the prior art with the benefit of hindsight.

43. The burden of proof for establishing obviousness is clear and convincing evidence, as opposed to for example preponderance of the evidence.

**F.    The Level of Ordinary Skill in the Art**

44. It is my understanding that the legal definition of a "person of ordinary skill in the art" is a hypothetical person of ordinary skill in the pertinent field at the time of the claimed invention.  In determining the level of ordinary skill in the art, I understand that several factors may be considered, including the education level of the inventors, the types of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made in the relevant technology, the sophistication of the technology, and the education level of active workers in the field.

45.  In my opinion, a person of ordinary skill in the art related to the '713 Patent at the time of filing would have had:  (1) at least an undergraduate degree in computer engineering or computer science or a related field; (2) computer programming experience in document and graphical data management; and (3) two years' work experience in document and graphical data management.

46. I meet these criteria and consider myself a person with at least ordinary skill in the art pertaining to the '713 Patent.  I would have been such a person at the time of the claimed invention of the '713 Patent.  I am therefore qualified to testify about how a person of

ordinary skill in the art would have understood the disclosure of the '713 Patent at the time of the claimed invention.

### G.     **Scope and Content of the Prior Art**

47. I understand that, to determine the scope and content of the prior art, one should determine what is disclosed in the prior art and whether this prior art was reasonably relevant to the particular problem the inventor faced in making the invention covered by the patent claims at issue. Such relevant prior art includes prior art in the field of the invention, and also prior art from other fields that a person of ordinary skill would look to when attempting to solve the problem.

48. Most of the prior art that I have reviewed in preparation for this Report was identified to me by the attorneys representing Defendants in this litigation. Furthermore, I have published in numerous technical journals and, as part of my research across my career, I have reviewed countless references in this or related fields of art. As explained in this Report, that prior art includes a number of references which in my opinion demonstrate the invalidity of the Asserted Claims.

### H.     **Differences Between the Claimed Invention and the Prior Art**

49. I understand that obviousness requires one to analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art at the time of the invention. Differences relating to features or functions that are not recited in the claims are not relevant to obviousness.

50. I understand that multiple prior art items can be combined to show that a claim of a patent is obvious. I understand that in deciding whether what is described in various items of prior art

may properly be combined, one can consider whether there was an apparent reason for a skilled person to combine the known elements in the fashion claimed by the patent at issue.

51. I understand that to determine whether there was an apparent reason to combine the known elements in the way a patent claims, one can look to interrelated teachings of multiple items of prior art, to the effects of demands known to the design community or present in the marketplace, and to the background knowledge possessed by a person of ordinary skill in the art.

52. I understand that any need or problem known in the field and addressed by the '713 Patent can provide a reason for combining the elements in the manner claimed.

53. As noted above, my review of the prior art vis-à-vis the Asserted Claims has shown that art to be very similar to, and often exactly the same as, the limitations of those claims. I discuss this issue again in the later sections dealing with each of the '713 Patent, identifying specific prior art references from within that body of art and explaining how those references anticipate and/or make obvious each Asserted Claim.

## I. Objective Evidence of Obviousness and/or Non-Obviousness

54. I understand that secondary considerations, such as long felt need, unexpected results, copying, and commercial success, if present, must be considered in determining obviousness.

55. I understand that these secondary considerations are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims. For example, commercial success is relevant in the obviousness context only if there is proof that the sales were a direct result of the unique characteristics of the claimed invention — in other words, if there is proof that the sales were a direct result of the features of the claimed invention that were not disclosed in the prior art. If the commercial success is the result of

18

something else, such as other economic and commercial factors unrelated to the claimed features, then the commercial success does not indicate non-obviousness.

### J.    **Written Description**

56. I understand that a claim is invalid if the specification does not contain a "written description of the invention" as required by the first paragraph of 35 U.S.C. § 112.  I understand that the written description requirement and its corollary, the new matter prohibition in the first paragraph of 35 U.S.C. § 132, both serve to ensure that a patent applicant was in full possession of the claimed invention on the application filing date.

57. I understand that when a patent applicant adds or amends a claim, the new claim language must be supported in the patent specification, as originally filed.  An inventor may file a patent application believing it to cover one invention; but, as a result of amendments during prosecution, the inventor may end up with a patent directed to a different invention.  If the patent application as originally filed does not support the invention as finally claimed (due to amendments made during prosecution), the claims of the patent are invalid for failing to meet the written description requirement of § 112.

58. I understand that, to satisfy the written description requirement, the specification must describe the claimed invention in sufficient detail to convey to one skilled in the art that the inventor had possession of the claimed invention at the time the inventor filed the patent application.  I understand that, although the specification does not have to include a word-for-word description of the claimed subject matter, the disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention.  Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims.

19

59. Even if a specification does not expressly describe the claimed subject matter, a patentee may argue that the subject matter is inherent in the disclosure. However, in order for a disclosure to be inherent, the missing descriptive matter must necessarily be present in the application's specification such that one skilled in the art would recognize such a disclosure.

60. I understand that a patentee cannot show that a patent specification satisfies the written description requirement by arguing that a claim limitation would have been obvious to a person of ordinary skill in the art.

### K. Enablement

61. I have been informed and understand that a patent specification must disclose sufficient information to enable a person of ordinary skill in the art, after reading the specification, to make and use the full scope of the claimed invention without undue experimentation. I further understand that a patent need not expressly state information that skilled persons would likely know or could readily obtain. It is my understanding that a patent is invalid if it fails to meet the enablement requirement of 35 U.S.C. § 112, first paragraph.

62. Counsel explained to me that the ultimate conclusion of whether the written description requires undue experimentation is based on upon the consideration of several factors (which I have been told are commonly known as the "Wands factors"). I understand that these Wands factors are as follows:

(1)    the quantity of experimentation necessary;
(2)    the amount of direction or guidance disclosed in the patent;
(3)    the presence or absence of working examples in the patent;
(4)    the nature of the invention;
(5)    the state of the prior art;
(6)    the relative skills of those in the art;
(7)    the predictability of the art; and

20

(8)     the breath of the claims.

**L.     Indefiniteness**

63. Counsel has also informed me about certain legal principles that are applicable to the definiteness requirement in patent law.  In particular, I have been informed that United States Patent Law requires that a patent specification "conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2 (pre-AIA) (emphasis added).  It is my understanding that this requirement is known as the "definiteness requirement," and that a claim that fails to meet this requirement is invalid for being "indefinite."

64. I understand that a patent is indefinite if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, one skilled in the art about the scope of the invention.  It is also my understanding that this standard was articulated by the United States Supreme Court in a recent decision, *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).  I am familiar with the Nautilus decision.

65. Consistent with this indefiniteness standard that has been established by the United States Supreme Court, it has been explained to me that indefiniteness is to be evaluated from the perspective of someone of ordinary skill in the relevant art at the time the patent was filed.  I also understand that in assessing whether claims are indefinite, the claims must be read in light of the patent's specification and prosecution history.  It is also my understanding that the scope of the claim language recited in a patent cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.  Rather, a patent must provide some objective standard in order to allow the public to determine the scope of the claimed invention.

66. It is my understanding that indefiniteness is a question of law to be decided by the Court. However, I also understand that the question of indefiniteness may sometimes depend upon factual findings, such as the knowledge and understanding of a person of ordinary skill in the art.

67. I also understand that the patent applicants can be their own lexicographers, and thus can use whatever terms they choose in the claims to define the invention. Accordingly, compliance with the definiteness requirement only requires the claim language to meet a threshold of clarity — a reasonable degree of particularity and distinctness. Thus, indefiniteness cannot be grounded on the belief that more suitable language or modes or expression are available.

68. I also understand that a patent claim is indefinite if it is not amenable to construction. In particular, a claim is indefinite if a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as knowledge of the relevant art area.

69. I also understand that a patent claim is indefinite if it creates a zone of uncertainty as to infringement. Patent claims must delineate the outer boundaries of the claimed subject matter to give the public full and fair notice of what the patent covers and what is free for all to use. Thus, the patent claims must be sufficiently precise to permit a potential competitor to determine whether or not there is infringement. Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.

70. Further, I understand that subjective claim limitations are indefinite. The claims must provide an objective anchor for the public to determine the scope of the claimed invention. The public is not on notice of the patentee's right to exclude if the meaning of claim

language would depend on the unpredictable vagaries of any one person's opinion. The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.

71. I also understand that claim 10 of the '713 Patent has been found indefinite by the Court. As noted above, this Report does not provide any opinion as indefinite independent claim 10 or its dependent claims 11-19. However, if asked, I am prepared to supplement this Report or provide testimony regarding these claims.

## V.   OVERVIEW OF THE '713 PATENT

72. The '713 Patent generally deals with archives and the storage and management of documents or graphical items. '713 Patent at 1:10-11. The '713 Patent seeks to limit the number of redundant items that appear in large archival databases and teaches how the system and users can reduce those redundancies. *Id*. at 2:18-20; 2:27-40. Documents are first converted into a standardized input format. *Id.* at 2:55-57, Fig. 2A, claim 3. Once the documents have been converted into the standardized format, a parser dissects and converts the input source code into object code. *Id.* at 2:57-59, claim 1. These object structures can be analyzed and compared to ensure that no redundant objected structures are stored in the archive. *Id.* at 3:60-4:8, claim 1. As a result of this analysis and comparison, the method identifies potentially redundant object structures and presents them to the user for manual reconciliation. *Id.* at 13:13-20, claim 1. The user has the ability to review the identified object structures and to manually remove or edit the identified object structures. *Id.* at 6:60-65, 7:12-16.

73. A further problem the '713 Patent seeks to resolve is the inefficiency associated with a single edit that needs to be made to multiple objects in the archive (for example, an image object

that needs to be updated in many documents stored in the archive). '713 Patent at 1:32-40. The patent teaches a process for application of a single edit that automatically propagates to multiple linked object structures throughout the archive (i.e., one-to-many edits). *Id.* at 3:27-30, 7:23-38, 157-41.

74. Below is the language of the asserted claims of the '713 Patent:

> 1. A method of archiving an item comprising in a computer processing system:
>
>> presenting the item to a parser;
>>
>> parsing the item into a plurality of multi part object structures wherein portions of the structures have searchable information tags associated therewith;
>>
>> evaluating the object structures in accordance with object structures previously stored in an archive;
>>
>> presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule.
>
> 2. The method as in claim 1 wherein the respective structure can be manually edited after being presented for reconciliation.
>
> 3. The method as in claim 1 which includes, before the parsing step, converting an input item to a standardized format for input to the parser.
>
> 4. The method as in claim 1 which includes storing a reconciled object structure in the archive without substantial redundancy.
>
> 5. The method as in claim 4 which includes selectively editing an object structure, linked to other structures to thereby effect a one to many change in a plurality of archived items.
>
> 6. The method as in clam 5 which includes compiling an item to be output from the archive, wherein at least one object type structure of the item has been edited during the one to many change and wherein the compiled item includes a plurality of linked object type structures converted into a predetermined output file formal.
>
> 7. The method as in claim 6 which includes compiling a plurality of items wherein the at least one object type structure had been linked in the archive to members of the plurality.
>
> 9. The method as in claim 1 which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values.

## VI.     FILE HISTORY THE '713 PATENT

75. The application for the '713 Patent was filed on October 15, 2001, with named inventor
Steven E. Berkheimer.  The '713 Patent claims priority to U.S. Provisional Patent
Application No. 60/240,179, Oct. 13, 2000.

76. The PTO issued a first Non-Final Office Action on December 08, 2004, finding claims 1-7,
9-10, and 12-19 under 35 U.S.C. § 102 as anticipated by U.S. Patent No. 5,671,353, to Tian
et al. ("Tian"), claims 8, 11, and 20-28 obvious under 35 U.S.C. § 103 over Tian in view of
U.S. Patent No. 6,456,395, to Ringness.  The PTO also rejected claims 4-8, 10-19, 25, and 28
under 35 U.S.C. § 112, ¶ 2, finding that the terms "substantial redundancy," "minimal
redundancy," and "substantially non-redundant" were indefinite.

77. The Applicant filed a Response on May 18, 2005 attempting to traverse the §§ 102, 103, and
112 rejections without amendment.

78. On August 08, 2005, the PTO issued a Final Office action withdrawing the § 112 rejection,
but maintaining the rejections under §§ 102 and 103.

79. Applicant filed a Request for Continued Examination on February 13, 2006 (the "RCE"),
again attempting to traverse the §§ 102 and 103 rejections without amendment.  Applicant
distinguished Tian on the basis, *inter alia*, that Tian failed to teach the same type of parsing
taught by the application — namely, "dissection (breaking apart) of source code (documents
and graphical items as referenced in the Application) so that it can be translated into object
code (the unique data model taught in the Application)."  RCE at 11.

80. On May 01, 2006, the PTO issued a second, Non-Final Rejection maintaining the same
rejections of the claims under §§ 102 and 103.

81. On August 04, 2006, Applicant filed a response containing an interview summary memorializing a telephonic interview with a new examiner. Applicant again attempted to traverse the §§ 102 and 103 rejections without amendment.

82. On October 13, 2006, the new examiner likewise issued a Final Office action maintaining the rejections under §§ 102 and 103.

83. On January 1, 2007, Applicant filed a Notice of Appeal along with a Pre-Appeal Brief Request for Review.

84. On February 09, 2007, the PTO issued a notice that the review panel was withdrawing the rejection and reopening prosecution.

85. On April 12, 2007, the PTO issued a Restriction/Election Requirement finding the patent directed to two distinct groups of claims.

86. On May 9, 2007, Applicant responded by amending the second group of restricted claims to be dependent upon the first, thereby rendering the restriction moot.

87. On August 09, 2007, the Office issued a third Non-Final Office Action objecting to various errors in the claims and rejecting claims 1-7, 9-10, and 12-19 under § 103 as obvious over Tian in view of Reissue Patent No. 37,722 to Burnard et al. ("Burnard"), and claims 11 and 20-28 as under § 103 as obvious over Tian and Burnard, further in view of Ringness.

88. On November 13, 2007 and March 10, 2008, Applicant filed a second Notice of Appeal and Amendment correcting the objected to errors in the claims, respectively.

89. On March 17, 2008, Applicant filed its opening Appeal Brief ("Berkheimer Appeal Brief"). Applicant's arguments included that "evaluate," as used in the claims meant "to form an idea of the amount, number, or value of (an item), to assess or estimate the nature, ability, or quality of (an item)." Berkheimer Appeal Brief at 7. Applicant also argued, "It is obvious to

26

one of ordinary skill in the art of archiving (an archivist), that an archive is a collection of materials, documents, records (data) . . . . [and] that archival software is a computer program designed to facilitate the management of an archive as described here." *Id.* at 9. Applicant further distinguished Tian on the grounds that "One of ordinary skill in that art also knows that [Tian's] type of semantic parsing makes use of a dictionary rather than a parser and that a parser is used in another form of parsing, wherein source code is converted/translated into object code through the use of a parser, which is sometimes also called a compiler." *Id.* at 14.

90. On March 17, 2008, the PTO issued a Notice of Allowance noting that Tian "teaches a structure providing a plurality of semantic definition and validation objects and a method which semantically validates a DICOM message by passing the message through the structure" but did not anticipate or render obvious the claims.

91. The '713 Patent issued on November 04, 2008.

## VII.   SUMMARY DESCRIPTION OF PERTINENT PRIOR ART

### A.   U.S. Patent No 5,623,679 to Kevin G. Rivette, et al. (the "'679 Patent"):

92. The '679 Patent was filed on April 18, 1995 and published on April 22, 1997. Accordingly, I understand the '679 Patent qualifies as prior art under at least 35 U.S.C. §§ 102(a), (b), and (e).

### B.   U.S. Patent No 5,893,131 to William Kornfield (the "'131 Patent"):

93. The '131 Patent was filed on December 23, 1996 and published on April 06, 1999. Accordingly, I understand the '131 Patent qualifies as prior art under at least 35 U.S.C. §§ 102(a), (b), and (e).

      **C.**    <u>**U.S. Patent No. 7,178,105 to David Ferrucci, et al. (the "'105 Patent")**</u>

94.  The '105 Patent was filed on February 04, 2000 and published on February 13, 2007.

Accordingly, I understand the '105 Patent qualifies as prior art under at least 35 U.S.C. § 102

(e).

      **D.**    <u>**U.S. Patent No. 5,652,884 to Jack Palevich (the "'884 Patent")**</u>

95.  The '884 Patent was filed on November 14, 1994 and published on July 29, 1997.

Accordingly, I understand the '105 Patent qualifies as prior art under at least 35 U.S.C.

§§ 102(a), (b), and (e).

      **E.**    <u>**WIPO Publication No. 97/34240 (PCT/US97/04574) (the "'240 Publication to Buford")**</u>

96.  The '240 Publication to Buford was filed on March 17, 1997 and published on September 18,

1997.  Accordingly, I understand the '240 Publication to Buford qualifies as prior art under at

least 35 U.S.C. § 102(b).

      **F.**    <u>**"Personalized & Database Printing," by David Broady & Frank Romano (the "Romano-PDP")**</u>

97.  The Romano-PDP article was published in April 1999.  Accordingly, I understand the

Romano-PDP qualifies as prior art under at least 35 U.S.C. §§ 102(a) and (b).

      **G.**    <u>**Exstream Version 1 System (the "Exstream Learning Guide")**</u>

98.   The "Exstream Learning Guide," Release 1.0 was a product in public use or on sale in this

country at least as early as September 1, 1999.   Accordingly, I understand the Exstream

Learning Guide qualifies as prior art under at least 35 U.S.C. § 102(b).

      **H.**    <u>**Additional Secondary References**</u>

99.  "Intelligent Offices: Object-Oriented Multi-Media Information Management in Client/Server

Architectures," ISBN-13: 978-0471547006 is a publication by Wiley Professional

Computing ("Intelligent Offices"). Intelligent Offices was published in April 1992. Accordingly, I understand the Intelligent Offices qualifies as prior art under at least 35 U.S.C. §§ 102(a) and (b).

100.    "Acrobat PDF and Workflow In Detail" is a publication by Frank Romano ("Acrobat PDF & Workflow"). Acrobat PDF & Workflow published in June 2000. Accordingly, I understand the Acrobat PDF & Workflow qualifies as prior art under at least 35 U.S.C. §§ 102(a) and (b).

## VIII.   OPINIONS AND BASES FOR OPINIONS REGARDING THE '713 PATENT

### A.    The Asserted Claims of the '713 Patent Are Invalid as Being Directed To Unpatentable Subject Matter

101.    As described below, one of ordinary skill in the art would not find anything in the '713 Patent claims that amounts to an "inventive concept" or "significantly more" than the abstract idea of archiving data, where new data items to be archived are analyzed and compared to previously stored data. As set out in the specification of the '713 Patent, the systems and methods disclosed by the '713 Patent require only a general-purpose computer and can be implemented using conventional components in conventional ways without any unexpected result. For the reasons explained in this Report, it is my opinion that the asserted claims of the '713 Patent do not recite patent-eligible subject matter under 35 U.S.C. § 101.

#### 1.    The Claims Are Drawn to an Abstract Idea

102.    In my opinion, each of the Asserted Claims is drawn to the abstract idea of archiving data, where new data items to be archived are analyzed and compared to previously stored data. Fundamentally, this is an abstract idea that could be completed manually by a human using a pen and paper. For example, humans often maintain file cabinets in order store and archive documents. In such instances, it would not be uncommon for a human to examine

29

and compare portions of new documents to stored portions of documents to identify variances when archiving new documents. Such action would practice common sense because the person would wish to avoid archiving duplicates of portions of the same documents. One of skill in the art would not find anything else in the claims that adds a meaningful limitation to this underlying abstract idea.

103.    I understand that abstract ideas such as mathematical equations, mathematical formulae and algorithms, methods of "organizing human activity," ideas themselves, and fundamental economic practices are patent ineligible. I understand that computerized elements that do nothing to transform the claim from a mental process into a novel method or unique application of that idea are similarly not patent-eligible:

104.    The claims of the '713 Patent share traits in common with some of the above subject matter. Claim 1, for example, recites steps for "parsing," "evaluating," and "presenting" data. Claim 1, however, does not specify how the computer system is specially programmed to perform the claimed steps. Rather, the claims recite the functional steps to be performed at a high level of generality. One of skill in the art would understand that implementing these steps in a computer system would generally use basic and well-known data processing techniques, such as recognizing, organizing, storing, and comparing data. Accordingly, one of ordinary skill in the art would find that the claims are directed to the abstract idea of archiving data, where new data items to be archived are analyzed and compared to previously stored data

> **2.    The Claims Merely Recite Conventional Components Used in Conventional Ways**

105.    One of skill in the art would not find anything in the claims that adds a meaningful limitation to the underlying abstract idea of archiving data, where new data items to be

30

archived are analyzed and compared to previously stored data. The Asserted Claims lack any form of an inventive concept because they merely employ conventional and generic computing components and functionality, such as an archive, a parser, a compiler, an evaluator, and manual reconciliation, which were all well known to those of skill in the art at the time of the filing of the '713 Patent.

106. One of skill in the art reading the '713 Patent would understand that it merely teaches using a general-purpose computer to perform generic computer functions, such as parsing data, evaluating data, and presenting data to a user. Notably, the claims of the '713 Patent do not inform one of skill in the art how a general-purpose computer carries out these generic computer functions. One of skill in the art reviewing the patent specification, including the Figures, would find them to reference only a generic workflow. For example, Figure 1 illustrates the system as being implemented by several, common and abstract computer components, including a "server," "mass storage & archive," "output devices," "mouse/ keyboard," and "display":



'713 Patent, Fig. 1.

107.   Therefore, in my opinion, one of skill in the art would not find that the '713 Patent

claimed any specialized computer or other equipment for carrying out the claimed parsing,

evaluating and presenting steps.  *See, e.g.*, '713 Patent, claim 1 (reciting "parsing…",

"evaluating…", and "presenting…" without specifying any particular hardware for

performing those tasks).  The steps of "evaluating" and "presenting," as used in all of the

asserted claims, were well known at the time the '713 Patent was filed.

108.   The concept of storing data and data objects in an archive or database was also well

known at the time of the filing of the '713 Patent.  *See, e.g.*, Background of the Invention,

'713 Patent, col. 1:20-2:41.  Plaintiff similarly acknowledged that he did not invent archives,

databases or tools to interact with them.  Berkheimer Deposition at 21:21-22:2, 240:19-21.

32

109.     The Court construed "parser" to be "a program that dissects and converts source code

into object code." This construction of a "parser" is consistent with what a person of

ordinary skill in the art would understand to be a "compiler." Parser has also been

interpreted by the Applicant in his appeal brief as a "compiler." Berkheimer Appeal Brief at

14. Compilers that dissect and convert source code into object code were well known at the

time the '713 Patent was filed. *See* Appendix 6, Dictionary of the Internet, 2001, p. 62

(defining "compiler" as "a program which takes a program written in a source code such as

JAVA and then converts it into machine code"); Appendix 7, Microsoft Computer

Dictionary, 5th ed., 2002, p. 116 (defining "compiler" as "2. A program that translates all the

source code of a program written in a high-level language into object code prior to execution

of the program."). Plaintiff admits that he did not invent the parsers disclosed in his

invention. Berkheimer Deposition at 241:20-24.

110.     That the object code contains "a plurality of multi-part object structures" similarly does

not add a meaningful limitation to the underlying abstract idea. Object structures were

commonly known well before the '713 Patent. Generating a multi-part object structure is

routine and conventional activity within the computer science field.

111.     Both "object code" and "source" code were well known at the time the '713 Patent was

filed. *See* Appendix 7, Microsoft Computer Dictionary, 5th ed., 2002, p. 372 (defining

"object code" as "the code, generated by a compiler or an assembler, that was translated from

the source code of a program. The term most commonly refers to machine code that can be

directly executed by the system's central processing unit (CPU)…"), p. 491 (defining "source

code" as "Human-readable program statements written by a programmer or developer in a

high-level or assembly language that are not directly readable by a computer. Source code needs to be compiled into object code before it can be executed by a computer.")

112.    Similarly, the "evaluating" and "presenting" steps also do no add meaningful limitations to the abstract idea. One of skill in the art would find each of these limitations to be conventional activity in the computer science field capable of being performed by general-purpose computers. Neither the evaluating nor presenting steps requires any specialized computer.

113.    I understand the Court construed the "evaluating" step to require "analyzing the plurality of multi-part object structures obtained by parsing and comparing it with object structures previously stored in the archive to determine if there is variance between the object and at least one of a predetermined standard and a user defined rule." Claim 1, however, does not inform one of skill in the art how a variance between objects is determined based on a predetermined standard and a user defined rule. Thus, this step is generic and abstract and does not place a meaningful limitation on the underlying abstract idea.

114.    Those of skill in the art would understand that evaluating documents or document objects was well known at that time of the filing of the '713 Patent. Such functionality was performed manually prior to any computer implementation of these features. Plaintiff agreed that both evaluating and converting existed prior to the filing of the '713 Patent. Berkheimer Deposition at 242:8-243:4.

115.    Similarly, presenting documents or objects to a user for manual reconciliation in a computer system was not new or novel at the time the '713 Patent was filed. Such functionality was also performed manually prior to any computer implementation of this step.

34

116.    Finally, to the extent that Claim 9, or any other claim, requires implementation of the object-oriented data structure using object-oriented programming, object-oriented programming and the use of objects were widely used at least as early as the 1980s with the advent of object-oriented programming languages, such as C++.  I understand Plaintiff conceded that he did not invent object-oriented programming.  Berkheimer Deposition at 242:1-7.

117.    For all of these reasons, one of ordinary skill in the art would not find anything in the '713 Patent claims that amounts to an "inventive concept" or "significantly more" than the abstract idea of archiving data, where new data items to be archived are analyzed and compared to previously stored data.

118.    Accordingly, one of ordinary skill in the art would find that the claims of the '713 Patent do not recite patent-eligible subject matter under 35 U.S.C. § 101.

### B.      The Claims Fail to Recite Anything Novel

119.    Prior to the time of the alleged invention, archiving items in a database was well known to one of ordinary skill in the art.  As set out in the specification, a problem that the '713 Patent set out to solve was the storage of redundant documents and document elements in digital asset management systems.  '713 Patent at 1:24-26.  Redundant elements may involve relatively minor variations in size and position in a document, which may contribute to inefficiency in storage in a digital archive.  *Id.* at 1:26-32.  One purported problem with this is large memory requirements to store documents in the archive.  *Id.* at 1:32-35.  Such storage of redundant common graphics elements allegedly lead to inefficiencies and increased costs.  *Id.* at 2:23-24.

120.    A further inefficiency identified in the '713 Patent relates to gross redundancy and menial work-effort involved with editing and replacing multiple instances of common graphic elements present in large numbers of documents in an archive.  '713 Patent at 1:36-40.

121.    The Applicant sought to address these issues through an asset and content system for managing a database of linked documents or graphical items.  '713 Patent at 2:27-30. Documents or graphical items would be inserted into the database based on standards associated with pre-existing documents or graphical items, which can link common elements of later-entered documents or graphical items to pre-existing common elements.  *Id.* at 2:31-35.  A user is provided with the ability to review newly entered items for control and consistency.  *Id.* at 2:36-38.  Finally, the Applicant sought to address the issue of content management though the use of one-to-many changes in the asset management environment. *Id.* at 2:38-41.

122.    All of these disclosed features disclosed and claimed in the '713 Patent were known functions at the time the application was filed (*e.g.*, archives, programs that convert source code to object code, evaluating object structures in a database, presenting items to users for manual reconciliation and one-to-many changes).  When combined into a single computerized system, these known features perform the exact same functions to yield predictable results.

123.    Archives and databases were well known at the time of the invention.  The Background of the Invention recognizes and describes such databases.  *Id.* at 1:20-2:41.  One of skill in the art would recognize that databases and database management were well known at the time of the filing of the '713 Patent.  Plaintiff similarly acknowledged that he did not invent archives, databases or tools to interact with them.  Berkheimer Deposition at 21:21-22:2,

36

240:19-21. Plaintiff admits that he did not invent the parsers disclosed in his invention. Berkheimer Deposition at 241:20-24. Additionally, Plaintiff concedes that he did not invent object-oriented programming. Berkheimer Deposition at 242:1-7. Plaintiff similarly agrees that user a computer for both evaluating and converting existed prior to the patent. Berkheimer Deposition at 242:8-243:4.

124.    Plaintiff's admissions are consistent with the understanding of one of skill in the art at the time of the invention. In particular, the claimed archive, parser, parsing, evaluating and converting were well known at the time of filing the '713 Patent. The prior art cited in Appendices 5A-F, as well as technical references and texts at the time further illustrate these items were well known the time of the filing of the '713 Patent.

125.    A person of ordinary skill in the art would have been generally motivated to combine the prior art cited in Appendices 5A-F because they all relate to document and graphical data management. Further, in view of the rapid rise in the volume of digital documents and graphical items that were generated and required to be stored by digital asset management systems, a person of ordinary skill would have been further motivated to combine the various references in order to improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

126.    Accordingly, all elements of the asserted claims were known individually such that they could be readily combined to create the claimed invention by a skilled artisan, and many were already present in various combinations in existing digital asset management systems at the time, as explained in further detail in my Appendices.

127. In my opinion and as illustrated below and in the prior art references in Appendices 5A-F, one of skill in the art would have found that prior art existing at the time the '713 Patent was filed renders the Asserted Claims anticipated and/or obvious.

### C.   The Asserted Claims of the '713 Patent Are Anticipated by, or Rendered Obvious in Light of, the Following Prior Art

128. Because the Court's claim construction order found claim 10 indefinite, I understand claim 10 and its dependent claims are no longer at issue in this action. Accordingly, I understand that only Claims 1-7 and 9 of the '713 Patent remain at issue against HP at this time. To the extent Plaintiff asserts different claims against HP, I reserve the right to supplement my Report accordingly.

129. Claim charts attached as Appendices 5A-5H identify where each element of claims 1-7 and 9 of the '713 Patent can be found in the prior art under the Court's constructions. In addition, where applicable, I have considered the claims in light of the claim interpretations in Plaintiff's infringement allegations.

130. All citations to prior art references and screenshots contained within this Report and these Appendices are exemplary and I explicitly reserve my right to supplement or amend this Report and any of my Appendices in response to opinions expressed by Plaintiff's experts or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this Report. My Report and Appendices are cumulative to one another, and my opinion is reflected in the aggregate of these documents. As such, the information contained in my Appendices is incorporated by reference into the Report, and the information in the Report is incorporated by reference into the Appendices.

131. As set forth in Appendices 5A-F, the prior art, and the combinations thereof, teach all of the limitations of all of the asserted claims. The Court construed "parser" to be "a program

38

that dissects and converts source code into object code." To the extent one considers the Court's construction of the term "parser" to require a compiler that converts source code (human-readable programming language) to object code (machine-readable language), a person of ordinary skill in the art would have been familiar with the use of a compiler in computer processing systems. One of ordinary skill in the art would understand that compilers are required for converting any human-readable programming language into a set of instructions that can be understood by a computer. *See* Appendix 6, Dictionary of the Internet, 2001, p. 62 (defining "compiler" as "a program which takes a program written in a source code such as JAVA and then converts it into machine code"); Appendix 7, Microsoft Computer Dictionary, 5th ed., 2002, p. 116 (defining "compiler" as "2. A program that translates all the source code of a program written in a high-level language into object code prior to execution of the program.").

132.  Because the elements of the Asserted Claims relate to well-known features at the time the '713 Patent was filed, to the extent that any of the prior art references or combinations of references are found not to include one or more elements of the asserted claims, it is my opinion that one skilled in the art would be motivated to use his or her background and experience, and/or combine two or more of the cited references to they relate to the same or similar subject matter.

133.  A person of ordinary skill in the art would have known how to combine traditional compilers with any of the prior art references or combinations identified in Appendices 5A-F. In this situation where one considers the Court's construction of the term "parser" to require a compiler that converts source code into object code, a person of ordinary skill in the art would have been motivated to utilize a compiler in these prior art systems in order to convert

39

human-readable programming description of documents and graphical items into a set of instructions describing components within these documents and graphical items that can be understood by computers. Such a representation of documents and graphical items would provide an efficient and flexible framework for digital asset management systems. In addition, such a representation would allow for extremely fast manipulation of the stored documents and graphical items, thus allowing for rapid modification and rendering at run time.

134. I have also been informed by counsel that that certain functional claim limitations directed to intended uses and mental steps may not be accorded any patentable weight. As illustrated in the attached Appendices 5A-5F, each of the claim limitations was well known to those of ordinary skill in the art at the time the '713 Patent was filed. However, to the extent that Plaintiff contends that any claim limitation is a computerize implementation of a mental step, and argues the identified prior art does not teach that limitation on that basis, such limitation should not be given any patentable weight. I reserve the right to supplement this report to address any issues regarding the mental steps doctrine and/or and claim limitations being performed by a user.

135. For the reasons explained in this Report and Appendices, it is my opinion that the asserted claims of the '713 Patent are anticipated by, or are rendered obvious in view of, at least the following prior art, alone or in combination:

1.    **Appendix 5A – U.S. Patent No 5,623,679 to Kevin G. Rivette, et al. (the "'679 Patent")**

136. It is my opinion that Claims 1-7 and 9 of the '713 Patent are invalid as obvious over the '679 Patent further in view of at least:  (1) Intelligent Offices publication and Acrobat PDF & Workflow publication to convert to a standardized format for input to the parser; (2) the '105

40

Patent to Ferrucci and Acrobat & Workflow publication to store a reconciled object structure in the archive without substantial redundancy; (3) the '105 Patent to Ferrucci and the '240 Publication to Buford to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items; (4) the '131 Patent to Kornfield to include a plurality of linked object-type structures converted into a predetermined output file format; (5) '131 Patent to Kornfield to include compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality; and/or (6) the '131 Patent to Kornfield and the Romano-PDP publication to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values. It would have been obvious to one having ordinary skill in the art, at the time the application leading to the '713 Patent was filed, to combine, without undue experimentation, the elements in the references cited in Appendix 5A as set forth therein, for example, to create the claimed invention in Claims 1-7 and 9 of the '713 Patent. A person having ordinary skill in the art at the time of the filing of the '713 Patent would have been motivated to combine the references cited in Appendix 5A in order to, for example, improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

137.    Each of these references is directed towards digital asset management systems. The combination of these references involves the combination of well-known and familiar elements in the same general field of endeavor according to known methods to yield

predictable results, *e.g.*, (a) converting to standardized formats; (b) linking object structures; (c) minimizing redundancy; and (d) object structures having item properties or values, or element properties or values.

138.   Second, with respect to the '679 Patent and the "converting to standardized format" claim elements (claim 3), there are several reasons why a person of ordinary skill in the art would combine the '679 Patent with the teachings of the Intelligent Offices publication and the Acrobat PDF & Workflow publication.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the Intelligent Offices publication and the Acrobat PDF & Workflow publication.  Thus, it would have been obvious to a person of ordinary skill in the art to modify the '679 Patent to create standardized format in order to convert both raster and vector component files.

139.   Each of the '679 Patent, the Intelligent Offices publication and the Acrobat PDF & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, recognizing objects and converting both raster and vector component files.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

140.   Third, with respect to the '679 Patent and the "without substantial redundancy" claim element, there are several reasons why a person of ordinary skill in the art would combine the '679 Patent with the teachings of the '105 Patent to Ferrucci and Acrobat & Workflow publication.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the '105 Patent to Ferrucci and Acrobat & Workflow publication.  Thus, it would have been obvious to a person of

42

ordinary skill in the art to modify the '679 Patent to maintain a database without substantial redundancy in order to identify and remove duplicative documents and graphical items stored in digital asset management systems. A person of ordinary skill in the art would have been motivated to do so in order to reduce database storage requirements and increase reusability, as taught by the '105 Patent to Ferrucci and the Acrobat & Workflow publication.

141.    Each of the '679 Patent, the '105 Patent to Ferrucci, and Acrobat & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, optimizing database storage requirements. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

142.    Fourth, with respect to the '679 Patent and the "one-to-many" claim element, there are several reasons why a person of ordinary skill in the art would combine the '679 Patent with the teachings of the '105 Patent to Ferrucci and '240 Publication to Buford. For example, a person of ordinary skill in the art at the time of the invention would have recognized that one-to-many changes is taught by the variable reconciliation disclosed by the '105 Patent to Ferrucci and the instance objects disclosed by '240 Publication to Buford. Thus, it would have been obvious to a person of ordinary skill in the art at the time of the '713 Patent to modify the '679 Patent to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items because variable linking and editing to effect a one-to-many change was disclosed by these references.

143.    Each of the '679 Patent, the '105 Patent to Ferrucci, and the '240 Publication to Buford address related problems that were well understood by those of skill in the art, *e.g.*, using

43

simultaneous collaborative author-mode access to a document. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

144. Fifth, with respect to the '679 Patent and the "plurality of linked object-type structures converted into a predetermined output file forma[t]" claim element, there are several reasons why a person of ordinary skill in the art would combine the '679 Patent with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at the time of the invention would have recognized the conversion step as disclosed by the compiling an item to an output in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '679 Patent to compile an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file format because compiling an item in a standardized format was disclosed by the '131 Patent to Kornfield.

145. Each of the '679 Patent and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, compiling a document in a standardized format. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

146. Sixth, with respect to the '679 Patent and the "linking" claim element, there are several reasons why a person of ordinary skill in the art would combine the '679 Patent with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at

44

the time of the invention would have recognized the linking step as disclosed by the hierarchical parse tree disclosed in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '679 Patent to compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality because a hierarchical parse tree was disclosed by the '131 Patent to Kornfield.

147.    Each of the '679 Patent and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

148.    Last, with respect to the '679 Patent and the "item and elements" claim element, there are several reasons why a person of ordinary skill in the art would combine the '679 Patent with the teachings of the '131 Patent to Kornfield and the Personalized & Database Printing publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the item and elements requirement as disclosed by the hierarchical parse tree and the component and container variables disclosed in the '131 Patent to Kornfield and the Personalized & Database Printing publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '679 Patent to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values because hierarchical parse tree and component and container variables were disclosed by the '131 Patent to Kornfield and the Personalized & Database Printing publication.

149.    All of the '679 Patent, the '131 Patent to Kornfield, and the Personalized & Database

Printing publication address related problems that were well understood by those of skill in

the art, *e.g.*, a hierarchical parse tree and component and container variables.  Thus, it would

have been obvious to a person of ordinary skill in the art to combine these references, as the

combination is nothing more than a combination of familiar elements according to known

methods to yield predictable results.

**2.      Appendix 5B – U.S. Patent No 5,893,131 to William Kornfield (the '131 Patent):**

150.    It is my opinion that Claims 1-7 and 9 of the '713 Patent are invalid as obvious over the

'131 Patent further in view of at least:  (1) Intelligent Offices publication and Acrobat PDF &

Workflow publication to convert to a standardized format for input to the parser; (2) the '105

Patent to Ferrucci and Acrobat & Workflow publication to store a reconciled object structure

in the archive without substantial redundancy; (3) the '105 Patent to Ferrucci and the '240

Publication to Buford to selectively edit an object structure, linked to other structures to

thereby effect a one-to-many change in a plurality of archived items; (4) the '131 Patent to

Kornfield to include a plurality of linked object-type structures converted into a

predetermined output file format; (5) '131 Patent to Kornfield to include compiling a

plurality of items wherein the at least one object-type structure had been linked in the archive

to members of the plurality; and/or (6) the '131 Patent to Kornfield and the Romano-PDP

publication to include forming object oriented data structures from the parsed items wherein

the data structures include at least some of item properties, item property values, element

properties and element property values.  It would have been obvious to one having ordinary

skill in the art, at the time the application leading to the '713 Patent was filed, to combine,

without undue experimentation, the elements in the references cited in Appendix 5B as set

46

forth therein, for example, to create the claimed invention in Claims 1-7 and 9 of the '713 Patent. A person having ordinary skill in the art at the time of the filing of the '713 Patent would have been motivated to combine the references cited in Appendix 5B in order to, for example, improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

151. Each of these references is directed towards digital asset management systems. The combination of these references involves the combination of well-known and familiar elements in the same general field of endeavor according to known methods to yield predictable results, *e.g.*, (a) converting to standardized formats; (b) linking object structures; (c) minimizing redundancy; and (d) object structures having item properties or values, or element properties or values.

152. Second, with respect to the '131 Patent to Kornfield and the "converting to standardized format" claim elements (claim 3), there are several reasons why a person of ordinary skill in the art would combine the '131 Patent to Kornfield with the teachings of the Intelligent Offices publication and the Acrobat PDF & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by Acrobat PDF & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '131 Patent to Kornfield to create standardized format in order to convert both raster and vector component files.

153. Each of the ''131 Patent to Kornfield, the Intelligent Offices publication, and the Acrobat PDF & Workflow publication address related problems that were well understood by those of

47

skill in the art, *e.g.*, recognizing objects and converting both raster and vector component files. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

154. Third, with respect to the '131 Patent to Kornfield and the "without substantial redundancy" claim element, there are several reasons why a person of ordinary skill in the art would combine the '131 Patent to Kornfield with the teachings of the '105 Patent to Ferrucci and Acrobat & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the '105 Patent to Ferrucci and Acrobat & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '131 Patent to Kornfield to maintain a database without substantial redundancy in order to identify and remove duplicative documents and graphical items stored in digital asset management systems. A person of ordinary skill in the art would have been motivated to do so in order to reduce database storage requirements and increase reusability, as taught by the '105 Patent to Ferrucci and the Acrobat & Workflow publication.

155. Each of the '131 Patent to Kornfield and the '105 Patent to Ferrucci and Acrobat & Workflow publication address related problems that were well understood by those of skill in the art, e.g., optimizing database storage requirements. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

156.    Fourth, with respect to the '131 Patent to Kornfield and the "one-to-many" claim element, there are several reasons why a person of ordinary skill in the art would combine the '131 Patent to Kornfield with the teachings of the '105 Patent to Ferrucci and the '240 Publication to Buford.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the one-to-many change as disclosed by the variable reconciliation disclosed by the '105 Patent to Ferrucci and the instance objects disclosed by the '240 Publication to Buford.  Thus, it would have been obvious to a person of ordinary skill in the art to modify the ''131 Patent to Kornfield to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items because variable linking and editing to effect a one-to-many change was disclosed by these references.

157.    Each of the '131 Patent to Kornfield, the '105 Patent to Ferrucci, and the '240 Publication to Buford address related problems that were well understood by those of skill in the art, *e.g.*, simultaneous collaborative author-mode access to a document.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

158.    Lastly, with respect to the '131 Patent to Kornfield and the "item and elements" claim element, there are several reasons why a person of ordinary skill in the art would combine the '131 Patent to Kornfield with the teachings of the Personalized & Database Printing publication.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the item and elements requirement are disclosed by the hierarchical parse tree and the component and container variables disclosed in the '131 Patent to

49

Kornfield and the Personalized & Database Printing publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '131 Patent to Kornfield to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values because hierarchical parse tree and component and container variables were disclosed by both the '131 Patent to Kornfield and the Personalized & Database Printing publication.

159.    Each of the '131 Patent to Kornfield and the Personalized & Database Printing publication address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree and component and container variables. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

### 3.    Appendix 5C – U.S. Patent No. 7,178,105 to David Ferrucci, et al. (the "'105 Patent")

160.    It is my opinion that Claims 1-7 and 9 of the '713 Patent are invalid as obvious over the '105 Patent further in view of: (1) Intelligent Offices publication and Acrobat PDF & Workflow publication to convert to a standardized format for input to the parser; (2) the '105 Patent to Ferrucci and Acrobat & Workflow publication to store a reconciled object structure in the archive without substantial redundancy; (3) the '105 Patent to Ferrucci and the '240 Publication to Buford to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items; (4) the '131 Patent to Kornfield to include a plurality of linked object-type structures converted into a predetermined output file format; (5) '131 Patent to Kornfield to include compiling a

50

plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality; and/or (6) the '131 Patent to Kornfield and the Romano-PDP publication to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values. It would have been obvious to one having ordinary skill in the art, at the time the application leading to the '713 Patent was filed, to combine, without undue experimentation, the elements in the references cited in Appendix 5C as set forth therein, for example, to create the claimed invention in Claims 1-7 and 9 of the '713 Patent. A person having ordinary skill in the art at the time of the filing of the '713 Patent would have been motivated to combine the references cited in Appendix 5C in order to, for example, improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

161.    Each of these references is directed towards digital asset management systems. The combination of these references involves the combination of well-known and familiar elements in the same general field of endeavor according to known methods to yield predictable results, *e.g.*, (a) converting to standardized formats; (b) linking object structures; (c) minimizing redundancy; and (d) object structures having item properties or values, or element properties or values.

162.    Second, with respect to the '105 Patent to Ferrucci and the "converting to standardized format" claim elements (claim 3), there are several reasons why a person of ordinary skill in the art would combine the '105 Patent to Ferrucci with the teachings of the Intelligent

Offices publication and the Acrobat PDF & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by Acrobat PDF & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '105 Patent to Ferrucci to create standardized format in order to convert both raster and vector component files.

163. Each of the '105 Patent to Ferrucci, the Intelligent Offices publication and the Acrobat PDF & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, recognizing objects and converting both raster and vector component files. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

164. Third, with respect to the '105 Patent to Ferrucci and the "without substantial redundancy" claim element, there are several reasons why a person of ordinary skill in the art would combine the '105 Patent to Ferrucci with the teachings of Acrobat & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the '105 Patent to Ferrucci and Acrobat & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '105 Patent to Ferrucci to maintain a database without substantial redundancy in order to identify and remove duplicative documents and graphical items stored in digital asset management systems. A person of ordinary skill in the art would have been motivated to do so in order to reduce database storage requirements and increase reusability, as taught by the '105 Patent to Ferrucci and the Acrobat & Workflow publication.

165.    Each of the '105 Patent and Acrobat & Workflow publication address related problems that were well understood by those of skill in the art, e.g., optimizing database storage requirements.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

166.    Fourth, with respect to the '105 Patent to Ferrucci and the "one-to-many" claim element, there are several reasons why a person of ordinary skill in the art would combine the '105 Patent to Ferrucci with the teachings of the '240 Publication to Buford.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the one-to-many change as disclosed by the variable reconciliation disclosed by both the '105 Patent to Ferrucci and the instance objects disclosed by the '240 Publication to Buford.  Thus, it would have been obvious to a person of ordinary skill in the art to modify the '105 Patent to Ferrucci to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items because variable linking and editing to effect a one-to-many change was disclosed by these references.

167.    Each of the '105 Patent to Ferrucci and the '240 Publication to Buford address related problems that were well understood by those of skill in the art, *e.g.*, simultaneous collaborative author-mode access to a document.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

168.    Fifth, with respect to the '105 Patent to Ferrucci and the "plurality of linked object-type structures converted into a predetermined output file forma[t]" claim element, there are

several reasons why a person of ordinary skill in the art would combine the '105 Patent to Ferrucci with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at the time of the invention would have recognized the conversion step as disclosed by the compiling an item to an output in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '105 Patent to Ferrucci to compile an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file format because compiling an item in a standardized format was disclosed by the '131 Patent to Kornfield.

169. Each of the '105 Patent to Ferrucci and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, compiling a document in a standardized format. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

170. Sixth, with respect to the '105 Patent to Ferrucci and the "linking" claim element, there are several reasons why a person of ordinary skill in the art would combine the '105 Patent to Ferrucci with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at the time of the invention would have recognized the linking step as disclosed by the hierarchical parse tree disclosed in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '105 Patent to Ferrucci to compiling a plurality of items wherein the at least one object-type structure had

been linked in the archive to members of the plurality because hierarchical parse tree was disclosed by the '105 Patent to Ferrucci.

171. Each of the '105 Patent to Ferrucci and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

172. Last, with respect to the '105 Patent to Ferrucci and the "item and elements" claim element, there are several reasons why a person of ordinary skill in the art would combine the '105 Patent to Ferrucci with the teachings of the '131 Patent to Kornfield and the Personalized & Database Printing publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the item and elements requirement as disclosed by the hierarchical parse tree and the component and container variables disclosed in the '131 Patent to Kornfield and the Personalized & Database Printing publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '105 Patent to Ferrucci to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values because hierarchical parse tree and component and container variables were disclosed by the '131 Patent to Kornfield and the Personalized & Database Printing publication.

173. Each of the '105 Patent to Ferrucci, the '131 Patent to Kornfield, and the Personalized & Database Printing publication address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree and component and container variables. Thus, it

55

would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

### 4. Appendix 5D – WIPO Publication No. 97/34240 (PCT/US97/04574) (the "'240 Publication to Buford")

174.    It is my opinion that Claims 1-7 and 9 of the '713 Patent are invalid as obvious over the '240 Publication to Buford further in view of: (1) Intelligent Offices publication and Acrobat PDF & Workflow publication to convert to a standardized format for input to the parser; (2) the '105 Patent to Ferrucci and Acrobat & Workflow publication to store a reconciled object structure in the archive without substantial redundancy; (3) the '105 Patent to Ferrucci and the '240 Publication to Buford to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items; (4) the '131 Patent to Kornfield to include a plurality of linked object-type structures converted into a predetermined output file format; (5) '131 Patent to Kornfield to include compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality; and/or (6) the '131 Patent to Kornfield and the Romano-PDP publication to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values. It would have been obvious to one having ordinary skill in the art, at the time the application leading to the '713 Patent was filed, to combine, without undue experimentation, the elements in the references cited in Appendix 5D as set forth therein, for example, to create the claimed invention in Claims 1-7 and 9 of the '713 Patent. A person having ordinary skill in the art at the time of the filing of the '713 Patent would have been motivated to combine the references cited in Appendix 5D in order to, for

56

example, improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

175. Each of these references is directed towards digital asset management systems. The combination of these references involves the combination of well-known and familiar elements in the same general field of endeavor according to known methods to yield predictable results, *e.g.*, (a) converting to standardized formats; (b) linking object structures; (c) minimizing redundancy; and (d) object structures having item properties or values, or element properties or values.

176. Second, with respect to the '240 Publication to Buford and the "converting to standardized format" claim elements (claim 3), there are several reasons why a person of ordinary skill in the art would combine the '240 Publication to Buford with the teachings of the Intelligent Offices publication and the Acrobat PDF & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by Acrobat PDF & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '240 Publication to Buford to create standardized format in order to convert both raster and vector component files.

177. Each of the '240 Publication to Buford, the Intelligent Offices publication and the Acrobat PDF & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, recognizing objects and converting both raster and vector component files. Thus, it would have been obvious to a person of ordinary skill in the art to

combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

178.    Third, with respect to the '240 Publication to Buford and the "without substantial redundancy" claim element, there are several reasons why a person of ordinary skill in the art would combine the '240 Publication to Buford reference with the teachings of the '105 Patent to Ferrucci and Acrobat & Workflow publication.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the '105 Patent to Ferrucci and Acrobat & Workflow publication.  Thus, it would have been obvious to a person of ordinary skill in the art to modify the '240 Publication to Buford to maintain a database without substantial redundancy in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.  A person of ordinary skill in the art would have been motivated to do so in order to reduce database storage requirements and increase reusability, as taught by the '105 Patent to Ferrucci and the Acrobat & Workflow publication.

179.    Each of the '240 Publication to Buford, the '105 Patent to Ferrucci, and Acrobat & Workflow publication address related problems that were well understood by those of skill in the art, e.g., optimizing database storage requirements.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

180.    Fourth, with respect to the '240 Publication to Buford and the "one-to-many" claim element, there are several reasons why a person of ordinary skill in the art would combine the '240 Publication to Buford with the teachings the '105 Patent to Ferrucci.  For example, a

person of ordinary skill in the art at the time of the invention would have recognized the one-to-many change as disclosed by both the variable reconciliation disclosed by both the '105 Patent to Ferrucci and the instance objects disclosed by the '240 Publication to Buford. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '240 Publication to Buford to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items because variable linking and editing to effect a one-to-many change was disclosed by these references.

181. Each of the '240 Publication to Buford and the '105 Patent to Ferrucci address related problems that were well understood by those of skill in the art, *e.g.*, simultaneous collaborative author-mode access to a document. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

182. Fifth, with respect to the '240 Publication to Buford and the "plurality of linked object-type structures converted into a predetermined output file forma[t]" claim element, there are several reasons why a person of ordinary skill in the art would combine the '240 Publication to Buford with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at the time of the invention would have recognized the conversion step as disclosed by the compiling an item to an output in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '240 Publication to Buford to compile an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a

59

predetermined output file format because compiling an item in a standardized format was disclosed by the '131 Patent to Kornfield.

183.    Each of the '240 Publication to Buford and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, compiling a document in a standardized format. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

184.    Sixth, with respect to the '240 Publication to Buford and the "linking" claim element, there are several reasons why a person of ordinary skill in the art would combine the '240 Publication to Buford with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at the time of the invention would have recognized the linking step as disclosed by the hierarchical parse tree disclosed in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '240 Publication to Buford to compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality because hierarchical parse tree was disclosed by the '131 Patent to Kornfield.

185.    Each of the '240 Publication to Buford and '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

186.    Last, with respect to the '240 Publication to Buford and the "item and elements" claim element, there are several reasons why a person of ordinary skill in the art would combine the

60

'240 Publication to Buford with the teachings of the '131 Patent to Kornfield and the Personalized & Database Printing publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the item and elements requirement as disclosed by the hierarchical parse tree and the component and container variables disclosed in the '131 Patent to Kornfield and the Personalized & Database Printing publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify the '240 Publication to Buford to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values because hierarchical parse tree and component and container variables were disclosed by the '131 Patent to Kornfield and the Personalized & Database Printing publication.

187.    Each of the '240 Publication to Buford, the '131 Patent to Kornfield, and the Personalized & Database Printing publication address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree and component and container variables. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

### 5.    Appendix 5E – "Personalized & Database Printing," by David Broady & Frank Romano (the "Romano-PDP")

188.    It is my opinion that Claims 1-7 and 9 of the '713 Patent are invalid as obvious over Romano-PDP further in view of at least:  (1) Intelligent Offices publication and Acrobat PDF & Workflow publication to convert to a standardized format for input to the parser; (2) the '105 Patent to Ferrucci and Acrobat & Workflow publication to store a reconciled object structure in the archive without substantial redundancy; (3) the '105 Patent to Ferrucci and

the '240 Publication to Buford to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items; (4) the '131 Patent to Kornfield to include a plurality of linked object-type structures converted into a predetermined output file format; (5) '131 Patent to Kornfield to include compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality; and/or (6) the '131 Patent to Kornfield and the Romano-PDP publication to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values. It would have been obvious to one having ordinary skill in the art, at the time the application leading to the '713 Patent was filed, to combine, without undue experimentation, the elements in the references cited in Appendix 5E as set forth therein, for example, to create the claimed invention in Claims 1-7 and 9 of the '713 Patent. A person having ordinary skill in the art at the time of the filing of the '713 Patent would have been motivated to combine the references cited in Appendix 5E in order to, for example, improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

189.   Each of these references are directed towards digital asset management systems. The combination of these references involves the combination of well-known and familiar elements in the same general field of endeavor according to known methods to yield predictable results, *e.g.*, (a) converting to standardized formats; (b) linking object structures;

(c) minimizing redundancy; and (d) object structures having item properties or values, or element properties or values.

190.    Second, with respect to Romano-PDP and the "converting to standardized format" claim elements (claim 3), there are several reasons why a person of ordinary skill in the art would combine Romano-PDP with the teachings of the Intelligent Offices publication and the Acrobat PDF & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by Acrobat PDF & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify Romano-PDP create standardized format in order to convert both raster and vector component files.

191.    Each of the Romano-PDP, the Intelligent Offices publication and the Acrobat PDF & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, recognizing objects and converting both raster and vector component files. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

192.    Third, with respect to Romano-PDP and the "without substantial redundancy" claim element, there are several reasons why a person of ordinary skill in the art would combine Romano-PDP with the teachings of the '105 Patent to Ferrucci and Acrobat & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the '105 Patent to Ferrucci and Acrobat & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify Romano-PDP to maintain a database without substantial

redundancy because in order to identify and remove duplicative documents and graphical items stored in digital asset management systems. A person of ordinary skill in the art would have been motivated to do so in order to reduce database storage requirements and increase reusability, as taught by the '105 Patent to Ferrucci and the Acrobat & Workflow publication.

193.     Each of Romano-PDP, the '105 Patent to Ferrucci and Acrobat & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, optimizing database storage requirements. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

194.     Fourth, with respect to Romano-PDP and the "one-to-many" claim element, there are several reasons why a person of ordinary skill in the art would combine Romano-PDP with the teachings of the '105 Patent to Ferrucci and the '240 Publication to Buford. For example, a person of ordinary skill in the art at the time of the invention would have recognized the one-to-many change as disclosed by the variable reconciliation disclosed by the '105 Patent to Ferrucci and the instance objects disclosed by the '240 Publication to Buford. Thus, it would have been obvious to a person of ordinary skill in the art to modify Romano-PDP to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items because variable linking and editing to effect a one-to-many change was disclosed by these references.

195.     Each of Romano-PDP, the '105 Patent to Ferrucci and the '240 Publication to Buford address related problems that were well understood by those of skill in the art, *e.g.*, simultaneous collaborative author-mode access to a document. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the

combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

196.    Fifth, with respect to Romano-PDP and the "plurality of linked object-type structures converted into a predetermined output file forma[t]" claim element, there are several reasons why a person of ordinary skill in the art would combine Romano-PDP with the teachings of the '131 Patent to Kornfield.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the conversion step as disclosed by the compiling an item to an output in the '131 Patent to Kornfield.  Thus, it would have been obvious to a person of ordinary skill in the art to modify Romano-PDP to compile an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file format because compiling an item in a standardized format was disclosed by the '131 Patent to Kornfield.

197.    Each of Romano-PDP and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, compiling a document in a standardized format.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

198.    Sixth, with respect to Romano-PDP and the "linking" claim element, there are several reasons why a person of ordinary skill in the art would combine Romano-PDP with the teachings of the '131 Patent to Kornfield.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the linking step as disclosed by the hierarchical parse tree disclosed in the '131 Patent to Kornfield.  Thus, it would have been

65

obvious to a person of ordinary skill in the art to modify Romano-PDP to compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality because hierarchical parse tree was disclosed by the '131 Patent to Kornfield.

199.    Each of Romano-PDP and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

200.    Last, with respect to Romano-PDP and the "item and elements" claim element, there are several reasons why a person of ordinary skill in the art would combine Romano-PDP with the teachings of the '131 Patent to Kornfield and the Personalized & Database Printing publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the item and elements requirement as disclosed by the hierarchical parse tree and the component and container variables disclosed in the '131 Patent to Kornfield and the Personalized & Database Printing publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify Romano-PDP to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values because hierarchical parse tree and component and container variables were disclosed by the '131 Patent to Kornfield and the Personalized & Database Printing publication.

201.    Each of Romano-PDP, the '131 Patent to Kornfield, and the Personalized & Database Printing publication address related problems that were well understood by those of skill in

the art, *e.g.*, a hierarchical parse tree and component and container variables. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

### 6. Appendix 5F – Exstream Version 1 System (the "Exstream Learning Guide")

202.    It is my opinion that Claims 1-7 and 9 of the '713 Patent are invalid as obvious over Exstream Learning Guide further in view of at least: (1) Intelligent Offices publication and Acrobat PDF & Workflow publication to convert to a standardized format for input to the parser; (2) the '105 Patent to Ferrucci and Acrobat & Workflow publication to store a reconciled object structure in the archive without substantial redundancy; (3) the '105 Patent to Ferrucci and the '240 Publication to Buford to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items; (4) the '131 Patent to Kornfield to include a plurality of linked object-type structures converted into a predetermined output file format; (5) '131 Patent to Kornfield to include compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality; and/or (6) the '131 Patent to Kornfield and the Romano-PDP publication to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values. It would have been obvious to one having ordinary skill in the art, at the time the application leading to the '713 Patent was filed, to combine, without undue experimentation, the elements in the references cited in Appendix 5F as set forth therein, for example, to create the claimed invention in Claims 1-7 and 9 of the '713 Patent. A person having ordinary skill in the art at the time of the filing of the '713 Patent

would have been motivated to combine the references cited in Appendix 5F in order to, for example, improve the efficiency in managing such data archives. For example, one of ordinary skill in the art would have been motivated to use a combination of methods taught by the prior art in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.

203.    Each of these references are directed towards digital asset management systems. The combination of these references involves the combination of well-known and familiar elements in the same general field of endeavor according to known methods to yield predictable results, *e.g.*, (a)  converting to standardized formats; (b) linking object structures; (c) minimizing redundancy; and (d) object structures having item properties or values, or element properties or values.

204.    Second, with respect to Exstream Learning Guide and the "converting to standardized format" claim elements (claim 3), there are several reasons why a person of ordinary skill in the art would combine Exstream Learning Guide with the teachings of the Intelligent Offices publication and the Acrobat PDF & Workflow publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by Acrobat PDF & Workflow publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify Exstream Learning Guide create standardized format in order to convert both raster and vector component files.

205.    Each of the Exstream Learning Guide, the Intelligent Offices publication and the Acrobat PDF & Workflow publication address related problems that were well understood by those of skill in the art, *e.g.*, recognizing objects and converting both raster and  vector component files.  Thus, it would have been obvious to a person of ordinary skill in the art to combine

68

these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

206.    Third, with respect to Exstream Learning Guide and the "without substantial redundancy" claim element, there are several reasons why a person of ordinary skill in the art would combine Exstream Learning Guide with the teachings of the '105 Patent to Ferrucci and Acrobat & Workflow publication.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the standardized format as disclosed by the '105 Patent to Ferrucci and Acrobat & Workflow publication.  Thus, it would have been obvious to a person of ordinary skill in the art to modify Exstream Learning Guide to maintain a database without substantial redundancy in order to identify and remove duplicative documents and graphical items stored in digital asset management systems.  A person of ordinary skill in the art would have been motivated to do so in order to reduce database storage requirements and increase reusability, as taught by the '105 Patent to Ferrucci and the Acrobat & Workflow publication.

207.    Each of Exstream Learning Guide, the '105 Patent to Ferrucci, and Acrobat & Workflow publication address related problems that were well understood by those of skill in the art, e.g., optimizing database storage requirements.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

208.    Fourth, with respect to Exstream Learning Guide and the "one-to-many" claim element, there are several reasons why a person of ordinary skill in the art would combine Exstream Learning Guide with the teachings of the '105 Patent to Ferrucci and the '240 Publication to

Buford.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the one-to-many change as disclosed by the variable reconciliation disclosed by the '105 Patent to Ferrucci and the instance objects disclosed by the '240 Publication to Buford.  Thus, it would have been obvious to a person of ordinary skill in the art to modify Exstream Learning Guide to selectively edit an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items because variable linking and editing to effect a one-to-many change was disclosed by these references.

209.    Each of Exstream Learning Guide, the '105 Patent to Ferrucci, and the '240 Publication to Buford address related problems that were well understood by those of skill in the art, *e.g.*, simultaneous collaborative author-mode access to a document.  Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

210.    Fifth, with respect to Exstream Learning Guide and the "plurality of linked object-type structures converted into a predetermined output file forma[t]" claim element, there are several reasons why a person of ordinary skill in the art would combine Exstream Learning Guide with the teachings of the '131 Patent to Kornfield.  For example, a person of ordinary skill in the art at the time of the invention would have recognized the conversion step as disclosed by the compiling an item to an output in the '131 Patent to Kornfield.  Thus, it would have been obvious to a person of ordinary skill in the art to modify Exstream Learning Guide to compile an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the

70

compiled item includes a plurality of linked object-type structures converted into a predetermined output file the '131 Patent to Kornfield.

211. Each of Exstream Learning Guide and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, compiling a document in a standardized format. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

212. Sixth, with respect to Exstream Learning Guide and the "linking" claim element, there are several reasons why a person of ordinary skill in the art would combine Exstream Learning Guide with the teachings of the '131 Patent to Kornfield. For example, a person of ordinary skill in the art at the time of the invention would have recognized the linking step as disclosed by the hierarchical parse tree disclosed in the '131 Patent to Kornfield. Thus, it would have been obvious to a person of ordinary skill in the art to modify Exstream Learning Guide to compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality because hierarchical parse tree was disclosed by the '131 Patent to Kornfield.

213. Each of Exstream Learning Guide and the '131 Patent to Kornfield address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

214. Last, with respect to Exstream Learning Guide and the "item and elements" claim element, there are several reasons why a person of ordinary skill in the art would combine

71

Exstream Learning Guide with the teachings of the '131 Patent to Kornfield and the Personalized & Database Printing publication. For example, a person of ordinary skill in the art at the time of the invention would have recognized the item and elements requirement as disclosed by the hierarchical parse tree and the component and container variables disclosed in the '131 Patent to Kornfield and the Personalized & Database Printing publication. Thus, it would have been obvious to a person of ordinary skill in the art to modify Exstream Learning Guide to include forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values because hierarchical parse tree and component and container variables were disclosed by the '131 Patent to Kornfield and the Personalized & Database Printing publication.

215. Each of Exstream Learning Guide, the '131 Patent to Kornfield, and the Personalized & Database Printing publication address related problems that were well understood by those of skill in the art, *e.g.*, a hierarchical parse tree and component and container variables. Thus, it would have been obvious to a person of ordinary skill in the art to combine these references, as the combination is nothing more than a combination of familiar elements according to known methods to yield predictable results.

### D. Enablement and/or Written Description Under 35 U.S.C. § 112, ¶ 1

216. I have read the '713 Patent and its prosecution history. The '713 Patent seeks to limit the number of redundant document and graphical items stored in large archives, and provides a method to reduce those redundancies. '713 Patent at 2:18-20, 2:27-40. A further problem the '713 Patent seeks to resolve is the inefficiency associated with an edit that needs to be

made to multiple objects in the archive (for example, an image that needs to be updated in many documents stored in the archive). *Id.* at 1:32-40.

217.    Many of the terms set out in the claims have a traditional understanding to one of ordinary skill in the art at the time the '713 Patent was filed.  For example, the following claim terms appear in the claims:

- "multi-part object structures"
- "object oriented data structures"
- "item properties" / "document properties"
- "item property values" / "property values"
- "element properties" / "property elements"
- "element property values"
- "linked object oriented elements"

218.    In the context of object-oriented programming, as known at the time of the invention, each of these terms had a commonly understood meaning.  For example, "object structures" and their related properties and values were well known to one of ordinary skill in the art at the time the '713 Patent was filed.  Similarly, linking such object elements to one another was well known to one of ordinary skill in the art at the time.  There is no written or enabling description in the specification, or the Provisional Application No. 60/240,179 from which the '713 Patent claims priority, for these terms other than the terms' ordinary understanding to one of skill in the art.

219.    As discussed above, a person of ordinary skill would understand the traditional meaning of source code to mean human-readable program statements written by a programmer or developer in a high-level programming language, and object code to mean machine code that can be directly executed by a system's central processing unit.  A person of ordinary skill in the art would be familiar with the notion of a compiler for converting source code into object code in this sense.  To the extent that Plaintiff argues any other interpretation of source code

73

or object, then there is no disclosure in the '713 Patent or its Provisional Application that provides written description support or an enabling disclosure sufficient to enable a person of ordinary skill in the art to practice the full scope of the invention without undue experimentation. As such, in my opinion, the asserted claims of the '713 Patent are invalid for lack of written description and/or failure to enable a person of ordinary skill in the art to practice the full scope of the invention without undue experimentation.

220. Additionally, as set forth in this Report, the claims of the '713 Patent are obvious in light of the prior art. To the extent that Plaintiff provides an alternate understanding or interpretation in his expert reports outside of the normal understanding of these terms, I reserve the right to supplement this report.

221. As noted above, the Court found the claim term "minimal redundancy" indefinite. For the same reasons, the term "without substantial redundancy" should similarly be found indefinite. To the extent that the term "without substantial redundancy" is not indefinite, the '713 Patent does not provide sufficient a sufficient written or enabling description.

222. Specifically, neither the specification of the '713 Patent nor its Provisional Application provides a written description and/or an enabling disclosure related to "without substantial redundancy." In the context of the Wands factors, there is no direction or guidance in the '713 Patent. There were no working examples disclosed in the patent. In fact, I understand that Plaintiff never created a working embodiment or working prototype (Berkheimer Deposition at 27:9-20) or attempted to develop the system (Berkheimer Deposition at 29:18-20).

223.    Thus, in my opinion, to the extent that "without substantial redundancy" is not found indefinite, there is insufficient written description and, likewise, there is no enabling disclosure for that term in the '713 Patent or its provisional application.

224.    To the extent that Plaintiff provides an alternate understanding or interpretation in his expert reports for the term "without substantial redundancy," I reserve the right to supplement this report.

### E.    Secondary Considerations of Non-Obviousness

225.    It is my understanding that during discovery Plaintiff was asked to identify what it believes to be the secondary considerations and other objective indicia of non-obviousness for the alleged inventions recited in the '713 Patent.  In this respect, I understand that on December 9, 2013, Plaintiff provided no response, but identified documents that allegedly responded to the request as SB000001 to SB000504, as well as documents related to the abilities, features, functionality and benefits and advantages of various systems described in documents SB000539-545, 552-561 and 586-620.

226.    I have reviewed this response, as well as the documents identified, and do not understand there to be any secondary considerations of non-obviousness.

227.    Documents SB000001-504 are the patent, provisional application and the file history. Outside of the descriptions of the known systems in the art and the problems to be solved, these documents do not provide any detail regarding the typical secondary factors of non-obviousness: *e.g*., commercial success, copying, simultaneous development, long-felt need, commercial acquiescence, expressions of skepticism, teaching away or failed attempts by others.

228.    Document SB000539-545 is a proprietary and confidential whitepaper related to the features and functionality of Integrated Graphics Software.  This document does not provide any description or detail related to commercial success, copying, simultaneous development, long-felt need, commercial acquiescence, expressions of skepticism, teaching away or failed attempts by others.

229.    Document SB000552-561 is a draft Grafiker Whitepaper related to the features and functionality of the Grafiker system.  This document does not provide any description or detail related to commercial success, copying, simultaneous development, long-felt need, commercial acquiescence, expressions of skepticism, teaching away or failed attempts by others.

230.    Document SB000586-520 is a proprietary and confidential document related to the features and functionality of a High-Performance Graphic Systems, Inc. graphics software system.  This document does not provide any description or detail related to commercial success, copying, simultaneous development, long-felt need, commercial acquiescence, expressions of skepticism, teaching away or failed attempts by others.

231.    Because these documents do not provide any evidence of non-obviousness, I do not agree with Plaintiff that there is any evidence of copying, simultaneous development, long-felt need, commercial acceptance, expressions of skepticism, teaching away or failed attempts by others.

232.    I am informed that Plaintiff's response to Interrogatory Number 9, which asked Plaintiff to identify all efforts to license or sell the '713 Patent or any attempts to commercialize the subject matter of any claim of the '713 Patent, was, "the Patent-in-Suit has not been licensed or sold."  I also understand that Plaintiff provided testimony regarding his invention.  In his

76

testimony, Plaintiff indicated that he has never created a working embodiment, he has never created a working prototype (Berkheimer Deposition at 27:9-20), he has never attempted to develop the system (Berkheimer Deposition at 29:18-20), and that he continues to seek funding for a commercial embodiment although he has never actually received any such funding (Berkheimer Deposition at 29:22-24). This testimony does not provide any description or detail related to commercial success, copying, simultaneous development, long-felt need, commercial acquiescence, expressions of skepticism, teaching away or failed attempts by others. To the contrary, Plaintiff's lack of a commercial embodiment or any sale of a product practicing his invention illustrates the lack of commercial success.

233.   To the extent that Plaintiff is allowed to raise any additional evidence or argument regarding secondary considerations of non-obviousness, I reserve my right to respond to any such evidence at the appropriate time.

## IX.   <u>CONCLUSION</u>

234.   Based on my background and experience and the materials reviewed to date, I have formed these opinions to a reasonable degree of technical certainty.

235.   This Report is based in part on the review of considered materials (see Appendix 4 for a listing thereof), and may be amended in the future should additional materials become available. I reserve the right to provide opinions on facts and other matters arising subsequent to this report, including in rebuttal to any matter raised by Plaintiff or its experts, either prior to or during any deposition, hearing or trial in this action.

236.   If I testify at trial in this case, I may rely on exhibits or visual aids to demonstrate the basis for my opinions. I have not yet prepared any such exhibits or visual aids, but I expect

that I may do so.  I also reserve the right to provide a tutorial relating to the general topics contained in this Report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of September 2015, at Deerfield, Illinois.

By:_____
    Dr. Dan Schonfeld