# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STEVEN E. BERKHEIMER,

        Plaintiff,

    v.

HEWLETT-PACKARD COMPANY,

        Defendant.

Civil Action No. 1:12-cv-09023

Judge John Z. Lee

## Expert Rebuttal Report of Peter Nelson Concerning
## Alleged Invalidity of U.S. Patent 7,447,713

## Table of Contents

I.  Introduction

II.  Background and Qualifications
    A.  Background
    B.  Previous Expert Witness Experience
    C.  Compensation

III.  Materials Considered

IV.  Legal Standards Applied

V.  Definition of Person of Ordinary Skill in the Art

VI.  Claim Construction

VII.  Technology Background

VIII.  Overview of the Patent-in-Suit

IX.  Analysis of Alleged Invalidity
    A. Summary of Conclusions
    B.  Overview
    C.  Patent Eligible Subject Matter
    D.  Detailed Analysis of Alleged Invalidity

X.  Other Analysis
    A. Enablement and Written Description
    B.  Secondary Considerations

XI.  Conclusion

## I. Introduction

I, Peter Nelson, declare as follows:

1.  I am a Professor and Dean for the College of Engineering at the University of Illinois at Chicago, Illinois, which is a position held from 2008 to present. My education background is as follows: a B.A. in Computer Science and Mathematics in May 1984 from North Park College in Chicago, Illinois; a M.S. in Computer Science in August 1986 and a Ph.D. in Computer Science in June 1988, both at Northwestern University in Evanston, Illinois. My complete CV is attached as Exhibit 1.

2.  I have been asked to submit this Rebuttal Report on behalf of Steven E. Berkheimer (Berkheimer) in connection with the above-captioned litigation. I have been retained as a technical expert by Berkheimer's counsel, primarily to provide my opinions on the technology claimed in U.S. Patent 7,447,713 (the "'713 Patent", sometimes referred to as the patent-in-suit) in relation to the software product known as HP Exstream.

3.  For the purposes of this Rebuttal Report I have been asked to provide my opinions regarding the alleged invalidity of the asserted method claims of the patent-in-suit as set forth in the Expert Report of Dr. Dan Schonfeld submitted by Defendant Hewlett-Packard Company ("HP) and the infringement of the asserted claims of the patent suit against the above named Defendant.

4.  This report sets forth my opinions based on the information identified and the analysis I have performed through the date of this report. This report, and my opinions contained herein, is subject to change or modification if additional relevant information becomes available that bears on my analysis. I understand that further expert discovery will be conducted in this case, and new

evidence may be uncovered. I also understand that the Defendant may submit expert testimony; supplement, amend, or add contentions concerning the patent-in-suit; and that new testimony or materials may be introduced at trial. I also understand that I may be asked at trial to express opinions regarding matters that are raised at trial. Accordingly, I reserve the right to supplement or amend my opinions or this report if additional information that affects my opinions becomes available.

5. I understand that the Court held a hearing on November 7, 2014 at which it heard arguments on the meaning of various disputed terms in the asserted claims. I understand that the Court on August 21, 2015 issued a ruling on the construction of the claims [docket 123]. For purposes of this report, where I evaluate or apply claim language from the patent-in-suit, I base my opinions concerning that claim language on the claims constructions issued by the Court's ruling. I reserve the right to supplement or amend this report as necessary or appropriate if the Court provides further guidance on claim construction.

6. If asked at hearings or trial in this litigation, I am prepared to explain in detail, with appropriate visual aids, the operation and function of the asserted claims of the patent-in-suit, the content and applicability of background technology and the prior art subject of the Expert Report of Dr. Dan Schonfeld, and my opinions on the issue of validity or invalidity of the asserted method claims of the patent-in-suit. Such testimony may include, for example, background material relevant to the patent-in-suit; the prior art subject of the Expert Report of Dr. Dan Schonfeld, the hypothetical person of ordinary skill in the pertinent field of the '713 Patent at the time of the invention, and the conclusions and opinions I have reached in this report and the basis for the same. This report contains my opinions formulated to date and the bases and support for my opinions. All or portions of the documents and information relied upon herein, including that

listed as Exhibit 2, may be used as exhibits at trial. In addition, I may prepare additional demonstrative exhibits to be exchanged by counsel prior to my testimony based on the documents and information relied upon and my analysis of those documents and information, including exhibits that will be used to summarize or support them.

## II. Background and Qualifications

## A. Background

7.      As noted above, I am currently a Professor and the Dean for the College of Engineering at the University of Illinois at Chicago (UIC),  in the Department of Computer Science  At UIC, I currently am the Dean for the College of Engineering since 2008.  I have been a faculty member at UIC since 1988 to present holding various assistant, associate and professor positions in the Department of Electrical Engineering and Computer Science and in the Department of Computer Science.

8.      I hold one degree from North Park College and hold two degrees from Northwestern University: (1) a Bachelor of Arts degree, magna cum laude, with a double major in computer science and mathematics from North Park College earned in May, 1984; (2) a Master of Science in Computer Science degree earned in August, 1986 from Northwestern University; and (3) a doctorate degree, a Ph.D. in Computer Science (Thesis Titles: "A Parallel A* Algorithm," M.S. Thesis (Advisor: Lawrence Henschen), Department of Electrical Engineering and Computer Science, Northwestern University, earned in 1986., Ph.D.  Thesis "Parallel Bidirectional Search using Multi-Dimensional Heuristics," Ph.D. Dissertation (Advisor: Lawrence Henschen), Department of Electrical Engineering and Computer Science, Northwestern University, earned in June, 1988.

9.      I joined the University of Illinois at Chicago as an Assistant Professor in 1988, was

promoted to a tenured Associate Professor in 1994, and was promoted to a tenured full Professor in 2000. In addition to my academic professorial positions, I have also served as Director of the Artificial Intelligence Laboratory since 1991, as Department Head of the UIC Department of Computer Science from 2001 – 2007, and as Dean of the College of Engineering since 2008.

10. I have taught computer science courses at both the undergraduate and graduate level. I have served as the thesis advisor for twelve Ph.D. graduates and over 35 M.S. graduates.

11. My computer science research is developing artificial intelligence methods to solve problems in the fields of transportation, manufacturing, bioinformatics and anti-spamming. Since 1991 I have been active in research and development in the field of Intelligent Transportation Systems. Some of my work has also been in the area of evolutionary algorithms which are optimization and search algorithms which mimic the process of natural evolution.

12. In 1994-95 my UIC AI Laboratory developed a regional Corridor Traffic Information Center for the Illinois Department of Transportation that included one of the very the first World Wide Web sites to graphically display current traffic conditions, see GCMTravel.com for details. Our traffic map web site currently has over 50 million hits per year.

13. I have published over 80 research articles in journals and conferences. A list of all publications authored in the previous 10 years is set forth in my attached Exhibit 1 curriculum vitae. I have received over $25 million of research funding as from numerous corporations and government agencies including the National Science Foundation, National Institutes of Health, National Research Council, Argonne National Laboratories, Illinois Department of Transportation, Motorola and Sun Microsystems.

14. I have been a speaker at technical conferences in North America, Europe, Asia and Australia.

15.     Over the past 30 years I have worked as a computer science consultant for numerous companies including AT&T Information Systems, Bell Laboratories, Bell Communications Research, Discover Card Financial Services, Peapod, UBS Warburg, and Reuters.

16.     Additional details about my employment history, fields of expertise, and publications are further described in my curriculum vitae attached as Exhibit 1 to this report.

## B. Previous Expert Witness Experience

17.     The following is a list of cases in which I have testified or provided affidavits at trial, hearing, or by deposition within the preceding four years:

- Electronic Frontier Foundation, Petitioner, v. Personal Audio, LLC, Patent Owner, IPR Case IPR2014-00070 before the USPTO PTAB (hired by Patent Owner) 2013-2014.

## C. Compensation

18.     I am being compensated for services provided in this case at my usual and customary rate of $450/hour plus expenses.  My compensation is not conditioned on the conclusions I reach as a result of my analysis or on the outcome of this case.

## III. Materials Considered

19.     A listing of the materials I considered as part of this report and in forming my opinions as set forth in this report is attached as Exhibit 2 to this report.

20.     I have received, reviewed, and/or considered the written materials identified in the attached Exhibit 2 to this report and the specific materials cited in this report. Additionally, I have reviewed the Expert Report of Dr. Dan Schonfeld and all alleged prior art references Dr. Dan Schonfeld relies upon in his Report.

## IV. Legal Standards Applied

21.     I am not an attorney. I have been informed about the legal standards concerning the validity or invalidity of a U.S. patent (including patent eligible subject matter) by counsel for Berkheimer.

22.     I have been informed and understand that in a validity / invalidity analysis one must apply the claim construction determined and construed by the Court to disputed terms within the patent claims to ascertain their proper scope (see, Section VI). In the absence of the Court's construction as to a particular term, I understand that claim terms should be given their ordinary and customary meaning within the context of the patent as understood by a person of ordinary skill in the art (see, Section V).

23.     I understand that the claims of an issued patent are presumed valid and the evidence to overcome the presumption of validity must be clear and convincing. Claims can be proved invalid by clear and convincing evidence that they fail to comply with one or more requirements of patentability. I understand that clear and convincing evidence is a higher burden of proof than preponderance of the evidence.

24.     I have been informed and understand that a claimed invention is "anticipated" if each and every element of the claim has been disclosed in a single prior art reference consistent with 35 U.S.C. §102.

25.     It is my understanding that a printed publication anticipation under 35 U.S.C. § 102 requires that a single prior art reference discloses or contains, expressly or inherently, every limitation of the claimed invention. I understand that an element of a patent claim is inherent in a prior art reference if the element must necessarily be present and such would be recognized by

one of ordinary skill in the art. I understand that inherency cannot be established by mere probabilities or possibilities.

26. I understand that a reference must meet any one of the provisions of 35 U.S.C. § 102 to be deemed as prior art. I understand that, according to § 102, a person shall be entitled to a patent unless:

"(a) The invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

(b) The invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

(e) The invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent....

(f) he did not himself invent the subject matter sought to be patented, or

(g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed, or (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to

practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

27.     I understand that the phrase "printed publication" means sufficiently accessible to the public interested in the art, and depends upon dissemination and accessibility.

28.     It is my understanding that a claim is invalid for obviousness under 35 U.S.C. §103 if two or more prior art references in combination, disclose, expressly or inherently, every claim limitation so as to render the claim, as a whole, obvious. Alternatively, a claim can be invalid under 35 U.S.C. § 103 if a single prior art reference combined with the knowledge of one of ordinary skill in the art discloses every claim limitation so as to render the claim, as a whole, obvious. The relevant standard for obviousness is as follows: A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negated by the manner in which the invention was made.

29.     In determining whether or not a patented invention would have been obvious, the following factors should be considered: (a) the scope and content of the prior art; (b) the differences between the prior art and the claims at issue; (c) the level of ordinary skill in the art; and (d) whatever "secondary considerations" may be present.

30.     I understand that certain "secondary considerations" may be relevant in determining whether or not an invention would have been obvious, and that these secondary considerations may include commercial success of a product using the invention, if that commercial success is due to the invention; long-felt need for the invention; evidence of copying of the claimed

invention; industry acceptance; initial skepticism; failure of others; and praise of the invention.

31.     I understand that a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. But multiple prior art references or elements may, in some circumstances, be combined to render a patent claim obvious. I understand that I should consider whether there is an "apparent reason" to combine the prior art references or elements in the way the patent claims. Requiring a reason for the prior art combination protects against the distortion caused by hindsight. Hindsight reasoning is not an appropriate basis for combining references to form an obviousness combination. Along the same lines, one cannot use the Berkheimer '713 Patent as a blueprint to piece together the prior art in order to combine the right ones in the right way as to re-create the claimed inventions of the asserted method claims 1 to 7 and 9. To determine whether such an "apparent reason" to combine the prior art references or elements in the way a patent claims, it will often be necessary to look to the interrelated teaching of multiple patents, to the effects of demands known to the design community or present in the marketplace, and to the background knowledge possessed by a person having ordinary skill in the art.

32.     I have been further informed that it can be important to identify a reason that would have prompted one of ordinary skill in the relevant field to combine the elements in the way the claimed invention does. I understand that the "teaching, suggestion, or motivation" test is a useful, but not the only, guide in establishing a rationale for combining elements of the prior art. This test poses the question as to whether there is an explicit teaching, suggestion, or motivation in the prior art to combine prior art elements in a way that realizes the claimed invention. Though useful to the obviousness inquiry, I understand that this test should not be treated as a rigid rule. The U.S. Supreme Court in *KSR Int'l v. Teleflex Inc.* stated that "there must be some articulated

reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l v. Teleflex Inc.*, 127 S. Ct. 1727, 1741 (2007). I am familiar with the *KSR* decision.

33.   I understand that a reference that does not expressly disclose a claim limitation may nevertheless "inherently" disclose the limitation if the expressly missing matter is necessarily and inevitably present in the system or method described in the reference. The disclosure must be sufficient to show that the natural result flowing from the operation of the apparatus, system or method disclosed in the reference would require the missing matter (element) or result in the performance of a missing step.

34.   The first paragraph of 35 U.S.C. §112 provides that "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

35.   I understand that the invention is, for purposes of 35 U.S.C. §112, whatever is claimed. It is my further understanding that a patent claim is invalid if the patent fails to contain a written description of the invention that is sufficient to convey to one of ordinary skill in the art that the inventor had possession of the claimed invention at the time the inventor filed for the patent. I understand this to be legally referred to as the "written description" requirement.

36.   I also understand that pursuant to 35 U.S.C. §112 the patent specification must teach one of ordinary skill in the art, at the time the patent application was filed, how to make and use the full scope of the claimed invention without undue experimentation. I understand this to be legally referred to as the "enablement" requirement. It is my understanding that a patent must disclose sufficient detail regarding the inventions set forth in the patent claims to enable a person

of ordinary skill in the art to make and use the claimed invention without any undue experimentation. It is unnecessary to include in a patent any information that a person skilled in the art would likely know or could obtain. I understand that the focus of enablement is on the invention described in the claims, and not all subject matter discussed in the patent. Also, I understand that it is not necessary to describe all design problems and obstacles overcome to reach the patented solution, or to provide precise dimensions or working models for every application, as long as one skilled in the art could make and use the principles disclosed and claimed in the patent without undue experimentation. Factors which may be considered in determining whether undue experimentation may be required include (1) the quantity of experimentation required to make and use the invention; (2) the amount of direction and guidance provided in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill in the art; (7) the predictability of the art; and (8) the breadth of the claims.

37.     I also understand that this notion of enablement applies to printed publication prior art references. Thus, a prior art reference must be enabling in order to render a claim invalid.

38.     I have been informed and understand that United States Patent Law requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2 (pre-AIA). It is my understanding that this requirement is known as the "definiteness requirement," and that a claim that fails to meet this requirement is invalid for being "indefinite."

39.     I understand that a patent is indefinite if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, one skilled in the art about the scope of the invention. It is also my understanding that this standard was articulated

by the U.S. Supreme Court in the decision of *Nautilus, Inc. v. Biosig Instruments*, Inc., 134 S. Ct. 2120 (2014). I am familiar with the *Nautilus* decision.

40.     I have been informed and understand that the Patent Statute, 35 U.S.C. §101 sets forth the subject matter that may be patentable: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." I understand that the patent must set forth some specific, substantial, and credible use for the invention. I understand this to be legally referred to as the "utility" requirement of 35 U.S.C. §101.

41.     I have been informed and understand that 35 U.S.C. § 101 sets forth four categories of patentable eligible subject matter, namely any new and useful process, machine, manufacture, or composition of matter. I also understand that the law specifically recognizes three exceptions to patent eligibility: (1) laws of nature, (2) physical phenomena, and (3) abstract ideas.

42.     I have been informed by counsel that determining whether a patent claim is impermissibly directed to patent ineligible subject matter involves two steps. First, one must determine whether the claims at issue are directed to one of the three patent-ineligible categories, such as an abstract idea. I understand that this can be done by looking to the claims to determine whether an abstract idea is at the heart of claims. I have been informed by counsel that examples of abstract include fundamental economic practices long prevalent in the industry, certain methods of organizing human activity, certain applications of mathematical relationships and formulas, and mental processes that can be performed in the human mind or by a human using a pen and paper. Second, if the claims are determined to be directed to an abstract, then one must consider the elements of the claims both individually and as an ordered combination to determine

whether the additional elements recited in the claims transform the nature of the claim into a patent-eligible application of the idea. I have been informed by counsel that this second step has been referred to as a search for an "inventive concept" - i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to "significantly more" than a patent upon the ineligible concept itself. I have also been informed that well-understood, routine, conventional activity or technology - such as implementing the abstract idea with a general-purpose computer - does not constitute an "inventive concept."

## V. Definition of a Person of Ordinary Skill in the Art

43.     In my opinion, and based on my review of the patent-in-suit and related documents, and further based on my experience teaching and performing research relating to computer science, data processing, and database management and systems architecture, as well as my experience collaborating and consulting with concerns in these industries, it is my opinion that a hypothetical person of ordinary skill in the pertinent field of the '713 Patent at the time of the invention would have had: (1) an undergraduate degree in computer science or a related field; OR (2) three years' computer programming experience in document and graphical data management.

44.     My understanding is that factors that may be considered in determining the level of ordinary skill in the art may include: (i) "type of problems encountered in the art;" (ii) "prior art solutions to those problems;" (iii) "rapidity with which innovations are made;" (iv) "sophistication of the technology;" and (v) "educational level of active workers in the field." In a given case, every factor may not be present, and one or more factors may predominate.

45.     As of approximately the time of the invention (October 2000 – October 2001 time frame), I was at least a person of ordinary skill in the art having work experience in document

and graphical data management.

46. In Paragraph 45 of his Report, Dr. Schonfeld uses an arguably higher threshold for a person of ordinary skill in the art. Regardless of whether the court uses his definition or mine, my ultimate conclusions do not change. I note, however, that a lower threshold for a person of skill in the art would further strengthen the opinions I have with regard to obviousness. Even using the definition established by Dr. Schonfeld, a person of ordinary skill will have minimal, if any, insight into the kinds of features desirable in the type of methods envisioned by the patent-in-suit.

## VI. Claim Construction

47. It is my understanding that the Court has issued a ruling on the proper construction of the patent-in-suit. I have analyzed the claims under the Court's constructions. Those constructions are attached hereto in Exhibit 3.

48. I also understand that in the absence of a specific construction, claim terms must be given their ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention.

49. For purposes of this report, where I evaluate or apply claim language from the patent-in-suit, I base my opinions concerning that claim language on the claim constructions issued by the Court.

50. I reserve the right to supplement or amend this report as necessary or appropriate if the Court provides further guidance on claim construction.

## VII. Technology Background

51. The '713 Patent generally concerns an object-oriented data model approach to digital asset and enterprise content management systems, including the processing and archiving of

digital files, linked documents, and graphical items. This processing concerns parsing of standardized format documents or graphical items into object-oriented representations. These object-oriented representations include data and metadata on document and element components, element properties and element property values that are tagged for subsequent identification and linking purposes and can be manipulated and entered into an archival database with relationships maintained among the elements of the item for subsequent retrieval, editing, recompiling and outputting of the item. The parsed objects and associated relationships are analyzed and compared to objects and relationships derived from other documents or items that are part of the archive so as to allow importing of objects and relationships or to correct and edit objects and relationships in accordance with user established rules and/or standards pertaining thereto. The objects and relationships can be modified and utilized in various combinations, via multiple methods, to achieve object integrity and one-to-many modification and concurrent updating of the archive.

52.    At trial, I expect to provide a tutorial about the technology at-issue in this case. To assist me in my explanation of the technology at trial, I may use demonstrative exhibits, animations, and graphics.

## VIII.  Overview of the Patent-In-Suit

53.    The title of U.S. Patent No. 7,447,713 (hereafter cited to as the "'713 Patent") is "System and Method for Archiving and Outputting Documents or Graphical Items". The '713 Patent issued on November 4, 2008.  The '713 Patent results from application number 09/977,502 filed October 15, 2001 and claims priority to provisional patent application number 60/240179 filed on October 13, 2000.

## IX.    Validity Analysis

54.    I have been asked by counsel for Berkheimer to study the asserted '713 Patent claims in relation to the alleged prior art subject of the Expert Report of Dr. Dan Schonfeld to determine whether the asserted method claims of the patent-in-suit are valid or invalid in view of such alleged prior art. My opinions are set forth in this report and they are formed to a reasonable degree of technical certainty.

55.    In preparation of this report and for expert testimony that I may be called upon to provide, I have considered and may rely upon the patent-in-suit, portions of its file history, relevant claim constructions, the alleged prior art subject of the Expert Report of Dr. Dan Schonfeld, as well as data or other documents identified in this report or included in Exhibit 2 attached hereto. My opinions are also based upon my education, training, research, knowledge, and experience in the field of computer science.

56.    In testifying, I may use some or all of the data or other documents and information. as well as exhibits, identified in this report or included in Exhibit 2, additional data or other information identified in discovery, as well as any materials relied upon by the defendant's experts, to support or summarize my opinion. In addition, I may supplement these materials with other materials or charts to provide additional context, background, or information.

## A.    Summary of Conclusions

57.    Based on my independent analysis, I have concluded that the asserted method claims 1 to 7, and 9 of the '713 Patent are directed to patent eligible subject matter and are valid over the alleged prior art raised in the Report of Dr. Dan Schonfeld.

58.    In view of the court's *Markman* claim construction, I RESERVE any opinions or

comment on the validity of asserted system claims10 to 19 of the '713 Patent.

**B.    Overview of the Expert Report of Dr. Dan Schonfeld**

59.    My opinions herein are primarily based upon my review of the alleged prior art subject of the Expert Report of Dr. Dan Schonfeld.

60.    Sections VII and VIII of Dr. Schonfeld's Report are addressed to various combinations of the Appendix 5A through 5F references and are sections where he attempts to invalidate the asserted method claims 1-7 and 9 of the '713 Patent. I have addressed his analysis and conclusions in the relevant sections below.

61.    I understand that there may be some question as to whether or not the various references qualify as patent eligible subject matter. I understand that this is primarily a legal determination, but to the extent that the question involves technical expertise or knowledge, I am prepared to testify as set forth in this Rebuttal report.

**C.    Patent Eligible Subject Matter**

62.    Dr. Schonfeld's Report at paragraphs 101 to 127 sets forth his opinion that the asserted method claims of the '713 Patent do not recite patent-eligible subject matter under 35 U.S.C. § 101.

63.    I understand that patent eligibility is a threshold issue of patentability and a question of law for the court. See *Bilski v. Kappos*, 561 U.S. 593, 621 (2010); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2010). In view thereof, I believe this legal issue is to be resolved by the court and the opinions of either myself or Dr. Schonfeld as to what we think one of ordinary skill in the art would think or understand of this issue presented is of minimal, if any, value. Nevertheless I disagree with Dr. Schonfeld's opinion that the asserted claims of the '713 Patent do not recite patent-eligible subject matter under 35 U.S.C. § 101 for the following

reasons.

64.     Section 101 specifies four independent categories of inventions or discoveries that are eligible for protection: processes, machines, manufactures, and compositions of matter. 'In choosing such expansive terms ... modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope.' " *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980)). If a claim is drawn to subject matter that falls outside the four statutory categories of § 101, it is not patent eligible. *In re Nuijten*, 500 F.3d 1346, 1354 (Fed.Cir.2007). This is true without regard to whether it might otherwise be ineligible because it encompasses a law of nature, natural phenomenon, or abstract idea. See *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014).

65.     I understand that in *Alice*, the Supreme Court applied a two-part test to determine patent eligibility under 35 U.S.C. § 101.  First, a court must determine whether the claims are directed to an abstract idea. *Id.* at 2355-56. Second, if the claims are directed to an abstract idea, a court must determine whether the remaining claim elements - individually or "as an ordered combination" - add an "inventive concept" sufficient to "transform the nature of the claim" into a patent-eligible application. *Id.* at 2358.

66.     The method recited in claim 1 of the '713 Patent (and in the asserted dependent claims 2 to 7 and 9 as well) is a 35 U.S.C. § 101 statutory "process" and thus patent eligible unless one of the common-law exceptions to section 101 applies. No such exception properly applies.

67.     Dr. Schonfeld's Report at paragraph 102 states that:

> "In my opinion, each of the claims that the asserted claims are "drawn to the abstract idea of archiving data, wherein new data items to be archived are analyzed and compared to previously stored data.  Fundamentally, this is an abstract idea that could be completed

manually by human using pen and paper. ... it would not be uncommon for a human to examine and compare portions of new documents to stored portions of documents to identify variances when archiving new documents. Such action would practice common sense because the person would wish to avoid archiving duplicates of portions of the same documents. One of skill in the art would not find anything else in the claims that adds a meaningful limitation to this underlying abstract idea."

68.    I disagree, and one of ordinary skill in the art at the time of the invention would disagree, that the asserted method claims are drawn to such an abstract idea because the method claims at issue specifically define subject matter well beyond Dr. Schonfeld's above characterization. The claims at issue are not "the abstract idea of archiving data, wherein new data items to be archived are analyzed and compared to previously stored data" because much more is involved.

69.    For example, the claims do not define such a "data" archiving that could be manually completed by humans. The asserted method claims all involve a transformation of an item into a different structure, a different state or thing, namely the parsing of an item (from source code into object code) into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith. A human, inclusive of one of ordinary skill in the art at the time of the invention, would not be able to perform such a parsing transformation of source code into object codes in his or her mind. A person of ordinary skill in the art at the time of the invention would understand that the claimed method could not be performed in the human mind but would require the parser and parsing and tagging as called for in the claims.

70.    Dr. Schonfeld's Report at paragraph 102 states:

"For example, humans often maintain file cabinets in order store and archive documents.

In such instances, it would not be uncommon for a human to examine and compare portions of new documents to stored portions of documents to identify variances when archiving new documents. Such action would practice common sense because the person would wish to avoid archiving duplicates of portions of the same documents. One of skill in the art would not find anything else in the claims that adds a meaningful limitation to this underlying abstract idea."

71.     The above example bears no resemblance to the asserted '713 Patent method claims. A file cabinet human comparison of a new document to a previously stored document is not the subject matter of the asserted '713 Patent method claims.

72.     In order to argue the claims at issue are patent ineligible as "an abstract idea", Dr. Schonfeld recasts the asserted '713 Patent method claims into an abstraction they are not.

73.     I understand that while the two-prong test of *Alice* governs patent eligibility under § 101, the "machine or transformation test" can be "an investigative tool" that may provide "a useful clue" for what constitutes a patent-eligible process under § 101. According to the "machine or transformation test", a claimed process can be patent-eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), aff'd on other grounds, *Bilski*, 561 U.S. 593.

74.     I find, and one of ordinary skill in the art at the time of the invention would find, that the asserted '713 Patent method claims are drawn to a method which transforms an item presented to a parser into a different structure, a different state or thing, namely the parsing of an item (from source code into object code) into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith. This is not a function that

can be performed by a human mind or manually by human using pen and paper. This is true especially given a variety of differing input items that could be presented to the parser.

75.     The asserted '713 Patent method claims are not so broad as to ensnare fundamental truths or principles that would pre-empt basic tools of the technical work, and Dr. Schonfeld has not made any showing that the asserted '713 Patent method claims merely involve principles fundamental to the ubiquitous use of the Internet or computers generally.

76.     To the contrary, the asserted '713 Patent method claims cover "more than a mere abstract idea," and involve "numerous limitations that narrow the scope of the patent", namely:

1. A method of archiving an item in a computer processing system comprising:
    presenting the item to a parser;
    parsing the item into a plurality of multi part object structures wherein portions of the structures have searchable information tags associated therewith;
    evaluating the object structures in accordance with object structures previously stored in an archive;
    presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule.

2. The method as in claim 1 wherein the respective structure can be manually edited after being presented for reconciliation.

3. The method as in claim 1 which includes, before the parsing step, converting an input item to a standardized format for input to the parser.

4. The method as in claim 1 which includes storing a reconciled object structure in the archive without substantial redundancy.

5. The method as in claim 4 which includes selectively editing an object structure, linked to other structures to thereby effect a one to many change in a plurality of archived items.

6. The method as in clam 5 which includes compiling an item to be output from the archive, wherein at least one object type structure of the item has been edited during the one to many change and wherein the compiled item includes a plurality of linked object type structures converted into a predetermined output file formal.

7. The method as in claim 6 which includes compiling a plurality of items wherein the at least one object type structure had been linked in the archive to members of the plurality.

9. The method as in claim 1 which includes <u>forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values.</u>

77. The foregoing underlined claim elements and limitations narrow the scope of the asserted '713 Patent method patent claims so as to not encompass fundamental truths or principles that would preempt basic tools of technical work or involve abstract ideas fundamental to the ubiquitous use of the Internet or computers generally. The claim elements and limitations of the asserted '713 Patent method claims do not preempt Dr. Schonfeld's proposed "abstract idea of archiving data, wherein new data items to be archived are analyzed and compared to previously stored data". Rather, the foregoing underlined claim elements and limitations provide "something more" than a patent upon an ineligible abstract concept itself and have "inventive concept".

78. The asserted '713 Patent method claims do not cover "an abstract concept" and have "something more" than a mere abstract idea. The foregoing underlined elements and limitations of the claims include "additional elements" or "meaningful limitation[s]" beyond Dr. Schonfeld's recasted abstract idea that individually or collectively transforms the nature of the claims into patent eligible application. Such "additional elements" or "meaningful limitation[s]" provide inventive concept, namely "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355.

79. Further, Dr. Schonfeld's Report at several instances (see, for example at paragraphs 104, 107, 112 mischaracterizes the asserted Claim1 as only requiring "presenting", "parsing", "evaluating", and "presenting" steps for "data" without specific accounting for the elements and limitations defined and set forth in the Claim 1 steps. Further the "data" used in Dr. Schonfeld's

abstraction (see, e.g., his paragraph 101) is not the same as and is distinct and disparate from the transformed parsed plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith and such object structures are evaluated in accordance with object structures previously stored in the archive wherein an evaluated object structure is presented for manual reconciliation at least where there is a predetermined variance between the object at least one of a predetermined standard and a user defined rule. Moreover, the asserted dependent method claims 2 to 7 and 9 set forth above further define specific elements and limitations unaccounted for in Dr. Schonfeld's opinion of patent-ineligible subject matter.

80.    Still further, the asserted '713 Patent method claims are patent eligible because they improve an existing technological process, not because they were implemented on a computer. The '713 Patent specification at Col. 4 line 50 to Col. 5 line 59 and at Col. 14 line 18 to Col. 15 line 49 sets forth such improvements and practical benefits and advantages of the invention.

81.    The improvements and practical benefits and advantages of the inventions is not the result of what Dr. Schonfeld's Report at paragraph 106 calls a "generic workflow" or a "Figure 1…system… implemented by several, common and abstract computer components, including a "server," "mass storage & archive," "output devices," "mouse/ keyboard," and "display". Rather Figure 1 and its computer 18 is highly refined by the block, functional, and flow diagrams of Figures 2A, 2B, 2C, 2D, 3, 4, 5A and 5B and their corresponding specification descriptions which provides detailed structure supporting the asserted '713 Patent method claims and their attendant improvements and practical benefits and advantages.

82.    The asserted '713 Patent method claims are not an abstract idea applied to a conventional general purpose computer. They, as the USPTO determined, recite novel, useful, non-obvious,

and specifically described subject matter.

## D. Detailed Analysis of Alleged Invalidity

83.     My analysis of the alleged prior art subject of the Expert Report of Dr. Dan Schonfeld with respect to the asserted method claims 1 to 7, and 9 of the '713 Patent is set forth below. I conclude that the asserted claims of the '713 Patent are valid and are not anticipated by and are not rendered obvious by the art and combinations asserted by Dr. Schonfeld.

84.     The citation of particular evidence with respect to a particular item in the discussion below is not exclusive. My opinions incorporate the analysis in the entirety of my Rebuttal Report as providing further explanation of how the asserted method claims 1 to 7, and 9 of the '713 Patent are valid in light of the contentions and alleged prior art discussed in the Expert Report of Dr. Dan Schonfeld.

85.     I understand that there may be some question as to whether or not the various references qualify as prior art.  I understand that this is primarily a legal determination, but to the extent that the question involves technical expertise or knowledge, I am prepared to testify as set forth in this Rebuttal Report.

86.     At paragraph 135 of his Report, Dr. Schonfeld states: "135. For the reasons explained in this Report and Appendices, it is my opinion that the asserted claims of the '713 Patent are anticipated by, or are rendered obvious in view of, at least the following prior art, alone or in combination:"

87.     The subsequent paragraphs 136 to 215 of Dr. Schonfeld's Report discusses the "prior art" he relies upon in his paragraph 135 opinion.

88.     My comments below are organized in the sequence of Dr. Schonfeld's topical headings set forth at paragraphs 135 to 215 of his Report.

*Appendix 5A Invalidity Chart of the '713 Patent over US. Patent No 5,623,679 to Kevin G.*
*Rivette, et al..*

89.    The "Appendix 5A Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

90.    The Rivette reference is directed to a method and apparatus for extracting, synchronizing, displaying, and manipulating text and image documents in electronic form for display. The text and image files for documents, such as for example patent documents, are initially stored on separate magnetic tape media. These data files are extracted from the respective tapes and placed onto a faster medium, such as a hard disk drive. The text and image files are synchronized to produce Equivalent Files using heuristic algorithms to create an approximate equivalence relationship between the text and the image files. A graphic user interface permits the user to display, manipulate, and edit the Equivalent File created or create libraries of patent Equivalent Files and image files or documents of another type.

91.    The prior art reference of the Rivette '679 patent does not disclose all of the limitations of Claim 1 in the '713 patent, and specifically does not disclose a method for "*parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith*" (Claim 1, Limitation 2).

92.    Schonfeld's Appendix 5A cites three passages of the Rivette '679 patent to support his hypothesis that Limitation 2 of Claim 1 is disclosed by the '679 patent. His first reference is to ('679 Patent 10:54-61):

As will be described, a process for creating an inverted tree index for the text contained in the PTO Text Files is disclosed. This indexing process results in a pre-built index for very fast text searching when using the graphic user interface of the present invention. Although the present invention describes an inverted tape index, other types of text searching methods may be employed, instead of the inverted tape index.

However, the inverted tree index cited by Schonfeld in the '679 Patent is not disclosing *searchable information tags* associated with a *multi-part object structure*. The inverted tree index in the '679 patent can be used only for searching for text instances within a single displayed PTO text file using the graphical user interface and cannot be used to search for object structures (defined by Schonfeld in Appendix 5A to be PTO text files and/or Equivalent Files) because each inverted tree index is associated with one and only one PTO text file.

93.     The second Rivette '679 passage cited by Schonfeld in Appendix 5A to support his hypothesis that Limitation 2 of Claim 1 is disclosed by Rivette is ('679 Patent 11:10-35):

FIG. 1 illustrates a block diagram of the present invention's production configuration to extract text and image files, to paginate the text files to produce Equivalent Files, and to index the Equivalent Files. The process begins with the PTO magnetic tapes 1 that are of type 3480 from the PTO. There are three different categories of PTO magnetic tapes: PTO text tapes, PTO image tapes and PTO assignment tapes. A UNIX machine 2 reads the data in the PTO tapes 1 into a large file buffer. *The data is then parsed to find each of the documents that are on the tapes. Parsing creates a table which contains patent numbers, the physical locations of the patent files on the tapes, the total number of bytes and other control information about each document that appears on the tape.* A document can be either a patent, a certificate of correction, a reissued patent disclaimer or any other post-issuance document. The data can then be either stored in a digital linear tape (DLT) 3 or in any other suitable data storage medium. Because the amount of disk storage space required for the total active set of patents is greater than 1 terabyte (TB), currently the data is stored into libraries S. The libraries may contain PTO Text Files 6, PTO Image Files 7 and post issuance documents 9. If a disk drive system with a large

enough storage is available, the data can be stored in a disk drive. At present, the PTO image tapes are left in their original medium, namely the 3480 magnetic tapes.

However, the '679 table containing patent numbers and the physical locations of the patent files on the tape is not disclosing *searchable information tags* associated with a *multi-part object structure*. Instead, this table is a table of contents identifying which patent is on which tape and where the patent is located on the tape.

94.    The third Rivette '679 passage cited by Schonfeld in Appendix 5A to support his hypothesis that Limitation 2 of Claim 1 is disclosed by Rivette is ('679 Patent 19:44-55):

> PTO Text Tapes are issued by the PTO on specific calendar dates and contain a unique Volume Serial Number (VSN). All patents issued on a certain date should be present in the tape(s) issued on that date. The tapes do not contain an index. *Therefore, extracting a specific PTO Text File requires that the entire 200 MB IBM.RTM. 3480 tape be read into a magnetic disk buffer and stripped of header blocks, tape marks labels, etc., and then parsed to create a Volume Table of Contents (VTOC). The VTOC contains the document number, byte count offset from the beginning of the tape, and the length of the document file in bytes.* A separate program may then be used to index the beginning byte of the file and copy the file segment to another file, which then becomes the PTO Text File for the specific patent. It is possible for a PTO Text File to span multiple PTO Text Tapes. When this happens, a procedure is utilized by the present invention to concatenate the multiple file segments together. The VTOC created from the magnetic disk buffer is used to update a Relational Database System (RDB) for future reference, and the buffer is then erased.

However, the '679 Volume Table of Contents containing document numbers, byte count offset and the length of file is not disclosing *searchable information tags* associated with a *multi-part object structure*. Instead, this table is a volume table of contents identifying which document is on which tape and where the where the document is located on the tape.

95.     The prior art reference of the Rivette '679 patent does not disclose all of the limitations of Claim 1 in the '713 patent, and specifically does not disclose a method for "*evaluating the object structures in accordance with object structures previously stored in an archive*" (Claim 1, Limitation 3). The '679 excerpts cited by Schonfeld in Appendix 5A do not disclose this limitation.

96.     Comparing the Rivette '679 patent to the '713 patent's Claim 1, Limitation 3, Schonfeld states in Appendix 5A (page 13):

> To the extent Plaintiff contends that this step is not disclosed in the '679 Patent, it would have been obvious to one of ordinary skill in the art to use the disclosure of the '679 Patent to compare the multipart object structures (Patent Files and/or Equivalent Files) with object structures previously stored in the archive (storing data files in a medium such as a hard disk drive).

It is difficult to respond specifically to this assertion since Dr. Schonfeld simply cites this limitation as being within the "knowledge" of the person of ordinary skill in the art when Dr. Schonfeld is not specific on what exactly that knowledge would be. I do not find his unsupported conclusions about what one of ordinary skill in the art would know to be factually supportable. There is no explanation of reason or motivation why the missing step of "*evaluating the object structures in accordance with object structures previously stored in an archive*" would be combined with the Rivette '679 patent and as such Dr. Schonfeld fails to provide an "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

97.     The Rivette reference does not disclose the claimed "evaluating the object structures in accordance with object structures previously stored in an archive". The asserted Rivette 5A chart analysis of "anchor pairs", step 7812 matching operation to identify ends of lines, columns, and pages, and pagination correction tool is not synonymous with the '713 Patent Claim 1

"evaluating the object structures in accordance with object structures previously stored in an archive". The defined "object structures" resultant from the '713 Patent Claim 1 parsing step is not what Rivette purportedly evaluates and such object structures are not evaluated "in accordance with object structures previously stored in an archive". This deficiency is not cured by the assertion by Dr. Schonfeld that, if this "evaluating" step is missing in the Rivette reference, one of ordinary skill in the art would have been motivated to compare Rivette "Patent Files and/or Equivalent Files" with previously stored "Patent Files and/or Equivalent Files" "to avoid storing multiple copies of the same constituent groupings of a document".

98.     Also the proposed motivational desirable goal to avoid storing multiple copies is too general and fails to provide an "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

99.     The Rivette reference also does not disclose the claimed "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule". The asserted Rivette 5A chart analysis of step 7812 matching operation to identify ends of lines, columns, and pages, Equivalent File synchronization to Image File, "anchor pairs", and pagination correction tool is not synonymous with "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule", in part because it does not present the defined "evaluated object structure" of the '713 Patent Claim 1.

100.    With respect to the '713 Patent Claim 2, the limitations of its base Claim 1, as discussed above, are not disclosed in Rivette.

101.    With respect to the '713 Patent Claim 3, the Rivette reference does not disclose the claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser". Dr. Schonfeld acknowledges this disclosure failure of Rivette by stating that the missing element would be obvious to one of ordinary skill in the art in view of Rivette reference combined with the teachings of the Intelligent Offices reference and the Acrobat PDF & Workflow in Detail reference. For this combination of references Dr. Schonfeld's 5A chart states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". This asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.  In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support.  Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5A Chart cited portions of the 443 page Intelligent Offices reference and the 519 page Acrobat PDF & Workflow in Detail reference for combination with Rivette among the myriad disparate teachings of the references. Moreover, the 5A Chart cited portions of Intelligent Offices of its Chapters 6, 10, 11, and 12 and associated OCR text recognition, image recognition, and speech recognition excerpts, as well as the 5A Chart cited portions of Acrobat PDF & Workflow in Detail of its Chapters 1 and 2 associated  PDF, raster /vector, component

file and consolidated file excerpts does not teach or suggest before the parsing step of the '713 Patent Claim 1, the converting of the input item to a standardized format for input to the parser, as required by the '713 Patent Claim 3. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Rivette reference.

102.    With respect to the '713 Patent Claim 4, the Rivette reference does not disclose the claimed "which includes storing a reconciled object structure in the archive without substantial redundancy". Dr. Schonfeld acknowledges this disclosure failure of Rivette by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Rivette reference combined with the teachings of the '105 Patent to Ferrucci and the Acrobat PDF & Workflow in Detail reference. For this combination of references Dr. Schonfeld's 5A chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.  In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick

and choose the 5A Chart cited portions of the '105 Patent to Ferrucci reference and the 519 page reference of Acrobat PDF & Workflow in Detail for combination with Rivette among the myriad disparate teachings of the references. Moreover, the 5A Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5A Chart cited portions of Acrobat PDF & Workflow in Detail and its associated optimized PDF files does not teach or suggest "storing a reconciled object structure in the archive without substantial redundancy", particularly the required "reconciled object structure" of the '713 Patent Claim 4. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Rivette reference.

103.    With respect to the '713 Patent Claim 5, the Rivette reference does not disclose the claimed "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Dr Schonfeld acknowledges this disclosure failure of Rivette by stating that the missing element would be obvious to one of ordinary skill in the art in view of Rivette reference combined with the teachings of the '105 Patent to Ferrucci and the Buford WO97/134240 reference. For this combination of references Dr. Schonfeld's 5A chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible

combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5A Chart cited portions of the '105 Patent to Ferrucci reference and the Buford reference for combination with Rivette among the myriad disparate teachings of the references. Moreover, the 5A Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5A Chart cited portions of Buford and its associated document consistency among clients during collaboration via an edit object does not teach or suggest the base Claim 1 and 4 limitations, and the Claim 5 further limitations of "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Rivette reference.

104. With respect to the '713 Patent Claim 6, the Rivette reference fails to teach the Claim 6 "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]". Dr Schonfeld acknowledges this disclosure failure of Rivette by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Buford reference combined with the teachings of the '131 Patent to Kornfeld. For this combination of references Dr. Schonfeld's 5A chart again states that the motivation as to why the combination would be made is because the references "all relate to

document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5A Chart cited portions of the '131 Patent to Kornfeld reference for combination with the Buford reference among the myriad disparate teachings of the references. Moreover, the 5A Chart cited portions of the '131 Patent to Kornfeld and its recognizing and parsing dissimilar data to provide a consistent format output for combination with the Buford reference (apparently as applied to Claim 5) does not teach or suggest the base Claim 1, 4 and 5 limitations, and the Claim 6 further limitations of "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Rivette reference.

105. With respect to the '713 Patent Claim 7, the Rivette reference fails to disclose the Claim 7 "which includes compiling a plurality of items wherein the at least one object-type structure

had been linked in the archive to members of the plurality". Dr Schonfeld acknowledges this disclosure failure of Rivette by stating that the missing element would be obvious to one of ordinary skill in the art in view of the teachings of the '131 Patent to Kornfeld. For this combination of references Dr. Schonfeld's 5A chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5A Chart cited portions of the '131 Patent to Kornfeld reference for combination with the Rivette reference among the myriad disparate teachings of the references. Moreover, the 5A Chart cited portions of the '131 Patent to Kornfeld and its recognizing and parsing dissimilar data to provide a consistent format output for combination with the Rivette reference does not teach or suggest the base Claim 1, 4, 5 and 6 limitations, and the Claim 7 further limitations of "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in

the same way as in the subject '713 Patent claim for the reasons stated with respect to the Rivette reference.

106.    With respect to the '713 Patent Claim 9, the Buford reference does not disclose the claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values".  Dr Schonfeld acknowledges this disclosure failure of  Buford by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Rivette reference combined with the teachings of the '131 Patent to Kornfeld and the reference of "Personalized & Database Printing" by Broudy and Romano ("Romano-PDP"). For this combination of references Dr. Schonfeld's 5A chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5A Chart cited portions of the '131 Patent to Kornfeld reference and the 5A Chart cited portions of Romano-PDP for combination with the Buford reference among the myriad disparate teachings of the

references. Moreover, the 5A Chart cited portions of the '131 Patent to Kornfeld and its parsing of record data to provide a consistent format output and the cited portions of the Romano-PDP reference of key trigger of variable text blocks, text boxes, lines, and graphics sets for combination with the Buford reference does not teach or suggest the base Claim 1 limitations, and the Claim 9 further limitations of "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values".  Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Rivette reference.

***Appendix 5B Invalidity Chart of the '713 Patent over U.S. Patent No 5,893,131 to William Kornfeld.***

107.  The "Appendix 5B Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

108.  The Kornfeld reference is generally directed to a method and apparatus for rendering a consistent format output for record data having inconsistent internal structures. Record data is batch entered into a database input buffer associated with a computer. Consecutive data lines are transferred from the input buffer to a stack. A parsing algorithm identifies related categories of the data in the stack. The individual data lines comprising each category are replaced with the associated compound category data line. Failures of the parsing algorithm to provide consistent

format output are detected. An interactive editor interface displays the input buffer or stack to the user. Manual parsing and correction of data errors is thereby permitted.

109.    The Kornfeld reference does not disclose the '713 Patent claimed "method of archiving an item". The Kornfeld method and apparatus for rendering a consistent format output for record data having inconsistent internal structures is not synonymous with the claimed "method of archiving an item".

110.    The Kornfeld reference does not disclose the claimed "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith" because the item document presented to its parser to produce "constituent grouping of a document" is not a conversion of source code into a "plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". There is no mention of searchable information tags being part of the parsed "record data". The Kornfeld "normalized categories" having lines of a table "tagged with best-fit category" is not the claimed "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". The Kornfeld reference does not disclose "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith".

111.    The Kornfeld reference does not disclose the claimed "evaluating the object structures in accordance with object structures previously stored in an archive". The Kornfeld parsing algorithm identification of related categories of data in a stack is not synonymous with the '713 Patent Claim 1 "evaluating the object structures in accordance with object structures previously stored in an archive", particularly the object structures resultant from the parsing into "a plurality

of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". The assertion by Dr. Schonfeld that, if this step is missing in the Kornfeld reference, one of ordinary skill in the art would have been motivated to compare the Kornfeld "constituent groupings of a document" with previously stored "constituent groupings of a document" "to avoid storing multiple copies of the same constituent groupings of a document". This assertion is not supported by the Kornfeld reference because its parsing directed toward the rendering of a consistent format output for record data having inconsistent internal structures with batch entry into a database input buffer of a computer does not teach or suggest the '713 Patent Claim 1 steps of "evaluating the object structures in accordance with object structures previously stored in an archive".

112. The asserted motivation referenced in paragraph 5 above to avoid multiple copies is too general and fails to provide an "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

113. The Kornfeld reference also does not disclose the claimed "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule". The Kornfeld asserted detection of a failure of its parsing algorithm to provide a consistent format output does not involve "an evaluated object structure" of the '713 Patent Claim 1 or the object structures resultant from the parsing into "a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". Rather the Kornfeld parsing designed to render a consistent format output identifies an inconsistent file format result is not dependent upon or related to the '713 Claim 1 steps of "evaluating the object structures in accordance with object structures previously stored in an archive"" and "presenting

an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule."

114.   With respect to the '713 Patent Claim 2, the Kornfeld  reference does not disclose the claimed "wherein the respective structure can be manually edited after being presented for reconciliation". The evaluated and presented "respective structure" of Claim 2 is not the Kornfeld defective or inconsistent format output. The manual correction editing of "a data error" via a user interface "to provide the desired output format" of the Kornfeld reference is not the editing of the '713 Patent Claim 2 "respective structure" "after being presented for reconciliation".

115.   Dr. Schonfeld asserts that if Kornfeld is not regarded as disclosing a manual editing of the '713 Patent Claim 2 "respective structure" "after being presented for reconciliation", then the combination of the reference of Acrobat PDF & Workflow in Detail with Kornfeld would render the '713 Claim 2 missing limitation obvious to  one of ordinary skill in the art. First, Dr. Schonfeld in his 5B Chart supplies no motivation as to why the combination would be made. Absent "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness," the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5B Chart cited portion of the 519 page reference of Acrobat PDF & Workflow in Detail for combination among the myriad disparate teachings thereof. Moreover, the 5B Chart cited portion of Acrobat PDF & Workflow in Detail of its Chapters 19 and 22 or select portions of pages 470-476 is too general and its associated citations to correction of "suspect words" with a text touch up tool or

correction of "certain problems" does not teach or suggest a manual editing of the '713 Patent Claim 2 "respective structure" "after being presented for reconciliation". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Kornfeld reference.

116.    With respect to the '713 Patent Claim 3, the Kornfeld reference does not disclose the claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser". Dr Schonfeld acknowledges this disclosure failure of Kornfeld by stating that the missing element would be obvious to one of ordinary skill in the art in view of Kornfeld reference combined with the teachings of the Intelligent Offices reference and the Acrobat PDF & Workflow in Detail reference. First, again Dr. Schonfeld in his 5B chart supplies no motivation as to why the combination would be made. Absent "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness," the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5B Chart cited portions of the 443 page Intelligent Offices reference and the 519 page reference of Acrobat PDF & Workflow in Detail for combination with Kornfeld among the myriad disparate teachings of the references. Moreover, the 5B Chart cited portions of Intelligent Offices of its Chapters 6, 10, 11, and 17 and associated OCR text recognition, image recognition, and speech recognition discussion, as well as the 5B Chart cited portions of Acrobat PDF & Workflow in Detail of its Chapters 1 and 2 and associated PDF, raster /vector, component file and consolidated file discussion does not teach or suggest before the parsing step of the '713 Patent Claim 1, the converting of the input item to a

standardized format for input to the parser, as required by the '713 Patent Claim 3. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Kornfeld reference.

117.    With respect to the '713 Patent Claim 4, the Kornfeld reference does not disclose the claimed "which includes storing a reconciled object structure in the archive without substantial redundancy". Dr Schonfeld acknowledges this disclosure failure of Kornfeld by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Kornfeld reference combined with the teachings of the '105 patent to Ferrucci and the Acrobat PDF & Workflow in Detail reference. This time Dr. Schonfeld's 5B chart supplies a stated motivation as to why the combination would be made, namely because the references "all relate to document and graphical data management". However this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.   In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5B Chart cited portions of the '105 Patent to Ferrucci reference and the 519 page reference of Acrobat PDF & Workflow in Detail for combination with Kornfeld among the myriad disparate teachings of the

references. Moreover, the 5B Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5B Chart cited portions of Acrobat PDF & Workflow in Detail and its associated optimized PDF files does not teach or suggest "storing a reconciled object structure in the archive without substantial redundancy", particularly the required "reconciled object structure" of the '713 Patent Claim 4. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Kornfeld reference.

118. With respect to the '713 Patent Claim 5, the Kornfeld reference does not disclose the claimed "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Dr Schonfeld acknowledges this disclosure failure of Kornfeld by stating that the missing element would be obvious to one of ordinary skill in the art in view of Kornfeld reference combined with the teachings of the '105 Patent to Ferrucci and the WO97/134240 Buford reference. For this combination of references Dr. Schonfeld's 5B chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect,

the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5B Chart cited portions of the '105 Patent to Ferrucci reference and the WO97/134240 Buford reference for combination with Kornfeld among the myriad disparate teachings of the references. Moreover, the 5B Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5B Chart cited portions of the WO97/134240 Buford reference and its associated document consistency among clients during collaboration via an edit object does not teach or suggest the base Claim 1 and 4 limitations, and the Claim 5 further limitations of "selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Kornfeld reference.

119.    With respect to the '713 Patent Claim 6, the Kornfeld reference is cited for an asserted teaching of a parsing algorithm to provide a consistent format output, includes compiling an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]". Kornfeld fails to teach the base Claim 1, 4, and 5 limitations. Kornfeld further fails to teach the Claim 6 "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]"

120.    With respect to the '713 Patent Claim 7, the Kornfeld reference is cited for an asserted teaching of a "constituent groupings of a document" somehow being "linked" (via "categories") in an archive (via "record data entered in a database) to members of a plurality of a "constituent groupings of a document" and it is submitted that the same somehow accounts for all limitations of Claim 7's base Claims 1, 4, 5, and 6 and the additional limitations of Claim 7 "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality". Kornfeld fails to teach the base Claim 1, 4, 5, and 6 limitations. Kornfeld further fails to teach the Claim 7 "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality".

121.    With respect to the '713 Patent Claim 9, the Kornfeld reference does not disclose the claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Dr Schonfeld acknowledges this disclosure failure of Kornfeld by stating that the missing element would be obvious to one of ordinary skill in the art in view of Kornfeld reference combined with the teachings of the Personalized & Database Printing (Broudy & Romano) reference. In this regard, Dr. Schonfeld's 5B chart again supplies a stated motivation as to why the combination would be made, namely because the references "all relate to document and graphical data management". I restate that this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered

motivation would encompass every possible combination of thousands or tens, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5B Chart cited portions of the 321 page Personalized & Database Printing (Broudy & Romano) reference for combination with Kornfeld among the myriad disparate teachings of the references. Moreover, the 5B Chart cited portions of the Personalized & Database Printing (Broudy & Romano) reference and its associated page 209 key trigger of responses of variable sets of text blocks, text boxes, and graphic does not teach or suggest Claim 9's claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Kornfeld reference.

***Appendix 5C Invalidity Chart of the '713 Patent over U.S. Patent No. 7,178,105 to David Ferrucci, et al..***

122.    The "Appendix 5C Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

123.    The Ferrucci reference is generally directed to a system and method for importing and reconciling component variables with container variables in a document, including identifying variables in a component, and for each of these variables determining if there is a variable in the container that refers to a same domain concept, and, if an identification occurs, associating the variable in the component with the variable in the container.

124.    The Ferrucci reference does not disclose the '713 Patent claimed "method of archiving an item". The Ferrucci system and method for importing and reconciling component variables with container variables in a document is not synonymous with the claimed "method of archiving an item".

125.    The Ferrucci reference is asserted to disclose a system and method for importing and reconciling component variables with container variables in a document. Such is not synonymous with the claimed "presenting the item to a parser" as part of the claimed method of archiving. The Ferrucci reference does not disclose the claimed "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". The Ferrucci system and method for importing and reconciling component variables with container variables in a document  is not a conversion of source code into a "plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". There is no mention of "parsing" in Ferrucci. The Ferrucci reference does not disclose "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith".

126.    The Ferrucci reference does not disclose the claimed "evaluating the object structures in accordance with object structures previously stored in an archive". The Ferrucci reconciling of

component variables with container variables is not synonymous with the '713 Patent Claim 1 "evaluating the object structures in accordance with object structures previously stored in an archive", particularly the object structures resultant from the parsing into "a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith".

127. The Ferrucci reference also does not disclose the claimed "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule". In Appendix 5C (page 18) Dr. Schonfeld incorrectly equates Ferrucci's "set of configuration rules" with '713 Patent Claim 1 Limitation 4 "user defined rule". Ferrucci's "set of configuration rules" are not used to determine when "interactive reconciliation mode" is activated. Ferrucci's "interactive reconciliation" is not dependent on "an evaluated object structure". Rather Ferrucci's "interactive reconciliation" is user initiated and does not depend on "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule."

128. With respect to the '713 Patent Claim 2, the Ferrucci reference does not disclose the claimed "wherein the respective structure can be manually edited after being presented for reconciliation". In Appendix 5C (page 14) Dr. Schonfeld identifies the '713 "object structures" as Ferrucci's "document components". However, the "document components" cannot be "manually edited" as is shown in Ferrucci's '105 Patent FIG. 5 and described in (Col. 6, Lines 53-60). In Ferrucci, the user can only edit the mappings in the "connector" (item 14 in FIG. 5) which is distinct from the "document component" (item 12 in FIG. 5). The manual editing of the Ferrucci reference (Col. 7, Line 57) is not the editing of the '713 Patent Claim 2 "respective

structure" "after being presented for reconciliation".

129.     With respect to the '713 Patent Claim 3, the Ferrucci reference does not disclose the claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser". Dr Schonfeld acknowledges this disclosure failure of Ferrucci by stating that the missing element would be obvious to one of ordinary skill in the art in view of Ferrucci reference combined with the teachings of the *Intelligent Offices* reference and the *Acrobat PDF & Workflow In Detail* reference. First, again Dr. Schonfeld in his 5C chart supplies no motivation as to why the combination would be made. Absent "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness," the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5C Chart cited portions in the *Intelligent Offices* reference (Chapters 6, 10, 11 and 12) and the citations of *Acrobat PDF & Workflow In Detail* (Chapters 1 and 2) for combination with Ferrucci among the myriad disparate teachings of the references. Moreover, the 5C Chart cited portions of *Intelligent Offices* (pages 135-136) and the 5C Chart cited portions of *Acrobat PDF & Workflow In Detail* (pages 37-40 and 2-4) do not teach or suggest before the parsing step of the '713 Patent Claim 1, the converting of the input item to a standardized format for input to the parser, as required by the '713 Patent Claim 3. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Ferrucci reference.\

130.     With respect to the '713 Patent Claim 4, the limitations of its base Claim 1, as discussed above, are not disclosed in Ferrucci.

131.    With respect to the '713 Patent Claim 5, the Ferrucci reference does not disclose the claimed "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Dr Schonfeld acknowledges this disclosure failure of Ferrucci by stating that the missing element would be obvious to one of ordinary skill in the art in view of Ferrucci reference combined with the teachings of the Buford reference. For this combination of references Dr. Schonfeld's 5C chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.  In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support.  Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5C Chart cited portions of the Buford reference for combination with Ferrucci among the myriad disparate teachings of the references. Moreover, the 5C Chart cited portions of the Buford reference and its "collaborative ... multiple client computers" does not teach or suggest the base Claim 1 and 4 limitations, and the Claim 5 further limitations of "selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Further, if the combination of references were made, the

same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Ferrucci reference.

132.    With respect to the '713 Patent Claim 6, the Ferrucci reference does not disclose the claimed "which includes compiling an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file [format]". Dr Schonfeld acknowledges this disclosure failure of Ferrucci by stating that the missing element would be obvious to one of ordinary skill in the art in view of Ferrucci reference combined with the teachings of the Kornfeld reference. For this combination of references Dr. Schonfeld's 5C chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.  In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support.  Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5C Chart cited portions of the Kornfeld reference for combination with Ferrucci among the myriad

disparate teachings of the references. Moreover, the 5C Chart cited portions of the Kornfeld reference and its "method for rendering a consistent format output for record data" does not teach the Claim 6 limitations "which includes compiling an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file [format]". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Ferrucci reference.

133.    With respect to the '713 Patent Claim 7, the Ferrucci reference does not disclose "The method as in claim 6 which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality.". Dr Schonfeld acknowledges this disclosure failure of Ferrucci by stating that the missing element would be obvious to one of ordinary skill in the art in view of Ferrucci reference combined with the teachings of the Kornfeld reference. For this combination of references Dr. Schonfeld's 5C chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one

of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5C Chart cited portions of the Kornfeld reference for combination with Ferrucci among the myriad disparate teachings of the references. Moreover, the 5C Chart cited portions of the Kornfeld reference and its "method for rendering a consistent format output for record data" does not teach the Claim 6 limitations "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality ". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Ferrucci reference.

134.    With respect to the '713 Patent Claim 9, the Ferrucci reference does not disclose the "method as in claim 1 which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Dr Schonfeld acknowledges this disclosure failure of Ferrucci by stating that the missing element would be obvious to one of ordinary skill in the art in view of Ferrucci reference combined with the teachings of the Kornfeld reference and *Personalized and Database Printing* reference. In this regard, Dr. Schonfeld's 5C chart again supplies a stated motivation as to why the combination would be made, namely because the references "all relate to document and graphical data management". I restate that this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of

obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5C Chart cited portions of the 308 page *Personalized and Database Printing* reference for combination with Ferrucci among the myriad disparate teachings of the references. Moreover, the 5C Chart cited portions of the Kornfeld reference and *Personalized and Database Printing* reference does not teach or suggest Claim 9's claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Ferrucci reference.

*Appendix 5D Invalidity Chart of the '713 Patent over WIPO Publication No. 97/34240 (PCT/US97/04574) to Buford.*

135.    The "Appendix 5D Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

136.    The Buford reference is generally directed to a compact tree representation that is used during the electronic storage, transmission, and presentation of a structured hypermedia document in a networked computer.

137.    The Buford reference is asserted to disclose presenting items to a parser, namely preprocessed structured documents to a program that dissects and converts source code (preprocessed structured documents) into object code (compact tree (CT) form).

138.    The Buford reference does not disclose the 713 Patent Claim 1 "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". The Buford parser performs a syntactical validation (Buford p. 5, line 22-23). After the Buford parsing:

> "The server 26 then stores the structure and CDATA tables as *a compact tree (CT) instance object 32* in a persistent data store 31, such as an object-oriented database, an object-oriented file system, or an object-relational database (Step 58). The instance object 32 is structured such that related structural elements (i.e., the document's elements and their corresponding sub-elements) *are located together in the compact tree*, which allows the clients 22 and 24 and the server 26 to access the instance object, and therefore the structured document, incrementally, as described below." (Buford 9:24 to 10:4)

139.    The compact tree instance object 32 is not "a plurality of multi-part object structures". The parsing of Buford crates a compact tree as a result.  Buford teaches that:

> "Each structured document is processed and parsed once at the network server, and *the result is stored in compact tree (CT) form in a persistent object store*. The CT form of the document then is delivered to requesting client computers as one

or more objects. When a document is edited at a client computer, the CT form or the edit operations can be transferred from the client to the server.

Since the document is retrieved in pre-parsed and pre-processed form, the client computer need not have a document parsing function. The parsing operation is done once at the server, and thereafter *the resulting representation may be accessed* many times by different clients. The clients do not need to parse the compact representation, because the representation retrieved by the client contains a parse tree and symbol definitions needed to render the document for presentation.

The compact tree techniques described above result in significantly smaller data transfers than traditional document transfer techniques." (Buford, 4:5-18) (italic emphasis added)

140. The Buford "resulting representation" of a document in a compact tree form is not synonymous with "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith"

141. The Buford reference does not disclose the claimed "evaluating the object structures in accordance with object structures previously stored in an archive". The Buford parser syntactical validation of a structured hypermedia document ("a structured document 25 encoded according to a standard syntax, such as SGML [ISO 1988]") while "breaking the document 25 into a parse tree 41 representing the document's structural hierarchy and a content list 43 representing the data contained in the document 25" is not the claimed "evaluating the object structures in accordance with object structures previously stored in an archive". Such syntactical validation is not of Claim 1's parsed "plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith", rather it is of the structured document's syntax presented to the Buford parser. Similarly there is no "evaluating" of the Claim 1 "object structures" obtained by parsing and there is no evaluation "in accordance with

object structures previously stored in an archive".

142.    The Buford parser performing a syntactical validation where documents are parsed into a parse tree and a content list representing the data contained in the document 25 is not synonymous with the claimed "evaluating the object structures in accordance with object structures previously stored in an archive"

143.    The Buford reference also does not disclose the claimed "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule". If a Buford document is structured according to a syntax that the server 26 does not recognize, the server 26 may follow alternative approaches (Buford p. 10, lines 25-26), but the same does not involve "an evaluated object structure" of the '713 Patent Claim 1.

144.    The Buford reference does not disclose the '713 Claim 1 steps of "evaluating the object structures in accordance with object structures previously stored in an archive"" and "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule."

145.    With respect to the '713 Patent Claim 2, the Buford  reference does not disclose the claimed "wherein the respective structure can be manually edited after being presented for reconciliation". The evaluated and presented "respective structure" of Claim 2 is not the Buford syntactical validation of failure to validate. Any client or client computer document editing of the Buford reference is not the editing of the '713 Patent Claim 2 "respective structure" "after being presented for reconciliation".

146.    With respect to the '713 Patent Claim 3, the Buford reference does not disclose the

claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser". Dr Schonfeld acknowledges this disclosure failure of Buford by stating that the missing element would be obvious to one of ordinary skill in the art in view of Buford reference combined with the teachings of the Intelligent Offices reference and the Acrobat PDF & Workflow in Detail reference. For this combination of references Dr. Schonfeld's 5D chart states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". This asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5D Chart cited portions of the 443 page Intelligent Offices reference and the 519 page Acrobat PDF & Workflow in Detail reference for combination with Buford among the myriad disparate teachings of the references. Moreover, the 5D Chart cited portions of Intelligent Offices of its Chapters 6, 10, 11, and 12 and associated OCR text recognition, image recognition, and speech recognition excerpts, as well as the 5D Chart cited portions of Acrobat PDF & Workflow in Detail of its Chapters 1 and 2 associated PDF, raster /vector, component file and consolidated file excerpts does not teach or suggest before the parsing step of the '713

Patent Claim 1, the converting of the input item to a standardized format for input to the parser, as required by the '713 Patent Claim 3. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Buford reference.

147.    With respect to the '713 Patent Claim 4, the Buford reference does not disclose the claimed "which includes storing a reconciled object structure in the archive without substantial redundancy". Dr Schonfeld acknowledges this disclosure failure of Buford by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Buford reference combined with the teachings of the '105 patent to Ferrucci and the Acrobat PDF & Workflow in Detail reference. Dr. Schonfeld's 5D chart supplies a stated motivation as to why the combination would be made, namely because the references "all relate to document and graphical data management". Again,  this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references  in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5D Chart cited portions of the '105 Patent to Ferrucci reference and the 519 page reference of Acrobat PDF &

Workflow in Detail for combination with Buford among the myriad disparate teachings of the references. Moreover, the 5D Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5D Chart cited portions of Acrobat PDF & Workflow in Detail and its associated optimized PDF files does not teach or suggest "storing a reconciled object structure in the archive without substantial redundancy", particularly the required "reconciled object structure" of the '713 Patent Claim 4. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Buford reference.

148.    With respect to the '713 Patent Claim 5, the Buford reference does not disclose the claimed "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Dr Schonfeld acknowledges this disclosure failure of Buford by stating that the missing element would be obvious to one of ordinary skill in the art in view of Buford reference combined with the teachings of the '105 Patent to Ferrucci. For this combination of references Dr. Schonfeld's 5D chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one

of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5D Chart cited portions of the '105 Patent to Ferrucci reference for combination with Buford among the myriad disparate teachings of the references. Moreover, the 5D Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5D Chart cited portions of the Buford reference and its associated document consistency among clients during collaboration via an edit object does not teach or suggest the base Claim 1 and 4 limitations, and the Claim 5 further limitations of "selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Buford reference.

149. With respect to the '713 Patent Claim 6, the Buford reference fails to teach the Claim 6 "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]". Dr Schonfeld acknowledges this disclosure failure of Buford by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Buford reference combined with the teachings of the '131 Patent to Kornfeld. For this combination of references Dr. Schonfeld's 5D chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data

management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5D Chart cited portions of the '131 Patent to Kornfeld reference for combination with the Buford reference among the myriad disparate teachings of the references. Moreover, the 5D Chart cited portions of the '131 Patent to Kornfeld and its recognizing and parsing dissimilar data to provide a consistent format output for combination with the Buford reference does not teach or suggest the base Claim 1, 4 and 5 limitations, and the Claim 6 further limitations of "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Buford reference.

150. With respect to the '713 Patent Claim 7, the Buford reference fails to disclose the Claim 7 "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality". Dr Schonfeld acknowledges this disclosure failure of Buford by stating that the missing element would be obvious to one of

ordinary skill in the art in view of the Buford reference combined with the teachings of the '131 Patent to Kornfeld. For this combination of references Dr. Schonfeld's 5D chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5D Chart cited portions of the '131 Patent to Kornfeld reference for combination with the Buford reference among the myriad disparate teachings of the references. Moreover, the 5D Chart cited portions of the '131 Patent to Kornfeld and its recognizing and parsing dissimilar data to provide a consistent format output for combination with the Buford reference does not teach or suggest the base Claim 1, 4, 5 and 6 limitations, and the Claim 7 further limitations of "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Buford reference.

151.    With respect to the '713 Patent Claim 9, the Buford reference does not disclose the claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Dr Schonfeld acknowledges this disclosure failure of Buford by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Buford reference combined with the teachings of the '131 Patent to Kornfeld and the reference of "Personalized & Database Printing" by Broudy and Romano ("Romano-PDP"). For this combination of references Dr. Schonfeld's 5D chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support.  Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5D Chart cited portions of the '131 Patent to Kornfeld reference and the 5D Chart cited portions of Romano-PDP for combination with the Buford reference among the myriad disparate teachings of the references. Moreover, the 5D Chart cited portions of the '131 Patent to Kornfeld and its parsing of record data to provide a consistent format output and the cited portions of the

Romano-PDP reference key trigger of variable text blocks, text boxes, lines, and graphics sets for combination with the Buford reference does not teach or suggest the base Claim 1 limitations, and the Claim 9 further limitations of "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Buford reference.

***Appendix 5E  Invalidity Chart of the '713 Patent over "Personalized & Database Printing," by David Broudy & Frank Romano.***

152.   The "Appendix 5E Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

153.   The Romano-PDP reference is stated to be "The Complete Guide" to "Personalized & Database Printing" and is directed to the "nuts & bolts of customized printing as well as provid[ing] a view for how personalized printing will change business practices around the world through one-to-one marketing." See title page and HP-B00000217.

154.   The Romano-PDP reference does not disclose the '713 Patent claimed "method of archiving an item". The Romano-PDP reference is not synonymous with the claimed "method of archiving an item".

155.   In Dr. Schonfeld's Appendix 5E Chart, the Romano-PDP reference is asserted to disclose

"a method of archiving (sxx) an item (xx) in a computer processing system (xx)." I do not know what the foregoing (sxx), and (xx) references mean in this context. The Romano-PDP page 130 statement that there are three types of databases including an object-oriented database, with data defined in object classifications and subclasses is not synonymous with the claimed "presenting the item to a parser" as part of the claimed method of archiving. In Dr. Schonfeld's Appendix 5E Chart, the Romano-PDP reference is asserted to disclose "presenting the item (xxx) to a program that dissects and converts source code (txx) into object code (xx). The Romano-PDP discloses the Patent Files consist of xx." I do not know what the foregoing (xxx), (txx), (xx), "the Patent Files" and xx references mean in this context. I do know that the Romano-PDP chart cited page 140-141 and 172 references to imported records or plain text files used to generate a personalized page, even with the use of a condition rule, is not the '713 Patent Claim 1 "presenting an item to a parser".

156.    Dr. Schonfeld's Appendix 5E Chart states: "In particular, the '679 Patent discloses using a program that dissects and converts source code (txxs) into object code (xxs) to dissect and convert the item (xx) into a plurality of multi-part object structures (xxs) wherein portions of the structures have searchable information tags (xx) associated therewith." The Appendix 5E Chart then references material from Romano-PDP 138-141. I do not know what the foregoing (txxs), (xxs), (xx), (xxs), and (xx) references mean. I do not know why the reference to a "the 679 Patent" is stated in this context concerning Romano-PDP. I do know that the subsequently cited excerpts to Romano-PDP pages 138-141 concerning Filemaker Pro field data, such as First Name, Last Name, SS Number, Date of Birth, Street, City, and State text for printing do not disclose the '713 Patent Claim 1 "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith".

157.    Dr. Schonfeld's Appendix 5E Chart ostensibly of the Romano PDF reference next states: "In particular, the '679 Patent discloses analyzing (xx) in the multi-part object structures (xx) obtained by parsing, and comparing the elements (xx) with the corresponding elements in the same object structure (xx) to determine if there is a variance between the object and at least one of a predetermined standard and a user defined rule (xx). To the extent Plaintiff contends that this step is not disclosed in the '679 Patent, it would have been obvious to one of ordinary skill in the art to use the disclosure of the '679 Patent to compare the multipart object structures (xx) with object structures previously stored in the archive (xx). A person with skill in the art would have been motivated to compare the Patent Files and/or Equivalent Files with previously stored Patent files and/or Equivalent Files in order to avoid storing multiple copies of the same patent."   I do not know what the foregoing  (xx), "the Patent Files and/or Equivalent Files", " with previously stored Patent files and/or Equivalent Files in order to avoid storing multiple copies of the same patent"  mean in this context. I do know that the subsequently cited excerpts to Romano-PDP pages 50, 153, and 184 concerning mail list merge/purge deletion of duplicate names and addresses and the general statement "Clean up and organize the data for consistency and corrections: or removal of duplicate records do not disclose the '713 Patent Claim 1 " "evaluating the object structures in accordance with object structures previously stored in an archive"" and "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule."

158.    To the extent there is an attempt to combine the Romano-PDP with a "679 Patent based on the motivation to "avoid storing multiple copies of the same patent" , there is no facts of how the combination is asserted. Also the proposed motivational desirable goal to avoid storing

multiple copies is too general and fails to provide an "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

159.    Dr. Schonfeld's Appendix 5E Chart further states: "Romano-PDP discloses presenting an evaluated object structure (xxx) for manual reconciliation (xx) at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule (xx)." I do not know what the foregoing (xxx), (xx) references mean in this context. I do know that the subsequently cited excerpts to Romano-PDP pages 204, 191, 153,172, and 181 concerning profile creation, addition of new fields, data finalization, programs for data management rules, and conditional placement of text or images do not disclose the '713 Patent Claim 1 "presenting an evaluated object structure for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule."

160.    The Romano-PDP reference does not disclose the elements and limitations of the '713 Patent Claim 1 and hence do not disclose the asserted method Claims 2 to 7 and 9 dependent thereon. The Romano-PDP reference does not disclose a conversion of source code into a "plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". The Romano-PDP reference does not disclose the claimed "evaluating the object structures in accordance with object structures previously stored in an archive", particularly the object structures resultant from the parsing into "a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith". The Romano-PDP reference does disclose the '713 Patent Claim 1 step of "presenting an evaluated object structure for manual reconciliation at least where there is a

predetermined variance between the object and at least one of a predetermined standard and a user defined rule."

161.    With respect to the '713 Patent Claim 2, the Romano-PDP reference does not disclose the claimed "wherein the respective structure can be manually edited after being presented for reconciliation". Dr. Schonfeld's Appendix 5E Chart cited excerpts to Romano-PDP pages 204, 191, 153, 172, and 181 concerning manual profile creation or redefinition if a field name is missing, workflow to layout print, data finalization, and variability do not disclose the '713 Patent Claim 2"wherein the respective structure can be manually edited after being presented for reconciliation".

162.    With respect to the '713 Patent Claim 3, the Romano-PDP reference does not disclose the claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser". Dr Schonfeld's Appendix 5E Chart acknowledges "Romano-PDP does not describe, before the parsing step, converting an input item to a standardized format for input to the parser." I agree there is no such disclosure in the following cited excerpts of Romano-PDP pages 130, 140-141, and 172 concerning import records, types of databases, including an object-oriented database, and imported records or plain text files used to generate a personalized page, even with the use of a condition rule. The citations are not synonymous with the claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser".

163.    With respect to the '713 Patent Claim 4, the Romano-PDP reference does not disclose the claimed "which includes storing a reconciled object structure in the archive without substantial redundancy". Dr. Schonfeld's Appendix 5E Chart acknowledges "Romano-PDP does not describe includes storing a reconciled object structure in the archive without substantial

redundancy". I agree there is no such disclosure in the following cited excerpts of Romano-PDP pages 130, 140-141, and 172. The citations are not synonymous with the claimed "which includes storing a reconciled object structure in the archive without substantial redundancy".

164.    With respect to the '713 Patent Claim 5, the Romano-PDP reference does not disclose the claimed "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items." Moreover, the 5E Chart cited reference to Romano-PDP page 130 does not teach or suggest the base Claim 1 and 4 limitations, and the Claim 5 further limitations of "selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items".

165.    With respect to the '713 Patent Claim 6, the Romano-PDP does not disclose the claimed "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]". Moreover, the 5E Chart cited reference to Romano-PDP page 130 does not teach or suggest the base Claim 1, 4, and 5 limitations and the Claim 6  "wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal [format]".

166.    With respect to the '713 Patent Claim 7, the Romano-PDP does not disclose the claimed "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality." Moreover, the 5E Chart cited reference to Romano-PDP page 130 does not teach or suggest the base Claim 1, 4,  5, and 6 limitations and the Claim 7 "which includes compiling a plurality of items wherein the at least one object-type

structure had been linked in the archive to members of the plurality."

167.    With respect to the '713 Patent Claim 9, the Romano-PDP does not disclose the claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values." Moreover, the 5E Chart cited reference to Romano-PDP page 130 does not teach or suggest the base Claim 1 and the Claim 9 "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values."

***Appendix 5F Invalidity Chart of the '713 Patent over the Exstream Learning Guide, Release 1.0 and the Exstream version 1 demo software.***

168.    The "Appendix 5F Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

169.    Dr. Schonfeld's Report at paragraph 98 states:

> "The "Exstream Learning Guide, Release 1.0  was a product in public use or on sale in this country at least as early as September 1, 1999.   Accordingly, I understand the Exstream Learning Guide qualifies as prior art under at least 35 USC § 102(b)."

Dr. Schonfeld's Report at Appendix 5F states:

> "In this chart, reference is made to "Exstream Learning Guide," Release 1.0 dated September 1, 1999 ("Exstream Learning Guide") (prod. nos. HP-B00013254 - HP-B00014064) (hereinafter "Exstream Learning Guide"), as well as the corresponding

Exstream version 1 *demo software*. Although not explicitly contained in this chart, the corresponding Extreme version 1 source code could also be used to confirm the functionality and features described and illustrated herein applying the same analysis. … the Exstream Learning Guide qualifies as prior art to U.S. Patent No. 7,447,713 ("the '713 patent") under at least 35 U.S.C. § 102(b) and § 103 and invalidates and renders obvious the claims of the '713 patent, including but not limited to claims 1-7 and 9 of the '713 patent *because it was released on September 1, 1999. (to be sure we use the primary reference and only use the true {sic} eecondary that we don't use for claim 1 where it can be a backup.)*"  (italic print emphasis added)

170.    The foregoing is insufficient to establish the Exstream Learning Guide reference as a prior art reference to '713 Patent as being in public use or on sale or a printed publication under 35 U.S.C. § 102(b).

171.    Local Patent Rule 3.1 requires "Final Unenforceability and Invalidity Contentions" to contain the information required by LPR 2.3 (b) and (c).

172.    Local Patent Rule 2.3 (b) state that Invalidity Contentions must contain the following information to the extent then known to the party asserting invalidity: "(1) identification, with particularity, of each item of prior art that allegedly anticipates each asserted claim or renders it obvious. Each prior art patent shall be identified by its number, country of origin, and date of issue. Each prior art publication must be identified by its title, date of publication, and where feasible, author and publisher. Prior art under 35 U.S.C. § 102(b) shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information

known or to whom it was made known. Prior art under 35 U.S.C. § 102(f) shall be identified by providing the name of the person(s) from whom and the circumstances under which the invention or any part of it was derived. Prior art under 35 U.S.C. § 102(g) shall be identified by providing the identities of the person(s) or entities involved in and the circumstances surrounding the making of the invention before the patent applicant(s).

173.    I understand that the HP Final Unenforceability and Invalidity Contentions pursuant to Local Patent Rule 3.1 dated April 17, 2014 has not specified for prior art under 35 U.S.C. § 102(b) "the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known."

174.    I understand that the HP Final Unenforceability and Invalidity Contentions pursuant to Local Patent Rule 3.1 dated April 17, 2014 has not specified for prior art under 35 U.S.C. § 102(g) the "identities of the person(s) or entities involved in and the circumstances surrounding the making of the invention before the patent applicant(s)"

175.    I understand that HP has produced a Software Development And Licensing Agreement No. 70000205 signed April 7, 2000 by Exstream Software and signed April 24, 2000 by FMR Corporation ("Fidelity") as HP-B00003350 to HP-B00003366. The Agreement at paragraph 4 a. thereof states:

> "Fidelity shall have no obligation to order any Product or Service by virtue of this Agreement alone. Whenever Fidelity does order products hereunder Fidelity shall issue written or electronically transmitted orders ("Order") to Supplier referencing this Agreement and the applicable Project Addendum Form. No Product or Service shall be

delivered prior to receipt of such Order by Supplier."

The foregoing Exstream Software / Fidelity Agreement does not explicitly reference the Exstream Learning Guide Release 1.0 or any related Exstream Version 1 software. I understand HP has not produced any "Project Addendum Form" relative the foregoing Exstream Software / Fidelity Agreement.

176.    The foregoing Exstream Software / Fidelity Agreement does not set forth facts and circumstances that the Exstream Learning Guide was in public use or on sale in the United States more than one year prior to the date of the application for the '713 Patent.

177.    There is no disclosure as required by LPR 3.1 of the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.

178.    To the extent Dr. Schonfeld's Invalidity Report contentions based upon the Exstream Learning Guide relies upon the same being a 35 USC § 102(b) printed publication, there is a threshold infirmity: the Exstream Learning Guide reference is not a printed publication under 35 U.S.C. § 102(b). Dr. Schonfeld does not explain why the Exstream Learning Guide reference is a qualified printed publication under 35 U.S.C. § 102(b).


179.    I understand that whether a document constitutes a printed publication under 35 U.S.C.§ 102 is a question of law based upon the underlying facts of each particular case. *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1332-33 (Fed. Cir. 2009).

180.    I understand that the statutory phrase "printed publication" has been interpreted to mean that "before the critical date the reference must have been sufficiently accessible to the public

interested in the art; dissemination and public accessibility are the keys to the legal determination of whether the prior art reference was "published." *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir.1989); see also *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (explaining that public accessibility is the "touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)"). The critical date is defined as the date one year prior to the filing date of the patent application. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1568 (Fed. Cir. 1988).

181. I understand that "Whether a reference is publicly accessible is determined on a case-by-case basis based on the 'facts and circumstances surrounding the reference's disclosure to members of the public.' " *In re Lister*, 583 F.3d 1307, 1311 (Fed.Cir.2009) (quoting *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed.Cir.2004)). Public accessibility is a legal conclusion based on underlying factual determinations. *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002)

182. I understand that "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374,1378 (Fed. Cir. 2006). *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (internal citation and quotation marks omitted). There is no factual showing in Dr. Schonfeld's Report that the Exstream Learning Guide reference was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence can locate it." *Kyocera*, 545 F.3d at 1350. Dr. Schonfeld does not provide sufficient factual support of the public availability of the Exstream Learning Guide reference.

183.    Dr. Schonfeld assumes the Exstream Learning Guide reference was publicly accessible and known to those of skill in the relevant field because it "was released" on September 1, 1999. Yet "released" does not equate to "published" or being a "printed publication". A 35 U.S.C. § 102(b) printed publication must be sufficiently assessable to the public interested in the art - actually published in such a manner that the members of the public who are likely to be concerned with and interested in the field of art to which the printed publication relates can locate it and avail oneself of the information it contains.

184.    To exacerbate the lack of public accessibility of the Exstream Learning Guide reference, it is evident a private company's alleged "release" of information may well be under conditions of confidentiality, particularly with respect to licensed software or beta "demonstration" software, and fail to provide precise directions to the public interested in the art to find it or reveal pre-knowledge of the information's available content one might expect to find in the reference.

185.    The preliminary need for precise knowledge of the existence of and of direction to locate the Exstream Learning Guide reference defeats the "public accessibility" requirement for a statutory "printed publication".  See, *SRI international, Inc. v. Internet Security Systems, Inc.*, 511 F3d 186, 1196-97 (Fed. Cir. 2008).


186.    The asserted content of the Exstream Learning Guide reference has not been shown to be catalogued or indexed in a meaningful way linking information available there to the interested public seeking it exercising due diligence.

187.    A publication must be (1) a work of public character, intended for general use; (2) within reach of the public. See, 1 W. Robinson, The Law of Patents for Useful Inventions, §§ 325-27

(1890). Private communications or e-mail exchanges, although printed, are not statutory "printed publications". A printed publication must be sufficiently assessable to the public interested in the art - actually published in such a manner that the members of the public who are likely to be concerned with and interested in the field of art to which the printed publication relates can locate it and avail oneself of the information it contains.

188.    The Exstream Learning Guide reference is not a "printed publication" available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it.

189.    Dr. Schonfeld's Report at Appendix 5F reference the "Exstream Learning Guide," Release 1.0 dated September 1, 1999 "as well as the corresponding Exstream version 1 demo software".

190.    I understand that HP has produced the Exstream Version 1.01.200 software (HP-B00013253 and the Exstream Version 1.60.000 software (HP-B00011060) and their related components (e.g., help files included with the installation software).

191.    The native .exe application files thereof installed on a Windows system includes Readme.txt, Exstream Release Notes, enhancement notes, and contains references to Exstream DEMO Version 1.01.200 and other demonstration notices. For example, the User Login screen for Dialogue TM  Version 1.60.000 states, in part:

"Version 1.60.000

Copyright (C) 1998,1999, 2000 Exstream Software Inc.

DEMONSTRATION ONLY:  This software is to be used for demonstration purposes only. Unauthorized or production use of this product is prohibited and is a violation of law."

(see screenshot 1 at Exhibit 2.)

192.    A screen shot for the Exstream DEMO Version 1.00.700 includes the statement:

"This system is a standalone version of the Exstream System for use by authorized dealers to learn the system and demo it to the respective clients.

xxxxx Do NOT distribute to end users or prospective clients xxxxx

Please e-mail any bugs/enhancement requests to beta@exstream.com

Read the "README" file. It includes

- Getting started information / Initial user login IDs

- Demo limitations

Read the "Exstream Release Notes" file for enhancements and bug fixes"

(see screenshot 2 at Exhibit 2.)

193.    A screenshot for the User Login for "Exstream Version 1.01.200 Demonstration" references "Licensed To DEMO" and includes the statement: "WARNING: The system will expire in less than two months and will not be usable." (see screenshot 3 at Exhibit 2)

194.    "Beta software" refers to computer software that is undergoing testing and has not yet been officially released. The beta phase follows the alpha phase, but precedes the final version. Some beta software is only made available to a select number of users or under conditions of confidentiality.


195.    Some software developers release beta versions of software in order to garner useful feedback before releasing the final version of a program. A software developer might release multiple "beta" versions of a program during the beta phase. Each version includes updates and bug fixes that have been made in response to user feedback. Since beta software is a pre-release version of the final application, it may be unstable or lack features that will be included in the

final release.

196. The "Appendix 5F Invalidity Chart" referenced in Dr. Schonfeld's Report does not disclose the claimed "methods" of the asserted '713 patent claims 1 to 7 and 9 because the asserted excerpts / art citations therein, singularly or as combined, are not identical to the claim elements and limitations of the claims 1 to 7 and 9 and do not disclose every element or limitation of the claim arranged or combined in the same way as in the claims.

197. The Exstream Learning Guide reference does not disclose the '713 Patent Claim 1 claimed "parsing the item into a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith".

198. Dr. Schonfeld states at Appendix 5F p. 8:

"…the Exstream Learning Guide discloses presenting the item (documents, messages and campaigns) to a program that dissects and converts source code (documents, messages and campaigns) into object code (objects and/or template elements including, for example, text, images, graphics, and tables). To the extent that Berkheimer contends that the parser is not expressly disclosed, a person of ordinary skill in the art would understand that the HP Exstream Learning Guide necessarily discloses presenting documents, messages, and campaigns to a parser to be converted into objects and/or template elements including, for example, text, images, graphics, and tables, when the documents, messages, and campaigns are imported into the system disclosed by the Exstream Learning Guide."

199. It is difficult to respond specifically to Dr. Schonfeld's above statement as to what one of ordinary skill in the art would understand as he appears to substitute his knowledge in hindsight and provides no factual support for the statement. I do not find his unsupported conclusions

about what one of ordinary skill in the art would know to be factually supportable.

200.     The Schonfeld Appendix Chart 5F at p. 8 states:

"Importing Images - Additional Information

When an image is imported into Designer, it is converted into a bitmap. Resolution will be optimized for Designer's use.

Designer can import OLE compliant objects. Designer supports ActiveX technology and objects."

201.     Dr. Schonfeld gives examples of importing a Rich Text Format (*.rtf) Text file by first creating a text box in Designer. Another example is that of importing an Image bitmap file.

202.     The former example of importation of a RTF Text file is consistent with the Exstream Version 1 software. A reference to importing an object in the Exstream version 1 demo software executables is the following string found in the "Exstream.exe" and Designer.exe" binaries (v1.0):

"You can import text from WORD and other word-processing programs into a text box using the IMPORT button. These files must be saved in RTF format."

203.     The "into" in the above phrase "into a text box" is a placement into a place and it does not teach to one of ordinary skill in the art at the time of the '713 patent a "becoming" or a transformation. The RTF text imported is an embedment into a place and it, the RTF text, remains essentially intact as it was before.

204.     Objects in the Exstream Learning Guide include, for example, applications, campaigns, messages, pages, documents, frames, templates, tables and graphics. [HP-B00013353] the Data Dictionary, and Environment information. To search for an object in a library, one selects the library heading of the type of objects for which you want to search and a search can be made for

an item therein based on an item description or create date. [HP-B00013292]

205.    In contradistinction, in the '713 Patent Claim 1 an item is parsed into, i.e. becomes, a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith. In the '713 Patent Claim 1, the item is parsed and becomes something it was not before, namely it is transformed into the plurality of multi-part object structures with searchable information tags as defined by the Claim.

206.    The RTF Text file imported into a text box is the whole text content RFT file, not a plurality of parsed multi-part object structures wherein portions thereof have searchable information tags. The RTF Text file remains essentially intact and is not markup language to get objects. During the importation nothing new is created. In contradistinction, Claim 1 creates a plurality of multi-part object structures wherein portions of the object structures have searchable information tags. In the Exstream Learning Guide and its version 1 software the imported RTF Text file is not a new object structure.

207.    If one has a Message object first and then embeds the RTF into it, the RTF Text file would just populate the existing messages attributes and the result is not a new object.

208.    Dr. Schonfeld states at Appendix 5F p. 17:

"...the Exstream Learning Guide discloses using a program that dissects and converts source code (documents, messages and campaigns) into object code (objects and/or template elements including, for example, text, images, graphics, and tables) to dissect and convert the item (documents, messages and campaigns) into a plurality of multi-part object structures (objects and/or template elements including, for example, text, images, graphics, and tables) wherein portions of the structures have searchable information tags (item properties, such as description or create date) associated therewith. To the extent

that Berkheimer contends that the parser is not expressly disclosed, a person of ordinary skill in the art would understand that the HP Exstream Learning Guide necessarily discloses parsing documents, messages, and campaigns into objects and/or template elements including, for example, text, images, graphics, and tables, when the documents, messages, and campaigns are imported into the system disclosed by the Exstream Learning Guide."

209.    Again, it is difficult to respond specifically to Dr. Schonfeld's above statement as to what one of ordinary skill in the art would understand as he appears to substitute his knowledge in hindsight and provides no factual support for the statement. I do not find his unsupported conclusions about what one of ordinary skill in the art would know to be factually supportable.

210.    The ability to import a RTF Text file or Image in the Exstream Learning Guide and its version 1 software is not a parsing of an item resultant in a multi-part object. Also the Message object has to exist first before one can import the RTF Text file or Image into it. This is not a parsing into a plurality of multi-part object structures. The single "imported item" is a single object, not a plurality of multi-part object structures.

211.    The "objects" in the Exstream Learning Guide and its version 1 software cited by Dr. Schonfeld are not a design object because they are not a separate creation. There is no conversion or transformation. For example, an RTF text file in a text box is still essentially what it was before and Exstream version 1 software uses a standard text editor interpreter for editing of the same.

212.    As Dr. Schonfeld notes one can add a "description" or "create date" for such objects in the Design Manager that is searchable. Yet the same is not the "713 Patent Claim 1 defined parsed plurality of multi-part object structures wherein portions of such structures have

searchable information tags associated therewith.

213.    The "objects" in the Exstream Learning Guide and its version 1 software have a "description" or "create date" added to them, but the objects themselves are not parsed as in Claim 1 and do not follow the convention of object code. Moreover, the search capability of the Exstream Learning Guide and its version 1 software is only for message content and does not involve portions of the plurality of multi-part object structures resulted from Claim 1's parsing step.

214.    Dr. Schonfeld states at Appendix 5F p. 22:

"...the Exstream Learning Guide discloses evaluating the object structures in accordance with object structures previously stored in an archive; i.e. analyzing the plurality of multi-part object structures obtained by parsing and comparing it with object structures previously stored in the archive to determine if there is variance between the object and at least one of a predetermined standard and a user defined rule."

215.    Dr. Schonfeld states at Appendix 5F p. 23:

"...the Exstream Learning Guide discloses analyzing (version control) the plurality of multi-part object structures (objects and/or template elements including, for example, text, images, graphics, and tables) obtained by parsing and comparing it with object structures (objects and/or template elements including, for example, text, images, graphics, and tables) previously stored in the archive (stored in an ODBC-compliant database) to determine if there is variance between the object (objects and/or template elements including, for example, text, images, graphics, and tables) and at least one of a predetermined standard and a user defined rule (meets with the administrators criteria for approval, including, for example, number of versions to keep and/or adheres to assigned

rules). To the extent that Berkheimer contends that the evaluating step is not expressly disclosed, a person of ordinary skill in the art could use the disclosures in the HP Exstream Learning Guide to evaluate objects and/or template elements including, for example, text, images, graphics, and tables, to determine whether the objects and/or template elements including, for example, text, images, graphics, and tables meets certain criteria with respect to previously stored objects and/or template elements including, for example, text, images, graphics, and tables. A person of skill in the art would have been motivated to compare the objects and/or template elements including, for example, text, images, graphics, and tables with previously stored objects and/or template elements including, for example, text, images, graphics, and tables in order to avoid storing multiple copies of the same objects and/or template elements including, for example, text, images, graphics, and tables."

216. Again, it is difficult to respond specifically to Dr. Schonfeld's above statement as to what one of ordinary skill in the art would understand or use from the disclosures in the HP Exstream Learning Guide to evaluate objects and/or template elements, as he appears to substitute his knowledge in hindsight and provides no factual support for the statement. I do not find his unsupported conclusions about what one of ordinary skill in the art would know or use to be factually supportable.

217. Further, the asserted "motivation to compare" is far too general, has no factual explanation or support, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

218. Dr. Schonfeld also states at Appendix 5F at p. 33:

"...the Exstream Learning Guide discloses presenting an evaluated object structure (objects and/or template elements including, for example, text, images, graphics, and tables) for manual reconciliation (content editing) at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule (meets with the administrators criteria for approval, including, for example, number of versions to keep and/or adheres to assigned rules)."

219. The Exstream Learning Guide "version control" is asserted as the evaluation analyzing and comparing of Claim 1's "the plurality of multi-part object structures" resultant from the parsing step with "object structures" previously stored in an archive, but as previously noted the "objects" of the Exstream Learning Guide and its version 1 software are not a parsed "plurality of multi-part object structures". Rather they are embedded objects imported into a place which remain essentially intact as they were before without transformation. Such "objects" are not parsed into and do not becomes a plurality of multi-part object structures wherein portions of the structures have searchable information tags associated therewith.

220. Further, with respect to the Exstream Learning Guide reference, the "objects" that are analyzed and compared to previously stored "objects" are not the evaluation called for in the '713 Patent Claim 1. Such "objects" are not a parsed "plurality of multi-part object structures".

221. In the '713 Patent Claim 1 "the plurality of multi-part object structures" obtained by parsing is evaluated with "object structures" previously stored in the archive and such an evaluated "object structure" is presented for manual reconciliation at least where there is a predetermined variance between the object and at least one of a predetermined standard and a user defined rule.

222. Further, the determination of any variance between the Exstream Learning Guide objects (objects and/or template elements including, for example, text, images, graphics, and tables) and at least one of predetermined standard and a user defined rule is stated by Dr. Schonfeld to be a mere meeting "with the administrators criteria for approval, including, for example, number of versions to keep and/or adheres to assigned rules".

223. Still further, use of the Edit Panel of the Exstream Learning Guide and its version 1 software for editing the contents of applications, campaigns, and documents, and for editing graphics as cited by Dr. Schonfeld at Appendix 5F p. 34 references editing of content, not a presenting for manual reconciliation of an evaluated object structure as called for in the '713 Patent Claim 1.

224. For example, when a "campaign" is dragged onto the Edit Panel, "all the messages included in that campaign are displayed" and the "list of objects will be the same that appears under the campaign in the tree." One "can add message, delete messages; and change the order of messages" from the Edit Panel. Such a display for editing of composite content is not the presenting of an evaluated object structure for manual reconciliation defined in the '713 Patent Claim 1.

225. With respect to the '713 Patent Claim 2, the Exstream Learning Guide does not describe a system that has a "respective structure" that can be manually edited after being presented for reconciliation. The editing of contents of a message object is not the same as editing its structure. Composite text editing is not the same as object code editing.

226. With respect to the '713 Patent Claim 3, there are no converters in the Exstream Learning Guide.

227. Yet Dr. Schonfeld asserts at Appendix 5F p. 38-39:

"Specifically, Exstream Learning Guide when combined with the Intelligent Offices publication and Acrobat PDF & Workflow In Detail publication disclose and makes obvious the combination of the references to the method as in claim 1 which includes, before the parsing step, converting an input item to a standardized format for input to the parser. A person of ordinary skill in the art would have been generally motivated to combine these references because they all relate to document and graphical data management."

228.    With respect to the '713 Patent Claim 3, the Exstream Learning Guide reference does not disclose the claimed "which includes, before the parsing step, converting an input item to a standardized format for input to the parser". Dr Schonfeld acknowledges this disclosure failure of the Exstream Learning Guide reference by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Exstream Learning Guide reference combined with the teachings of the 443 page *Intelligent Offices* reference and the 519 page *Acrobat PDF & Workflow In Detail* reference. For this combination of references Dr. Schonfeld's 5F chart states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". This asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.  In effect, the statement of obviousness made by Dr. Schonfeld is a mere

conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5F Chart cited portions in the *Intelligent Offices* reference (Chapters 6, 10, 11 and 12) and the citations of *Acrobat PDF & Workflow In Detail* (Chapters 1 and 2) for combination with the Exstream Learning Guide reference among the myriad disparate teachings of the references. Moreover, the 5F Chart cited portions of *Intelligent Offices* (pages 135-136) and the 5F Chart cited portions of *Acrobat PDF & Workflow In Detail* (pages 37-40 and 2-4) do not teach or suggest before the parsing step of the '713 Patent Claim 1, the converting of the input item to a standardized format for input to the parser, as required by the '713 Patent Claim 3. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Exstream Learning Guide reference.

229. Also with respect to Claim 3, Dr. Schonfeld cites to OCR text recognition wherein some form of proofreading is necessary to check the results of OCR. The technology for recognizing objects in a picture is admitted as not as abundant as for text recognition. The initial task of converting a picture to a shaded line drawing is called raster-to-vector (R-V) conversion. The composition of highly structured PDF files is also cited.

230. Yet it is admitted that in the Exstream Learning Guide an image is imported as a conversion into a bitmap. [Schonfeld Appendix Chart 5F at p. 8]

231. After a user creates a new Message object they can drag and drop the message to create a Document object that will include the message by embedding the message into it. The Exstream Learning Guide supports object linking and embedment but not parsing of source code into object code to create a plurality of multi-part object structures wherein portions of the structures

have searchable information tags associated therewith.

232. With respect to the '713 Patent Claim 4, Dr. Schonfeld asserts at Appendix 5F p. 48:

"Specifically, the Exstream Learning Guide when combined with the '105 Patent and Acrobat & Workflow In Detail publication disclose and makes obvious the combination of the references to the method of claim 1 which includes storing a reconciled object structure in the archive without substantial redundancy. A person of ordinary skill in the art would have been generally motivated to combine these references because they all relate to document and graphical data management."

233. With respect to the '713 Patent Claim 4, the Exstream Learning Guide reference does not disclose the claimed "which includes storing a reconciled object structure in the archive without substantial redundancy". Dr Schonfeld acknowledges this disclosure failure of the Exstream Learning Guide reference by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Exstream Learning Guide combined with the teachings of the '105 patent to Ferrucci and the Acrobat PDF & Workflow in Detail reference. Dr. Schonfeld's 5F chart supplies a stated motivation as to why the combination would be made, namely because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of

obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5F Chart cited portions of the '105 Patent to Ferrucci reference and the 519 page reference of Acrobat PDF & Workflow in Detail for combination with the Exstream Learning Guide among the myriad disparate teachings of the references. Moreover, the 5F Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation, as well as the 5F Chart cited portions of Acrobat PDF & Workflow in Detail and its associated optimized PDF files does not teach or suggest "storing a reconciled object structure in the archive without substantial redundancy", particularly the required "reconciled object structure" of the '713 Patent Claim 4. Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Exstream Learning Guide reference.

234.    With respect to the '713 Patent Claim 5, Dr. Schonfeld asserts at Appendix 5F p. 57-58:

"Specifically, the Exstream Learning Guide , when combined with the '105 Patent and Buford disclose and makes obvious the combination of the references to the method of claim 4, which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items. A person of ordinary skill in the art would have been generally motivated to combine these references because they all relate to document and graphical data management."

235.    With respect to the '713 Patent Claim 5, the Exstream Learning Guide reference does not disclose the claimed "which includes selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Dr Schonfeld

acknowledges this disclosure failure of the Exstream Learning Guide reference by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Exstream Learning Guide reference combined with the teachings of the '105 Patent to Ferrucci and the Buford reference. For this combination of references Dr. Schonfeld's 5F chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5F Chart cited portions of the '105 Patent to Ferrucci and the 5F Chart cited portions of the Buford reference for combination with Ferrucci among the myriad disparate teachings of the references. Moreover, the 5F Chart cited portions of the '105 Patent to Ferrucci and its variable reconciliation and the 5F Chart cited portions of Buford reference and its collaborative multiple client computers edit object of a document stored as a CT instance object does not teach or suggest the base Claim 1 and 4 limitations, and the Claim 5 further limitations of "selectively editing an object structure, linked to other structures to thereby effect a one-to-many change in a plurality of archived items". Further, if the combination of references were made, the same

would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Exstream Learning Guide reference.

236.     With respect to Claim 6 of the '713 Patent, Dr. Schonfeld asserts at Appendix 5F p. 65-66:

> "Specifically, the Exstream Learning Guide, when combined with the '131 Patent disclose and makes obvious the combination of the references of compiling an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file formal. A person of ordinary skill in the art would have been generally motivated to combine these references because they all relate to document and graphical data management."

237.     With respect to the '713 Patent Claim 6, the Exstream Learning Guide reference does not disclose the claimed "which includes compiling an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file [format]". Dr Schonfeld acknowledges this disclosure failure of the Exstream Learning Guide reference by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Exstream Learning Guide reference combined with the teachings of the '131 Patent to Kornfeld reference. For this combination of references Dr. Schonfeld's 5F chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field

of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5F Chart cited portions of the Kornfeld reference for combination with the Exstream Learning Guide reference among the myriad disparate teachings of the references. Moreover, the 5F Chart cited portions of the Kornfeld reference and its "method for rendering a consistent format output for record data" and the cited portions of the Exstream Learning Guide reference does not teach or suggest the base Claim 1, 4, and 5 limitations, and the does not teach the Claim 6 limitations "which includes compiling an item to be output from the archive, wherein at least one object-type structure of the item has been edited during the one-to-many change and wherein the compiled item includes a plurality of linked object-type structures converted into a predetermined output file [format]". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Exstream Learning Guide reference.

238. Dr. Schonfeld asserts at Appendix 5F p. 70:

"Specifically, the Exstream Learning Guide, when combined with the '131 Patent disclose and makes obvious the combination of the references of the method of claim 6,

which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality. A person of ordinary skill in the art would have been generally motivated to combine these references because they all relate to document and graphical data management."

239.    With respect to the '713 Patent Claim 7, the Exstream Learning Guide reference does not disclose the claimed method "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality." Dr Schonfeld acknowledges this disclosure failure of the Exstream Learning Guide reference by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Exstream Learning Guide reference combined with the teachings of the '131 Patent to Kornfeld reference. For this combination of references Dr. Schonfeld's 5F chart again states that the motivation as to why the combination would be made is because the references "all relate to document and graphical data management". Again, this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make.  In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support.  Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5F Chart cited portions of the Kornfeld reference for combination with the Exstream Learning

Guide reference among the myriad disparate teachings of the references. Moreover, the 5F Chart cited portions of the Kornfeld reference and its "method for rendering a consistent format output for record data" and the cited portions of the Exstream Learning Guide reference does not teach or suggest the base Claim 1, 4, 5, and 6 limitations, and the does not teach the Claim 7 limitations "which includes compiling a plurality of items wherein the at least one object-type structure had been linked in the archive to members of the plurality". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Exstream Learning Guide reference.

240.  With respect to the '713 Patent Claim 9, Dr. Schonfeld asserts at Appendix 5F p. 74:

"Specifically, the combination of the Exstream Learning Guide, the 131 patent, and the Personalized & Database Printing publication disclose and makes obvious the method of claim 1, which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values. A person of ordinary skill in the art would have been generally motivated to combine these references because they all relate to document and graphical data management."

241.  With respect to the '713 Patent Claim 9, the Exstream Learning Guide reference does not disclose the "method as in claim 1 which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Dr Schonfeld acknowledges this disclosure failure of Ferrucci by stating that the missing element would be obvious to one of ordinary skill in the art in view of the Exstream Learning Guide reference combined with the

teachings of the Kornfeld reference and the *Personalized and Database Printing* reference. In this regard, Dr. Schonfeld's 5F chart again supplies a stated motivation as to why the combination would be made, namely because the references "all relate to document and graphical data management". I restate that this asserted motivation is far too general, virtually all encompassing of every reference in the field of document and graphical data management despite myriad disparate teachings of the same, and lacks "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" as per *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The offered motivation would encompass every possible combination of thousands or tens of thousands, if not more, references in the general field of endeavor so as to be well beyond the abilities of one of ordinary skill in the art to comprehend or make. In effect, the statement of obviousness made by Dr. Schonfeld is a mere conclusion without support. Also the lack of articulated reasoning with rational underpinning fails to explain why one of ordinary skill in the art would selectively isolate, pick and choose the 5F Chart cited portions of the Kornfeld reference and the 308 page *Personalized and Database Printing* reference for combination with the Exstream Learning Guide among the myriad disparate teachings of the references. Moreover, the 5FChart cited portions of the Kornfeld reference and *Personalized and Database Printing* reference does not teach or suggest the base Claim 1 and Claim 9's claimed "which includes forming object oriented data structures from the parsed items wherein the data structures include at least some of item properties, item property values, element properties and element property values". Further, if the combination of references were made, the same would not re-create every element or limitation of the claim arranged or combined in the same way as in the subject '713 Patent claim for the reasons stated with respect to the Exstream Learning Guide reference.

## IX.   Other Analysis

### A.   Enablement and/or Written Description under 35 U.S.C. § 112, ¶ 1

242.    The Report of Dr. Schonfeld at paragraphs 216 to 224 sets forth certain assumptions and conclusions purporting to pertain to a lack of enablement and/or written description under 35 U.S.C. § 112. Dr. Schonfeld's arguments are not specifically detail or developed and rest upon a blanket conclusion without analysis that the '713 Patent does not have sufficient written description or enabling disclosure in the specification to support certain claim terms. I disagree and state that the block, functional, and flow diagrams of Figures 2A, 2B, 2C, 2D, 3, 4, 5A and 5B and their corresponding '713 Patent specification descriptions and examples of Columns 19 to 48 of the '713 Patent amply provides detailed description and disclosure supporting the asserted '713 Patent method claims.

243.    Dr. Schonfeld asserts that the claim language "without substantial redundancy" is indefinite for the same reasons that the term "minimal redundancy" was found indefinite in the court's *Markman* ruling in this litigation.  I disagree.  The terms are not the same and the claim context for each are different. Use of the term "substantial" has found acceptance in many patents and is ubiquitous in patent claims. Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts. The PTO allowed usage of the '713 Patent Claim 4 claim language "without substantial redundancy" upon a traversal by applicant. Moreover, there is an objective measure for judging the phrase "without substantial redundancy" in Claim 4 because the claim references "storing a reconciled object structure in the archive without substantial redundancy", thus the *archive* storage of a reconciled object structure provides the objective measure to judge "without

substantial redundancy".

244.   An infirmity in the court's *Markman* ruling relative the term "minimal redundancy" is the court's statement that the scope of the term is of subjective measure. To the contrary, the context of the term "minimal redundancy" in Claim 10 to one of ordinary skill in the art at the time of the invention provides an objective measure of the term's scope, namely it is the "archive of documents represented by linked object oriented elements" from which to measure and judge the term "minimal redundancy".

**B.     Secondary Considerations of Non-Obviousness**

245.   At the foregoing Section VII paragraph 51 there is stated a general description of the technology of the '713 Patent.

246.   On the issue of infringement, it is mine and the opinion of source code review expert Andy Pavlo that independent Claim 1 of the '713 Patent and its dependent claims 2 to 7 and 9 are *embodied* in the HP Exstream software program. It is my opinion that the commercial success of the HP Exstream product is in large part due to its employment of the '713 Patent independent Claim 1 and its dependent claims 2 to 7 and 9.

247.   I have reviewed the Expert Report of Melissa C. Snelson Concerning Economic Damages of U.S. Patent 7,447,713, including her analysis of the *Georgia-Pacific* factors 6, 9, 10 and 13 set forth therein.

248.   I agree that the asserted method claims embodied in the HP Exstream software program implicates the core portion of HP Exstream (namely Designer and Design Manager) and further, that the interaction of Designer and Design Manager with HP Exstream administrative settings defining the HP Exstream workflow approval process, input of standard form files into HP Exstream via HP Exstream converters, storage of a reconciled object structure in the "Design

database" to be used as Library Components for reuse, the ability to effect a one-to-many change in archived items (including the compiling of the same to a predetermined output file format), and compilation of application packages for output employs the invention of '713 Patent's independent Claim 1 and its dependent claims 2 to 7 and 9 and is a valuable aspect of HP Exstream responsible for its commercial success and acceptance.

249.    I also agree that, on a fundamental level, the asserted method claims are directed to the operability and functionality of HP Exstream's core creation side "Design and deployment" of its schematic architecture and that the output side is dependent thereon. I understand that the purpose of the output is to produce that created using the asserted method patent claims. The numerous modules that comprise HP Exstream rely upon the HP Exstream's core creation side "Design and deployment" of Designer and Design Manager, employing the asserted methods for its operability and functionality.

250.    With respect to the *Georgia-Pacific* factors 9 and 10 discussed in the Expert Report of Melissa C. Snelson Concerning Economic Damages of U.S. Patent 7,447,713, I agree with her analysis and it is my opinion that (1) the "real world benefits and return of investment" touted and claimed by the HP literature that Ms. Snelson cites therein (as well as other literature and testimony such as that discussed in association with *Georgia-Pacific* factor 6) is due to the asserted '713 Patent method claims being embodied in the HP Exstream software program, and (2) the sophisticated "enterprise customers" of HP Exstream find HP Exstream's operability and functionality beneficial due to the asserted '713 Patent method claims being *embodied* in the HP Exstream software program. The commercial success and acceptance of HP Exstream is due to the base or foundational nature of the technology of the '713 Patent and the fact that the asserted '713 Patent method claims are *embodied* in the HP Exstream software program.

251.    The '713 Patent specification at Col. 4 line 50 to Col. 5 line 49 and at Col. 14 line 18 to Col. 15 line 49 sets forth improvements and practical benefits and advantages of the invention.

**XI.    Conclusion**

256.    Based on my background and experience and the materials reviewed to date, I have formed these opinions to a reasonable degree of technical certainty.

257.    This Report is based in part on the review of considered materials (see Exhibit 2), and may be amended in the future should additional materials become available. I reserve the right to provide opinions on facts and other matters arising subsequent to this report, including in rebuttal to any matter raised by Plaintiff or its experts, either prior to or during any deposition, hearing or trial in this action.

258.    I have read and am familiar with the legal opinions of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); and *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S. Ct. 2120 (2014). Other than these opinions, the remaining case citations herein reflect my understanding as informed by the attorneys for Berkheimer.

I declare under the penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Date:  November 30, 2015

Peter Nelson, Ph.D.

Exhibit 1

# Curriculum Vitae

# Peter C. Nelson

**Professor and Dean**
**College of Engineering**
**University of Illinois at Chicago**
nelson@uic.edu

# Table of Contents

**Brief Biographical Sketch**

**Research Activities and Interests**
    **General Techniques for Improving Search Efficiency**
    **Intelligent Transportation Systems**
    **Manufacturing Optimization and Knowledge Discovery**
    **Anti-Spamming Counter Measures**
    **Computational Biology and Bioinformatics**
    **High-Availability Computer Clustering**

**Education**

**Positions Held**

**Publications**
    **Theses**
    **Books**
    **Book Chapters**
    **Journal Papers**
    **Conference Papers**

**Grants and Contracts**

**Graduate Students Supervised**
    **Ph.D. Dissertations Completed**
    **M.S. Theses Completed**
    **M.S. Projects Completed**

**Post-Doctoral Fellows Supervised**

**Direction of Research Associates and Technicians**

**Selected Popular Media Quotes and Interviews**

**Professional Activities and Awards**

**University of Illinois at Chicago Service Activities**

**Brief Biographical Sketch:**

Pete Nelson received his B.A. (1984) in Computer Science and Mathematics from North Park College, and his M.S. (1986) and Ph.D. (1988) in Computer Science from Northwestern University. Dr. Nelson is currently serving as Dean of UIC College of Engineering. Prior to this he served as Department Head of the Department of Computer Science at the University of Illinois at Chicago, where he is also a tenured Professor and co-Director of the Artificial Intelligence Laboratory.

The UIC Artificial Intelligence Laboratory specializes in applied AI research and development. Since Dr. Nelson founded it in 1991, the UIC AI Laboratory has undertaken a variety of applied intelligent systems projects in the areas of transportation, electronics manufacturing optimization, networking and molecular biology. Dr. Nelson has been the recipient of over $15 million of R&D contracts from a variety of government agencies and corporations including the National Institutes of Health, National Science Foundation, National Academy of Sciences, Federal Highway Administration, Argonne National Laboratory, Illinois Department of Transportation, Manufacturing Research Center, and numerous corporations. Dr. Nelson has published over 75 scientific articles and presented his research results at over 30 technical conferences in North America, Europe, Asia, and Australia.

**Research Activities and Interests:**

My research at UIC has focused on developing efficient artificial intelligence (AI) search techniques. This research has two components: basic research into developing general, efficient heuristic search algorithms, and applied research and development using heuristic search and other AI methods to solve problems in the areas of transportation, manufacturing, bioinformatics, anti-spamming measures and cluster computing.

**General Techniques for Improving Search Efficiency**

One of our most interesting results in this area has been the development of a new heuristic search algorithm named *perimeter search*. This admissible technique is referred to as perimeter search because it relies on a perimeter of nodes around the goal or destination node. During the search process, generated nodes are compared to the perimeter nodes. When a match is found, the search can terminate. Analytical and experimental results were published in the *Artificial Intelligence Journal* showing that perimeter search is more efficient than IDA* and A* in terms of time complexity and nodes expanded for two problem domains. Additional general search results have been in the area of search algorithms that learn; a method for reducing cycles for depth-first searches on graphs; and parallel bidirectional search algorithms.

**Intelligent Transportation Systems**

Our Intelligent Transportation Systems (ITS) research involves improving the utilization and efficiency of existing roadway transportation systems using information technology. From 1991-95, I conducted ITS research for the ADVANCE (Advanced Driver and Vehicle Advisory Navigation ConcEpt) project, supported by the Illinois Department of Transportation and the Federal Highway Administration (FHWA). ADVANCE equipped test vehicles in the northwestern suburbs of Chicago with on-board computers for

dynamic route planning and navigation. The vehicles received real-time traffic information via RF communications from a traffic information center, allowing them to plan and update optimal routes using up-to-the-minute traffic information. The traffic information center received traffic information from the vehicles, acting as roving traffic probes, as well as from roadway loop detectors, reliable voice reports, and other sources. My laboratory's responsibilities on the ADVANCE project were for software research and development for the traffic information center.

I have also conducted several other ITS-related projects. In 1994-95 my Laboratory developed a regional Corridor Traffic Information Center for IDOT that included the first World Wide Web site to graphically display current traffic conditions, see http://www.gcmtravel.com/gcm/maps_chicago.jsp for details (The CALTRANS WWW traffic map was also developed around the same time). Our traffic map web site has over 300,000,000 hits per year. Another project, funded by the National Research Council's Transportation Research Board, has developed new data fusion techniques utilizing artificial neural networks. Reliable data fusion is critically important for advanced traveler information systems, which must continually combine semantically distinct probe, loop detector, anecdotal, and historical data into meaningful current traffic information. Another project, initiated by the FHWA and the Illinois, Indiana, and Wisconsin Departments of Transportation, involves the research and development of a transportation information center for the vital Gary-Chicago-Milwaukee Priority Corridor, one of the four federally-designated ITS testbed corridors. This system distributes real-time transportation and incident information throughout the corridor to agencies and the traveling public. My laboratory has also been awarded contracts to assist the Illinois Tollway Authority with the development of a state-of-the-art traffic and incident management system, and a project with the Chicago Area Transportation Study (CATS) to development an intelligent web-based ridesharing system. Additional projects include work on an incident information system for the State of Wisconsin and transit projects funded by the Federal Transit Agency through the Great Cities Universities Consortium and the Regional Transportation Authority.

I am also currently serving as a co-PI on a $3.2 million NSF IGERT grant (Computer Science Professor Ouri Wolfson, P.I.) in the area of Computational Transportation Science involving four UIC colleges; for more information see cts.cs.uic.edu.

**Manufacturing Optimization and Knowledge Discovery**
Manufacturing optimization, modeling, and knowledge discovery research has been supported by Motorola for the last fifteen years. This work has involved optimizing the assignment of components to the feeder slots of high-speed "chip shooters" (devices which place IC chips onto printed wire circuit boards) in a high-mix manufacturing environment. A variety of AI methods (e.g., genetic algorithms, tabu search, neural networks, and rule-based systems) have been utilized to consistently produce near-optimal results for high-speed placement over a wide class of machines. The methods and software we developed have been used in Motorola factories around the world. This work has included balancing and optimizing a complete assembly line and generalizing our machine specific work into a flexible simulation and optimization toolkit. Extensions of

3

this work include the development of the data mining software for design and manufacturing, and meta-knowledge extraction and management for SMT optimization.

Much of our recent work with Motorola has focused on knowledge discovery using genetic programming techniques. We have developed a new genetic programming technique P-GEP which improves the problem solving capability of the original Gene Expression Programming (GEP) on complex data mining tasks. P-GEP adopts a novel genotype representation scheme which provides a mechanism for identifying promising components of the fittest chromosomes of each generation and preserving these for the following generations. Consequently, a relatively small population and a small number of generations are required to obtain satisfactory solutions. We have established a working framework for P-GEP and introduced an extendable incremental learning mechanism based on derived genes into its evolutionary process.

### Anti-Spamming Countermeasures

The primary reason why spam is profitable is that spammers can send messages for very little cost, with respect to both computing and human labor. We have built a system named Spamalot that uses intelligent agents to process spam messages and interact with systems referenced in spam. The goal is to consume spam senders' resources by engaging the spammer in an unproductive conversation or information exchange. The Spamalot approach is complementary to existing filtering techniques, giving mail users the option of employing Spamalot on spam messages that make it through their server or client filters.

### Computational Biology and Bioinformatics

Bioinformatics research has been funded by the National Institutes of Health National Center for Human Genome Research (R01) to develop a DNA restriction mapping tool. This tool automates the process of inferring DNA restriction maps from DNA segmentation data. We have studied the utility of certain AI techniques in this domain, namely Pratt's separation theory (to guarantee optimal use of the data), Dempster and Shafer's theory of evidence (for reasoning with uncertain data), and heuristic search guided with neural networks to traverse the search space efficiently. Our restriction mapping tool has been downloaded by numerous molecular biology laboratories around the world from our homepage.

More recent efforts have focused on using data mining for understanding the mechanisms of evolution and adaptation of organisms to the environment by identification of evolutionary variations of enzymes using advanced data-mining approaches. Protein classification is an important method for automated protein function prediction. This work has been supported by the Chicago Biomedical Consortium and has been a joint collaboration with the University of Chicago and Argonne National Laboratory

### High-Availability Computer Clustering

Work in the area of highly available (HA) computer clustering has been supported by Sun Microsystems and the National Science Foundation. Our work involves applying constraint logic programming (CLP), rule-based systems and heuristic search techniques to the configuration and failure handling in HA clusters.

**Education:**

| | |
|---|---|
| Northwestern University | Evanston, Illinois |
| Ph.D. in Computer Science | June 1988 |
| M.S. in Computer Science | August 1986 |
| | |
| North Park College | Chicago, Illinois |
| B.A. in Computer Science and Mathematics | May 1984 |

**Positions Held:**

2008 – present      Dean of Engineering
College of Engineering
University of Illinois at Chicago

2007 – 2008      Professor and Interim Dean
College of Engineering
University of Illinois at Chicago

2001 – 2007      Professor and Department Head
Department of Computer Science
University of Illinois at Chicago

2000 – 2001      Professor and Computer Science Division Chair
Department of Electrical Engineering and Computer Science
University of Illinois at Chicago

1994 - 2000      Associate Professor
Department of Electrical Engineering and Computer Science
University of Illinois at Chicago

1991 - present      Director
Artificial Intelligence Laboratory
Department of Electrical Engineering and Computer Science
University of Illinois at Chicago

1988 - 1994      Assistant Professor
Department of Electrical Engineering and Computer Science
University of Illinois at Chicago

1987 - present      Consultant
Computer science consulting for a variety of companies
including AT&T Bell Laboratories, Bell Communications
Research, Discover Card Financial Services, Peapod, UBS
Warburg, and Reuters.

1986 - 1992      Member of Technical Staff

(part-time)          AT&T Bell Laboratories

**Positions Held: (continued)**

| | |
|---|---|
| 1985 - 1988 | Teaching Assistant<br>Department of Electrical Engineering<br>   and Computer Science<br>Northwestern University |
| 1985<br>  (summer) | Software Engineer<br>AT&T Information Systems |
| 1984 - 1985 | Murphy Graduate Fellow<br>Northwestern University |

**Publications:**

<u>**Theses**</u>

"Parallel Bidirectional Search using Multi-Dimensional Heuristics," Ph.D. Dissertation (Advisor: Lawrence Henschen), Department of Electrical Engineering and Computer Science, Northwestern University, 1988.

"A Parallel A* Algorithm," M.S. Thesis (Advisor: Lawrence Henschen), Department of Electrical Engineering and Computer Science, Northwestern University, 1986.

<u>**Book Chapters**</u>

E. Torres, P. Nelson, N. Rouphail and J. Raj "Estimating Link Delays for Arterial Streets," <u>Urban and Regional Transportation Modeling: Essays in Honor of David Boyce</u> (edited by Der-Horng Lee)  Edward Elgar Publishing (2004) pp. 177-209.

Peng Fan, James G, Haran,  John Dillenburg, and Peter C. Nelson, "Cluster-Based Framework in Vehicular Ad-Hoc  Networks," <u>4th International Conference on AD-HOC Networks & Wireless</u>, October 6-8, 2005, Cancun, Mexico, published in <u>Lecture Notes in Computer Science</u>, Springer-Verlag, ISSN: 0302-9743, Volume 3738 / 2005, pp. 32-42.

John F. Dillenburg and Peter C. Nelson, "Data Handling in Intelligent Transportation Systems," <u>Wiley Encyclopedia of Computer Science and Engineering</u>  (edited by Benjamin Wah) John Wiley & Sons, Inc. (2008).

Li, Xin, Chi Zhou, Peter C. Nelson, and Thomas M. Tirpak. "Investigation of constant creation techniques in the context of gene expression programming." *LNCS* 3103 (2004).

6

Williams, C. A., Nelson, P. C., & Mohammadian, A. K. (2009). Attribute Constrained Rules for Partially Labeled Sequence Completion. In *Advances in Data Mining. Applications and Theoretical Aspects* (pp. 338-352). Springer Berlin Heidelberg.

**<u>Journal Papers</u>**
A.A. Toptsis, C.T. Yu, and P.C. Nelson, "Computing the Transitive Closure of Symmetric Matrices," <u>Lecture Notes in Computer Science Series</u>, Springer-Verlag Vol. 468, (1990) pp. 174-183.

T. Murata, P. C. Nelson, and J. Yim, "A Predicate - Transition Net Model for a Multiple Agent Planning System," <u>Information Sciences</u>, Vol. 57-58, (1991) pp.361-384.

P. C. Nelson and A. A. Toptsis, "Unidirectional and Bidirectional Search Algorithms," <u>IEEE Software</u>, Vol. 9, No. 2, March (1992) pp. 77-83.

P. C. Nelson and A. A. Toptsis, "Wave-Shaping in Multiprocessor Bidirectional Heuristic State Space Search," <u>Lecture Notes in Artificial Intelligence</u>, Springer-Verlag Vol. 541, (1991) pp. 92-104.

J.F. Dillenburg and P. C. Nelson, "Improving the Efficiency of Depth-first Search by Cycle Elimination," <u>Information Processing Letters</u>, Vol. 45, No. 1, (1993) pp. 5-10.

A. A. Toptsis and P.C. Nelson, "Parallel Bidirectional Heuristic State Space Search," <u>Heuristics,</u> Vol. 6, No. 4, (1993) pp. 40-49.

J.F. Dillenburg and P. C. Nelson, "Perimeter Search," <u>Artificial Intelligence Journal</u> Vol. 65, (1994) pp. 165-178.

J. Inglehart and P.C. Nelson, "On the limitations of automated restriction mapping," <u>Computer Applications in the Biosciences</u> Vol. 10, no. 3, (1994) pp. 249-261.

J. Yim, P. C. Nelson, and T. Murata, "Predicate - Transition Net Reachability Testing Using Heuristic Search," <u>Transactions of The Institute of Electrical Engineers of Japan,</u> Vol. 114-C, No. 9, (1994) pp. 907-913.

P. C. Nelson and C. Lain, "Heuristic Improvement through Triangulation," <u>Journal of Experimental and Theoretical Artificial Intelligence,</u> Vol. 7, No. 2, (1995) pp. 345-359.

J. F. Dillenburg and P. C. Nelson, "Improving Search Efficiency Using Possible Subgoals," <u>Mathematical and Computer Modelling,</u> Vol. 22, No. 4-7, (1995) pp.397-414.

A. Dikos, P.C. Nelson, T. Tirpak and W. Wang, "Optimization of PCCA in High-Mix Environments Using Genetic Algorithms," Annals of Operations Research, Vol. 75, (1997) pp. 303-324.

**Journal Papers (continued)**
J. A. Inglehart, P. C. Nelson and Yibo Zou, "Mapper: An Intelligent Restriction Mapping Tool," Bioinformatics, Vol. 14, No. 2, (1998) pp. 101-111.

J. A. Inglehart and P. C. Nelson, "Solving Systems of Difference Constraints Constrained by Random Variables," Heuristics, Vol. 10, No. 2, (1998) pp. 1-14.

P. V. Palacharla and P. C. Nelson, "Application of fuzzy logic and neural networks for dynamic travel time estimation," International Transactions in Operational Research (special issue Operations Research Methods in Intelligent Transportation Systems), Vol. 6, No. 1, (1999) pp. 145-160.

W. Wang, P. C. Nelson and T. M. Tirpak, "Optimization of High-Speed Multi-Station SMT Placement Machines Using Evolutionary Algorithms," IEEE Transactions on Electronics Packaging Manufacturing, Vol. 22, No. 2 (1999) pp. 137-146.

P. Csaszar, T. M. Tirpak, and P.C. Nelson, "Object-Oriented Simulator Design for an Automated High-Speed Modular Placement Machine Family," SIMULATION, Vol. 73, No. 6 (1999) pp.341-351.

P. Csaszar, T. M. Tirpak, and P.C. Nelson, "Optimization of a High-Speed Placement Machine Using Tabu Search Algorithms," Annals of Operations Research, Vol. 96, (2000) pp. 125-147.

P. Csaszar, P. C. Nelson, R. R. Rajbhandari, and T. M. Tirpak, "Optimization of Automated High Speed Modular Placement Machines Using Knowledge-Based Systems," IEEE Trans. on Systems, Man, and Cybernetics Part C: Applications and Reviews, Vol. 30, No. 4, November 2000. pp. 408-417.

Chi Zhou, Peter C. Nelson, Thomas M. Tirpak, Weimin Xiao and Spencer A. Lane, "An Intelligent Data Mining System for Drop Test Analysis of Electronic Products Manufacturing," IEEE Transactions on Electronics Packaging Manufacturing, Vol. 24, No. 3, (July 2001) pp. 222 -231.

Thomas M. Tirpak, Pradosh Kumar Mohapatra, Peter C. Nelson, and Rajan R. Rajbhandari, "A Generic Classification and Object-Oriented Simulation Toolkit for SMT Assembly Equipment," IEEE Transactions on Systems, Man, and Cybernetics – Part A: Systems and Humans, Vol. 32, No. 1, (January 2002), pp. 104-122.

Chi Zhou, Weimin Xiao, Peter C. Nelson, and Thomas M. Tirpak, "Evolving Accurate and Compact Classification Rules with Gene Expression Programming," IEEE Trans. on Evolutionary Computation, Vol. 7, No. 6, (December 2003), pages 519 – 531.

8

Auld, J., C. Williams, A. Mohammadian, and P. Nelson. "An Automated GPS-Based Prompted Recall Survey with Learning Algorithms". in the Journal of Transportation Letters: The International Journal of Transportation Research, Vol. 1(1), 2009, pp. 59-79.

Frignani, M. Z., J. Auld, A. Mohammadian, C. A. Williams, and P. C. Nelson, "Urban Travel Route and Activity Choice Survey: Internet-Based Prompted Recall Activity Travel Survey Using GPS Data", forthcoming in Transportation Research Record: Journal of the Transportation Research Board, Vol. 2183/2010, pp.19-28.

Nie, Y. M., Wu, X., Dillenburg, J. F., & Nelson, P. C. (2012). Reliable route guidance: A case study from Chicago. *Transportation Research Part A: Policy and Practice*, *46*(2), 403-419.

## Conference Papers

P. C. Nelson and L. J. Henschen, "Parallel Bidirectional Heuristic Searching," Proceedings of Canadian Information Processing Society 5, (Edmonton, Alberta), 1987, pp. 117-124.

P. C. Nelson, "Parallel Heuristic Search Using Islands," Proceedings of Fourth Conference on Hypercubes, Concurrent Computers, and Applications, (Monterey, California), March 1989, pp. 909-916.

P. C. Nelson and L. J. Henschen, "Multi-Dimensional Heuristics," Proceedings of Eleventh International Joint Conference on Artificial Intelligence, (Detroit, Michigan), August 1989, pp. 316-321.

T. Murata, P. C. Nelson, and J. Yim, "A Predicate - Transition Net Model for Single Agent Planning," Proceedings of AI, Simulation and Planning in High Autonomy Systems Conference, (Tucson, Arizona), March 1990, pp. 98-107.

A.A. Toptsis, C.T. Yu, and P.C. Nelson, "Computing the Transitive Closure of Symmetric Matrices," Proceedings of International Conference on Computing and Information (ICCI 90), (Niagara Falls, Ontario, Canada) May 1990, pp. 149-154.

P. C. Nelson and J. Dillenburg, "Experimental Analysis of Heuristic Island Search," Proceedings of The Fifth Rocky Mountain AI Conference, (Albuquerque, New Mexico), June 1990, pp. 231-238.

A.A. Toptsis, C.T. Yu, and P.C. Nelson, "Benchmarking Two Types of Restricted Transitive Closure Algorithms," Proceedings of IEEE COMPSAC 1990, October 1990, (Chicago, Illinois) pp. 375-381.

P. C. Nelson, J. F. Dillenburg, and L. Dubinsky, "HSAS: A Heuristic Development Tool," Proceedings of IEEE Conference on Tools for Artificial Intelligence, (Washington, D.C.) November 1990, pp. 478-484.

T. Murata, P. C. Nelson, and J. Yim, "Predicate-Transition Net Reachability Testing Using Artificial Intelligence Search Techniques," Proceedings of Third International Conference on Software Engineering and Knowledge Engineering, (Skokie, Illinois) June 1991, pp. 160-165.

P. C. Nelson and A. A. Toptsis, "Superlinear Speedup Using Bidirectionalism and Islands," Proceedings of 12th International Joint Conference on Artificial Intelligence - Workshop on Parallel Search, (Sydney, Australia) August 1991, pp. 129-134.

**Conference Papers (continued)**

P. C. Nelson and A. A. Toptsis, "Search Space Clustering in Parallel Bidirectional Heuristic Search," Proceedings of 4th University of New Brunswick Artificial Intelligence Symposium, (Fredericton, New Brunswick, Canada) September 1991, pp. 563-573.

J. Inglehart and P. C. Nelson, "LinkFinder: An Expert System that Constructs Phylogenic Trees," Proceedings of 2nd NASA CLIPS Conference, (Houston, Texas) August 1991, pp. 199-208.

P. C. Nelson and J. Warpinski, "NMESys: An Expert System for Network Fault Detection," Proceedings of 2nd NASA CLIPS Conference, (Houston, Texas) August 1991, pp. 52-57.

A. Kirson, B. Smith, D. Boyce, P. Nelson, J. Hicks, A. Sen, J. Schofer, F. Koppelman, C. Bhat, "The Evolution of ADVANCE," Proc. of 3rd International Conference on Vehicle Navigation and Information Systems, Sept. 1992, pp. 516-522.

P. C. Nelson, P. Petrov, and P. Pollock, "Assigning Segment and Link Identifiers for ADVANCE," Proceedings of Intelligent Vehicles 93 Symposium, (Tokyo, Japan) July 1993, pp. 152-156.

P. C. Nelson, J. Dillenburg, and C. Lain, "Vehicle-Based Route Planning in Advanced Traveler Information Systems," Proceedings of Intelligent Vehicles 93 Symposium, (Tokyo, Japan) July 1993, pp.370-372.

P. C. Nelson and P. Palacharla, "A Neural Network Model for On-line Data Fusion in ADVANCE," Proceedings of Pacific Rim Transportation Technology Conference, (Seattle, Washington) July 1993, pp. 237-243.

N.M. Rouphail and P.C. Nelson, "Data Fusion for an ATIS Operational Test: Description and Computational Issues," Proceedings of the First Congress on Computing in Civil Engineering, (Washington D.C.) June 1994, pp. 1532-1535.

10

P. Palacharla and P.C. Nelson, "Understanding Relations between Fuzzy Logic and Evidential Reasoning Methods," <u>Proceedings of Third IEEE International Conference on Fuzzy Systems</u>, (Orlando, Florida) June 1994, pp. 1933-1938.

P. Palacharla and P.C. Nelson, "Evidential Reasoning in Uncertainty for Data Fusion," <u>Proceedings of Fifth International Conference on Information Processing and Management of Uncertainty in Knowledge-Based Systems</u>, (Paris, France) July 1994, pp. 715-720.

**Conference Papers (continued)**

P. Palacharla, P. Nelson and V. Sisiopiku, "Data Fusion Using Fuzzy-Valued Logic," <u>Proceedings of 1994 Intelligent Vehicles Symposium</u>, (Paris, France) October 1994, pp. 115-119.

V. Sisiopiku, P. Palacharla and P.C. Nelson, "Fuzzy Reasoning Model for Converting Loop Detector Data into Travel Times," <u>Proceedings of 27th ISATA Advanced Transport Telematics/ Intelligent Vehicle Highway Systems Conference</u>, (Aachen, Germany) November 1994, pp. 373-380.

J. Dillenburg, C. Lain, P.C. Nelson, and D. Rorem, "The Design of the ADVANCE Traffic Information Center," <u>Proceedings of the 5th Annual Meeting of the Intelligent Transportation Society of America</u>, (Washington D.C.) March 1995, pp. 321-327.

P. Palacharla and P.C. Nelson, "On-line travel time estimation using fuzzy neural networks," <u>The Second World Congress on Intelligent Transport Systems</u>, (Yokohama, Japan) November 1995, pp. 112-116.

P. Mohapatra, P. C. Nelson, T. M. Tirpak, and P. Csaszar, "A Generic Simulation and Optimization System for Chip Placement Machines," <u>Proceedings of the International Conference on Information Technology (CIT' 99)</u>, (Bhubaneswar, India), December 1999, pp. 1-17.

P.C. Nelson, T. M. Tirpak, W. Wang, and P. Mohapatra, "Optimization of Gantry Type SMT Placement Machines Using Genetic Algorithms," <u>Proceedings of the Second International Symposium on Engineering of Intelligent Systems (EIS 2000)</u>, (Paisley, Scotland), June 2000, pp. 404-412.

T.M. Tirpak, A.J. Aswani, and P.C. Nelson, "Optimization of Revolver Head SMT Machines Using Simulated Annealing," <u>25th International Electronics Manufacturing Technology Symposium</u>, (Santa Clara, California), October 2000, pp. 214-220.

Peter Csaszar, Peter C. Nelson and Thomas M. Tirpak, "Tabu Search for Rugged Search Spaces with Multiple Symmetric Basins," <u>17th International Joint Conferences on Artificial Intelligence: Workshop on AI in Manufacturing</u>, (Seattle, WA), August 2001, pp. 46-51.

11

Chi Zhou, P.C. Nelson, W. Xiao, and T. M. Tirpak, "Discovery of Classification Rules by Using Gene Expression Programming," International Conference on Artificial Intelligence (IC-AI'02), Las Vegas, U.S.A., June 24-27, 2002, pp. 1355-1361.

**Conference Papers (continued)**

T. Tirpak, G. Sundaresan, C. Zhou, and P.C. Nelson, "Hybrid Evolutionary Algorithm - Expert System Solution for Optimizing SMT Placement Machines," International Conference on Information and Knowledge Engineering (IKE'02), Las Vegas, U.S.A., June 24-27, 2002, pp. 674-679.

C. Zhou and P. C. Nelson, "Predicting Traffic Congestion Using Recurrent Neural Networks," 9th World Congress on Intelligent Transport Systems, Chicago, October 14-18, 2002, electronic proceedings.

J. Dillenburg, O.Wolfson, and P. Nelson, "The Intelligent Travel Assistant," The 5th International Conference on Intelligent Transportation Systems, (Singapore), September 2002, pp. 691-696.

G. Trajcevski, O. Wolfson, B. Xu and P. Nelson, "Real-Time Traffic Updates in Moving Objects Databases," 5th International Workshop on Mobility in Databases and Distributed Systems, in conjunction with the 13th International Conference on Database and Expert Systems Applications, September 2002, Aix en Provence, France, electronic proceedings.

J.F. Dillenburg, P.C. Nelson, O. Wolfson, O. Yu, A.P. Sistla, S. McNeil, A. Ouksel, Xu and J. Ben-Arie, "Applications of a Transportation Information Architecture," Proc. of IEEE Conference on Networking, Sensing and Control (ICNSC04), March 2004, Taipei, Taiwan, pp. 480-485.

Xin Li, Chi Zhou, Peter C. Nelson, and Thomas M. Tirpak, "Investigation of Constant Creation Techniques in the Context of Gene Expression Programming," appeared as a late breaking paper at Genetic and Evolutionary Computation Conference (GECCO-2004), June 26-30,2004, Seattle, Washington, USA.

Zhuli Xie, Xin Li, Barbara Di Eugenio, Weimin Xiao, Thomas M. Tirpak, and Peter C. Nelson, "Using Gene Expression Programming to Construct Sentence Ranking Functions for Text Summarization," 20th International Conference on Computational Linguistics (COLING-2004), August 23-27, 2004, Geneva, Switzerland, pp. 1381-1384.

Marcin Kadluczka, Peter C. Nelson, and Thomas M. Tirpak, "N-to-2-Space Mapping for Visualization of Search Algorithm Performance," 15th IEEE Conference on Tools for Artificial Intelligence, November 2004, Boca Raton, FL, pp. 508-513.

Zhuli Xie, Weimin Xiao, Thomas M. Tirpak, and Peter C. Nelson. "Using Noun Phrase Centrality to Identify Topics for Extraction Based Summaries," <u>IASTED International Conference on Knowledge Sharing and Collaborative Engineering,</u> November 21-24, 2004, Virgin Islands, USA, pp. 89-94.

**<u>Conference Papers</u> (continued)**

Thomas M. Tirpak, Juan Lopez, and Peter C. Nelson, "Factory Doctor: A Decision-Support System for Electronics Manufacturing Optimization," <u>3rd International CIRP Conference on Reconfigurable Manufacturing,</u> (electronic proceedings) May 10-12, 2005, in Ann Arbor, MI.

Xin Li, Chi Zhou, Weimin Xiao, Peter C. Nelson, "Prefix Gene Expression Programming," appeared as a late breaking paper at <u>Genetic and Evolutionary Computation Conference (GECCO-2005),</u> June 25-29, 2005, Washington D.C., USA.

James Haran, Peng Fan, Peter C. Nelson, John F. Dillenburg, "An Intelligent Vehicle Approach To Mobile Vehicular Ad Hoc Networks," <u>The Second International Conference on Informatics in Control, Automation and Robotics (ICINCO 2005),</u> September 14-17, 2005, Barcelona, Spain, pp. 224-230.

Peng Fan, James G, Haran, John Dillenburg, and Peter C. Nelson, "Cluster-Based Framework in Vehicular Ad-Hoc Networks," <u>4th International Conference on AD-HOC Networks & Wireless,</u> October 6-8, 2005, Cancun, Mexico, pp. 32-42.

Robert Grossman, Michal Sabala, Anushka Aanand, Steve Eick, Leland Wilkinson, Pei Zhang, John Chaves, Steve Vejcik, John Dillenburg, Peter Nelson, Doug Rorem, Javid Alimohideen, Jason Leigh, Mike Papka, Rick Stevens, "Real Time Change Detection and Alerts from Highway Traffic Data," <u>The 2005 ACM/IEEE Conference on Supercomputing (SC '05),</u> November 12-18, 2005, Seattle, WA, USA, p. 69, (Received SC'05 HPC Analytics Challenge Award).

Xin Li, Chi Zhou, Weimin Xiao, and Peter C. Nelson, "Direct Evolution of Hierarchical Solutions with Self-Emergent Substructures," <u>The Fourth International Conference on Machine Learning and Applications (ICMLA'05),</u> December 15-17, 2005, Los Angeles, CA, USA, pp. 337-342.

Peng Fan, James G. Haran, John Dillenburg, and Peter C. Nelson, "Traffic Model for Clustering Algorithms in Vehicular Ad-Hoc Networks," <u>IEEE Consumer Communications and Networking Conference 2006 (CCNC2006)</u> January 8-10, 2006, Las Vegas, NV, USA, pp. 168-172.

Zhuli Xie, Barbara Di Eugenio, and Peter C. Nelson, "Adaptive Learning in Machine Summarization," <u>Nineteenth International FLAIRS Conference (FLAIRS 2006)</u> May 11-13, 2006, Melbourne Beach, FL, USA, pp. 180-181.

Qiongyun Zhang, Chi Zhou, Weimin Xiao, Peter C. Nelson, and Xin Li, "Using Differential Evolution for GEP Constant Creation," appeared as a late breaking paper at <u>Genetic and Evolutionary Computation Conference (GECCO-2006)</u>, July 8-12, 2006, Seattle, Washington, USA.

**Conference Papers (continued)**

Peter C. Nelson, Kenneth P. Dallmeyer, Lukasz M. Szybalski, Tom P. Palarz, Michael Wieher, "Spamalot: A Toolkit for Consuming Spammers' Resources," <u>3rd Conference on Email and Anti-Spam (CEAS 2006)</u>, July 27-28, 2006, Mountain View, California, USA, pp. 134-136.

Peng Fan, James G. Haran, John F. Dillenburg, and Peter C. Nelson, "An Improved Compound Clustering Algorithm in Vehicular Ad-Hoc Networks," <u>9th International Conference an  Applications of Advanced Technology in  Transportation 2006 (AATT06)</u>, August 13-16, 2006, Chicago, IL, USA, pp 424-430.

James G. Haran, John F. Dillenburg, and Peter C. Nelson "Real-time Image Processing Algorithms for the Detection of Road and Environmental Conditions", <u>9th International Conference an  Applications of Advanced Technology in Transportation 2006 (AATT06)</u>, August 13-16, 2006, Chicago, IL, USA, pp. 55-60.

Xin Li, Chi Zhou, Weimin Xiao, and Peter C. Nelson, "Introducing Emergent Loose Modules into the Learning Process of a Linear Genetic Programming System," <u>The Fifth International Conference on  Machine Learning and Applications (ICMLA'06)</u>, December 14-16, 2006, Orlando, FL, USA, pp. 219-224.

Peng Fan, Abolfazl (Kouros) Mohammadian, Peter C. Nelson, James Haran, and John Dillenburg, "A Novel Direction Based Clustering Algorithm in  Vehicular Ad Hoc Networks" <u>86th Annual Transportation Research Board Meeting</u>, January 2007, Washington, DC, USA.

Brian M. Cerny, Chi Zhou, Weimin Xiao, and Peter C. Nelson, "Probabilistically Guided Prefix Gene Expression Programming," <u>The Second International Workshop on Nature Inspired Cooperative Strategies for Optimization (NICSO 2007)</u>, Acireale, Sicily (Italy), November 8-10, 2007.

Fatemeh Vafaee, Peter C. Nelson, Chi Zhou and Weimin Xiao, "Dynamic Adaptation of Genetic Operator's Probabilities," <u>The Second International Workshop on Nature Inspired Cooperative Strategies for Optimization (NICSO 2007)</u>, Acireale, Sicily (Italy), November 8-10, 2007.

Qiongyun Zhang, Chi Zhou, Weimin Xiao, and Peter C. Nelson, "Improving Gene Expression Programming Performance by Using Differential Evolution," <u>The Sixth International Conference on  Machine Learning and Applications (ICMLA'07)</u>, December 13-15, 2007, Cincinnati, OH, USA, pp. 31-37.

14

Kenneth P. Dallmeyer, Peter C. Nelson, Elias Block, Brandon Elvidge, "Return to Spamlet," 2007 MIT Spam Conference, March 28, 2007 Cambridge, MA, USA.

Brian M. Cerny, Chi Zhou, Weimin Xiao, and Peter C. Nelson, "Using Differential Evolution for Symbolic Regression and Numerical Constant Creation," to appear as a full paper at the Genetic and Evolutionary Computation Conference (GECCO-2008), July 2008, Atlanta, GA, USA.

**Conference Papers (continued)**
Fatemeh Vafaee, Peter C. Nelson, Chi Zhou and Weimin Xiao (2008) "Dynamic adaptation of genetic operator's probabilities," *Computational Intelligence Series*, Springer Berlin-Heidelberg, 129: 159-168.

Fatemeh Vafaee, Weimin Xiao, Peter C. Nelson and Chi Zhou (2008) "Adaptively evolving probabilities of genetic operators," *IEEE, Machine Learning and Applications* (ICMLA 08): 292-299.

Fan, P., Sistla, P., & Nelson, P. (2008, September). Theoretical analysis of a directional stability-based clustering algorithm for VANETs. In *Proceedings of the fifth ACM international workshop on VehiculAr Inter-NETworking* (pp. 80-81). ACM.

Williams, C., A. Mohammadian, P. Nelson, and S. Doherty, (2008) "Mining Sequential Association Rules For Traveler Context Prediction", First International Workshop on Computational Transportation Science, The 5th Annual International Conference on Mobile and Ubiquitous Systems: Networks and Services, MOBIQUITOUS 2008, July 21, 2008 - Trinity College Dublin, Ireland.

Haran, J., A. Mohammadian, and P. Nelson, (2008) "Intelligent Traveler Assistant (ITA) Simulation Platform Design", First International Workshop on Computational Transportation Science, The 5th Annual International Conference on Mobile and Ubiquitous Systems: Networks and Services, MOBIQUITOUS 2008, July 21, 2008 - Trinity College Dublin, Ireland.

Auld, J., A. Mohammadian, P. Nelson, and S. Doherty, (2008) "Modeling Activity Scheduling Conflict Resolution Strategies", Proc. of the ASCE's 10th International Conference of Application of Advanced Technology in Transportation, Athens, Greece, May 28-30, 2008.

Fatemeh Vafaee, and Peter C. Nelson (2009) "Self-adaptation of genetic operator probabilities using differential evolution," *IEEE, Self-Adaptive and Self-Organizing Systems* (SASO 09): 274-275.

Biagioni, J. P., P. M. Szczurek, P. C. Nelson, and A. Mohammadian, "Tour-Based Mode Choice Modeling: Using an Ensemble of Conditional and Unconditional Data Mining Classifiers", Proc. of the 88th Annual Meeting of the Transportation Research Board, (DVD), Washington, D.C. January 2009.

15

Fatemeh Vafaee and Peter C. Nelson. (2009) "A genetic algorithm that incorporates an adaptive mutation based on an evolutionary model," *IEEE, Machine Learning and Applications*, (ICMLA 09): 101-107.

Fatemeh Vafaee, Gyorgy Turan and Peter C. Nelson (2010) "Optimizing Genetic Operator Rates Using A Markov Chain Model of Genetic Algorithms," *ACM, Genetic and Evolutionary Computation* (GECCO 10): 721-728.

### Conference Papers (continued)

Vafaee, Fatemeh, and Peter C. Nelson. "An explorative and exploitative mutation scheme." In *Evolutionary Computation (CEC), 2010 IEEE Congress on*, pp. 1-8. IEEE, 2010.

Auld, J., Mohammadian, A. K., & Nelson, P. C. (2011). Empirical analysis of the activity-planning process. *Transportation Research Record: Journal of the Transportation Research Board, 2231*(1), 76-84.

Xu, B., Wolfson, O., Yang, J., Stenneth, L., Yu, P. S., & Nelson, P. C. (2013, June). Real-time street parking availability estimation. In *Mobile Data Management (MDM), 2013 IEEE 14th International Conference on* (Vol. 1, pp. 16-25). IEEE.

Vafaee, F., Turan, G., Nelson, P. C., & Berger-Wolf, T. Y. (2014, July). Among-site rate variation: adaptation of genetic algorithm mutation rates at each single site. In *Proceedings of the 2014 conference on Genetic and evolutionary computation* (pp. 863-870). ACM.

Vafaee, Fatemeh, Gyorgy Turan, Peter C. Nelson, and Tanya Y. Berger-Wolf. "Balancing the exploration and exploitation in an adaptive diversity guided genetic algorithm." In *Evolutionary Computation (CEC), 2014 IEEE Congress on*, pp. 2570-2577. IEEE, 2014.

**Grants and Contracts:**
 **75+ grants and contracts**
 **Over $28 million research grants and contracts as P.I.**
 **Over $4 million of research grants and contracts as co-P.I. or Senior Personnel**
 **Over $4 million of institutional grants as co-P.I.**

"Multi-Dimensional Heuristics: A New AI Search Technique," 7/1/89 - 6/30/90, $8,000 (Sponsor: University of Illinois at Chicago Campus Research Board, Principal Investigator: P.C. Nelson).

"Software Research and Development for Intelligent Vehicle Highway Systems I," 7/25/91 - 9/30/92, $423,000 (Sponsors: Illinois Department of Transportation (IDOT) and the Federal Highway Administration (FHWA) through Illinois Universities Transportation Research Consortium (IUTRC), Principal Investigator: P.C. Nelson).

16

"Sun Scholarpak Software Grant," 1/1/92 - 12/31/97, $620,000 (Sponsor: Sun Microsystems, Principal Investigator: P.C. Nelson, Co-P.I.: D.E. Boyce).

"Software Research and Development for Intelligent Vehicle Highway Systems II," 7/1/92-3/31/94, $866,469 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Software Research and Development for Intelligent Vehicle Highway Systems III," 1/1/93 - 12/31/93, $137,020 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Advanced Traveler Information Systems," 3/16/93 - 12/31/93, $142,946 (Sponsor: Motorola, Principal Investigator: P.C. Nelson).

"Automated Restriction Mapper," 7/1/93 - 6/30/94, $8,000 (Sponsor: University of Illinois at Chicago Campus Research Board, Principal Investigator: P.C. Nelson).

"An Automatic Process Plan Selection System," 8/21/93 – 8/20/94, $14,000 (Sponsor: Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Software Research and Development for Intelligent Vehicle Highway Systems - IV," 9/1/93 - 3/31/95, $400,050 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Software Research and Development for Intelligent Vehicle Highway Systems - II: Supplemental Funding," 9/1/93 - 3/31/94, $69,900 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"An Intelligent Automated Restriction Mapping Tool," 1/1/94 - 12/1/97, $413,534 (Sponsor: National Institutes of Health National Center for Human Genome Research, Principal Investigator: P.C. Nelson).

"Software Research and Development for Intelligent Vehicle Highway Systems - V," 10/1/94 - 9/30/95, $465,931 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Application of Neural Networks to Data Fusion: A Feasibility Study," 5/1/95 – 8/20/96, $73,330 (Sponsor: National Research Council - Transportation Research Board, Principal Investigator: P.C. Nelson).

"Feeder Setup Optimization Software," 8/21/95 - 8/20/96, $3,750 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Technology Transfer of Feeder Setup Optimization Software," 8/21/95-8/20/97, $32,500 (Sponsors: Manufacturing Research Center, Principal Investigator: P.C. Nelson).

17

"Optimization of PCB Automated Placement Machines," 8/21/95 - 8/20/96, $21,250 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Software R&D for the Corridor Traffic Information Center," 10/1/95 - 9/30/96, $409,000 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Simulation, Modeling, and Optimization of PCB Automated Placement Machines," 8/21/96 - 8/20/97, $25,000 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"An Object-Oriented Toolkit for Electronics Assembly Machine Simulation, Optimization, and Product Design Evaluation," 9/23/96-8/22/98, $48,655 (Sponsor: Motorola, Principal Investigator: P.C. Nelson).

"Software R&D for the Corridor Traffic Information Center - II," 10/1/96 - 12/31/97, $633,102 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Regional Travel Forecasting Model Validation," 8/1/97 - 7/31/98, $19,663 (my share) (Sponsor: National Institute of Statistical Sciences, Principal Investigator: D.E. Boyce, Co-Principal Investigator: P.C. Nelson).

"Optimization of SMT Assembly Machines Using Evolutionary Algorithms and Tabu Search," 8/21/97 - 8/20/98, $32,500 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Optimization for Revolver-Head Type SMT Assembly Machines," 8/21/97 - 8/20/98, $46,850 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Software R&D for the Corridor Traffic Information Center - III," 1/1/98 - 6/30/98, $154,436 (Sponsors: IDOT and FHWA through IUTRC, Principal Investigator: P.C. Nelson).

"Research and Development of an Advanced Traffic Systems Center," 2/9/98-9/30/98, $75,738 (Sponsor: National Engineering Technologies Corporation, Principal Investigator: P.C. Nelson).

"Gateway Traveler Information and Datapipe Project," 7/1/98 – 12/31/03, $1,079,923 (Sponsor: Illinois Department of Transportation through Parsons Transportation Group, Principal Investigator: P.C. Nelson).

"Optimization of SMT Assembly Machines and Lines," 8/21/98-8/20/00, $102,344 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Enhancements to the Regional Transit Management System- Phase II," 9/1/98-12/31/04, $249,321 (Sponsor: Regional Transportation Authority, Principal Investigator: P.C. Nelson).

"An Object-Oriented Tool Kit for Electronics Assembly Machine Simulation, Optimization and Product Design Evaluation," 9/23/98-9/22/00, $40,510 (Sponsor: Motorola, Principal Investigator: P.C. Nelson).

"Web-Based Analysis and Knowledge Discovery Tools for Electronics Manufacturing," 8/23/99 – 12/31/02, $58,500 (Sponsor: Motorola through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Metropolitan Transportation Support Initiative METSI," 9/8/99-6/30/01, $42,060 (Sponsor: Illinois Department of Transportation, Principal Investigator: P.C. Nelson).

"Distributed Intelligent Dynamic Management," 2/7/00-8/31/03, $30,435 (Sponsor: Sun Microsystems through Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Intelligent Web-Based Analysis and Knowledge Discovery Tools for Manufacturing," 8/21/00 – 8/20/02, $43,800 (Sponsor: Motorola through the Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Ridematch System 21: An Intelligent Web-based System for Ride Matching," 1/1/01 – 6/30/04, $299,316 (Sponsor: IDOT/CATS, Principal Investigator: P.C. Nelson).

"Incident Management System Design and Integration Within the Entire Limits of the Illinois State Toll Highway System, " 1/15/01-12/31/02, $269,128 (Sponsor: : Illinois State Toll Highway Authority through a subcontract through National Engineering Technologies Corporation, Principal Investigator: P.C. Nelson).

"Research and Development of an Urban Traffic Management Center," 2/5/01 – 4/30/02, $16,343 (Sponsor: Chicago Department of Transportation through DMJM Illinois, Inc., Principal Investigator: P.C. Nelson).

"Gateway Traveler Information System," amendments 6/15/01-12/31/03, $325,102 (Sponsor: Illinois Department of Transportation through Parsons Transportation Group, Principal Investigator: P.C. Nelson).

"Rule-Based Extensions for Evolutionary SMT Optimization and Data Mining Tools for Manufacturing and Design," 8/21/01-1/31/10, $46,500 (Sponsor: Motorola through the Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Travel Information Systems at the User Level," 10/1/01 – 6/30/03, $37,208 (Sponsor: Federal Transit Authority through Great Cities Universities Consortium at U.M.S.L, Principal Investigator: P.C. Nelson).

19

"Research and Development of an Incident Information System," 1/1/02 – 10/15/03, $41,792 (Sponsor: Wisconsin Department of Transportation through Iteris, Inc., Principal Investigator: P.C. Nelson).

"Software Research and Development for the Corridor Traffic Information Center II," 7/1/02-6/30/04, $10,000 (Sponsor: IUTRC, Principal Investigator: P.C. Nelson).

"Data Mining Tools for Manufacturing and Design and Meta-Knowledge Extraction and Management for SMT Optimization," 8/21/02- 8/20/04, $71,588 (Sponsor: Motorola through the Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"CISE Research Resources: Matching Advanced Visualization and Intelligent Data Mining to High-Performance Experimental Networks," 11/1/02 - 10/31/05, $862,000 (Sponsor: National Science Foundation, Principal Investigator: T. DeFanti; Co-PIs O. Yu, J. Leigh, P. Nelson and R. Grossman).

"Regional Transit Asset Management System Enhancements," 5/1/03 – 12/31/04, $249,321 (Sponsor: Regional Transportation Authority, Principal Investigator: P. C. Nelson).

"Gateway Enhancements," 7/5/03 – 7/4/04, $293,377 (Sponsor: Illinois Department of Transportation, Principal Investigator: P. C. Nelson.)

"Knowledge Discovery for Manufacturing and Design," 8/21/03-7/31/14, $56,750 (Sponsor: Motorola through the Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Ridematch System 21 Enhancements: An Intelligent Web-based System for Ride Matching," 7/1/04 – 6/30/06, $217,802 (Sponsor: IDOT/CATS, Principal Investigator: P.C. Nelson).

"Learning the Origins and Representing Uncertainty in the Data Fusion Process for both Distributed and Centralized Architectures," 8/16/06-7/31/10, $36,277 (Sponsor: Motorola through the Manufacturing Research Center, Principal Investigator: P.C. Nelson).

"Gateway Traveler Information System Enhancements," 7/5/04 – 7/4/05, $392,876 (Sponsor: Illinois Department of Transportation, Principal Investigator: P. C. Nelson.)

"Knowledge Discovery for Manufacturing, Design and Business Intelligence," 8/16/04 – 8/15/07, $67,688 (Sponsor: Motorola through the Manufacturing Research Center, Principal Investigator: P.C. Nelson).  8/16/04-8/15/06, $49,625

"Regional Transit Asset Management Operations," 9/3/04-2/2/11, $310,216 (Sponsor: Regional Transportation Authority, Principal Investigator: P. C. Nelson).

20

"Ridematch System 21: Enhancements," 9/21/04 – 6/30/06, $217,802 (Sponsor: IDOT/CATS, Principal Investigator: P.C. Nelson).

"The Teraflow Project High Performance Flows for Mining Large Distributed Data Archives," 10/1/04-9/30/07, $46,506 (Sponsor: National Science Foundation, Principal Investigator: Robert Grossman, Senior Personnel: Peter C. Nelson).

"Regional Transit Asset Management Research and Development2/1/05-5/2/14, $679,528 (Sponsor: Regional Transportation Authority, Principal Investigator: P. C. Nelson, co-Principal Investigator: John F. Dillenburg).

"Cronos – A Data Mining Approach to Analysis of the Protein Space," 5/15/05-5/14/07, $57,024 (Sponsor: Argonne National Laboratory, Principal Investigator: P.C. Nelson, Co-PI: Bing Liu).

"Gateway Traveler Information System Enhancements II," 7/5/05 – 6/30/08, $2,433,739 (Sponsor: Illinois Department of Transportation, Principal Investigator: P. C. Nelson, co-Principal Investigator: John F. Dillenburg).

"IGERT Graduate Program in Computational Transportation Science," 6/1/06-5/31/14, $3,098,888  (Sponsor: National Science Foundation, Principal Investigator: Ouri Wolfson, Co-PIs: P.C Nelson, A. Ouksel, R. Sloan, P. Thakuriah.)

"Regional Rideshare Program (sharethedrive.org Operation, Maintenance and Enhancements," 6/15/06-6/30/08, $184,000 (Sponsor: PACE Division of Regional Transportation Authority, Principal Investigator: P.C. Nelson, co-Principal Investigator: John F. Dillenburg).

"Advanced System for Comparative Analysis of Metabolism," 7/1/06-12/31/07, $66,125 (Sponsor: Chicago Biomedical Consortium, Principal Investigators: Wen-Hsiung Li and P.C. Nelson, Co-PIs: Natalia Maltsev, Bing Liu, and Clement Yu).

"Women in Science and Engineering System Transformation," 8/1/06 – 7/30/11, $3,300,000 (Sponsor: National Science Foundation, Principal Investigator: Mo-Yin Tam, Co-Principal Investigators: Mitra Dutta, Dwight McBride, Claudia Morrisey and P. C. Nelson) *Note: PI and co-PIs reassigned in 2007 due to deanship and vice-provost personnel changes.*

"Interface from IDOT AVL Entry System to Gateway," 8/4/06 – 9/30/07, $31,184 (Sponsor: Meade Electric, Principal Investigator: P. C. Nelson, co-Principal Investigator: John F. Dillenburg)

"Commercial Vehicle Information Systems and Networks Requirements and Design," 9/6/06-3/31/07, $51,942 (Sponsor: Illinois Department of Transportation, Principal Investigator: P. C. Nelson, co-Principal Investigator: John F. Dillenburg)

"TAMP Development and Vista Installation," 12/1/06 – 6/30/08, $52,000 (Sponsor: Northeastern Illinois Planning Commission, Principal Investigator: P. C. Nelson, co-Principal Investigator: John F. Dillenburg)

"Providing Reliable Route Guidance Using the Gary-Chicago-Milwaukee (GCM) Traveler Information System," 1/1/08 – 6/30/09, $33,259 (Sponsor: Center for the Commercialization of Innocation Transportation Technology, Principal Investigator: Yu Marco Nie, Northwestern University, Co-Principal Investigator P. C. Nelson, co-Principal Investigator: John F. Dillenburg).

"UIC CS Scholars," 3/15/09-2/28/14, $598,000 (Sponsor: National Science Foundation, Co- Principal Investigator: P.C. Nelson).

"Develop Travel Reliability Inventory for Highway Networks," 1/10/10-6/30/11, $12,500 (Sponsor: Illinois Department of Transportation, Principal Investigator: P.C. Nelson, co-Principal Investigator: John F. Dillenburg).

"ENGAGE UIC," 8/1/11-9/1/13, $10,000 (Sponsor: Stevens Institute Technology, Principal Investigator: P.C. Nelson).

"Gateway Maintenance and Enhancements IV," 9/1/11-6/30/13, $4,213,596 (Sponsor: Illinois Department of Transportation, Principal Investigator: P.C. Nelson, co-Principal Investigator and Project Director: John F. Dillenburg).

"IGERT: Electronic Security and Privacy: Technological, Human Enterprise and Legal Considerations," 9/1/11-8/30/16, $3,200,000 (Sponsor: National Science Foundation, Principal Investigator: V.N. Venkatakrishan, Senior Personnel: P.C. Nelson).

"Data Archive Module for Traffic Systems Center Advance Traffic Management System and Illinois Tollway Traffic Management System," 12/3/12-12/31/13, $109,406 (Sponsor: Chicago Metropolitan Agency for Planning, Principal Investigator: P.C. Nelson,  co-Principal Investigator and Project Director: John F. Dillenburg).

"Expansion of Gateway for Great Lakes Regional Operations Coalition," 4/19/13-4/18/16, $368,000 (Sponsor: University of Wisconsin- Madison, Principal Investigator: P.C. Nelson, co-Principal Investigator: John F. Dillenburg).

"Gateway Maintenance and Enhancements V," 7/1/13-10/31/14, $2,877,882 (Sponsor: Illinois Department of Transportation, Principal Investigator: P.C. Nelson, co-Principal Investigator and Project Director: John F. Dillenburg).

"Gateway Traveler Information System VI," 11/1/14-6/30/16, $5,494,501 (Sponsor: Illinois Department of Transportation, Principal Investigator: P.C. Nelson, co-Principal Investigator and Project Director: John F. Dillenburg).

22

**Graduate Students Supervised:**
**Ph.D. Dissertations Completed**

James Haran (2011), (co-advisor with Prof. Kouros Mohammadian) "Vehicular Ad Hoc Network Microsimulation System for Transportation, Wireless, and Traveler Behavior."

Fatemeh Vafaee (2010), "Controlling Genetic Operator Rates in Evolutionary Algorithms."

Chad Williams (2010), (co-advisor with Prof. Kouros Mohammadian) "A Data Mining Approach to Rapidly Learning Traveler Activity Patterns for Mobile Applications."

Peng Fan (2008), (co-advisor with Prof. Kouros Mohammadian) "Design and Analysis of Clustering Frameworks in Vehicular Ad-hoc Networks."

Xin Li (2006), "Self-Emergence of Structures in Gene Expression Programming."

Marcin Kadluczka (2003), "Searching for General Metaheuristic for Optimization Problems and Knowledge Management."

Ben Kao (2003), (co-advisor with Prof. Simon Kasif) "Learning Algorithms For Large Datasets."

Chi Zhou (2002), "Gene Expression Programming and Rule Induction for Domain Knowledge Discovery and Management."

P. Csaszar (1998), "Optimization Automated Placement Machines Using Tabu Search Algorithms."

W. Wang, (1998) "Optimization of Surface Mount Technology Placement Machines using Evolutionary Algorithms."

J. Inglehart, (1997) "Inferring DNA Structures from Segmentation and Sequence Data via Intelligent Search."

P. Palacharla (1995), "A Pattern Recognition Approach to Data Fusion in Intelligent Vehicle Highway Systems."

J. Dillenburg (1993), "Techniques for Improving the Efficiency of Heuristic Search."

A. Toptsis (1992), "Parallel Bidirectional Island Search in Distributed Memory Multiprocessors."

J. Yim (1990), (co-advisor with Prof. Murata) "A Predicate/Transition Net Model

23

For Artificial Intelligence Robot Planning."

**Graduate Students Supervised:**
**M.S. Theses Completed**

Brian Cerny (2011), "Numerical Optimization as a Means to Symbolic Regression Program Synthesis."

Bharath Venkatakrishnan (2008), "Digital Coach: A Wireless Mobile Personal Training Assistant."

Kenneth Dallmeyer (2007), "Spamlet: A Toolkit for Consuming Spammers' Resources."

Amy Qiongyun Zhang (2006), "Improving GEP Performance by using Differential Evolution for Constant Creation."

Omid Rouhani-Kalleh (2006), "Analysis, Theory and Design of Logistic Regression Classifiers for Very Large Scale Data Mining."

Sathish Kumar Murugesan (2002), "Software Unit Scheduling in Highly Available Clusters Using Constraint Programming Techniques."

Pradosh Mohapatra (2000), "A Generic Simulation and Optimization System for Surface Mount Technology Placement Machines."

Hankus Lukasz (2000), "Object-Oriented Design of a GIS."

E. Torres (1996), "Application of Neural Networks to Data Fusion."

P. Noel (1996), "Strategies for Solving Semeai in Go Using Genetic Algorithms."

A. Dikos (1995), "Optimization of Printed Circuit Card Assembly in High-Mix Environments using Genetic Algorithms."

W. Wang (1995), "An Automated Process Plan Selection System."

J. Inglehart (1993), "On the Limitations of Automated Restriction Mapping."

C. Lain (1993), "Heuristic Improvement through Triangulation."

J. Dillenburg (1991), "Experimental Analysis of Heuristic Island Search."

**Graduate Students Supervised:**
**M.S. Projects Completed**

24

Narari Barm (2011), ""Effects of Parameter Settings on the Performance of Multiple-Population Genetic Algorithms with Different Topologies."

Weidong Zhang (2005), "A Three Dimensional Cochlear Implant Simulation with Circuit Model."

Gomathy Sundaresan (2002) "Hybrid Genetic Algorithm Rule-Based System for Optimizing SMT Placement Machines."

Tricia Sproule (2001) "LMT Client Test Tool."

Revanta Banerji (2000), "Semi-Automated Classification of Web Documents."

Mukund Pattangi (2000), "Rating and Censorship On the Internet."

Amitkumar J. Aswani (2000), " Optimization of Revolver Head SMT Machines Using Adaptive Simulated Annealing."

Juan Lopez (2000), "Cost Reduction & Calculation Tools for Electronics Manufacturing."

Eric S. Leung (1999), "Line Balancing of Multi-Station Revolver Head Machines Using Rule-Based Expert Systems."

M. T. Cornelison (1998) "Predicting Traffic Congestion Using Neural Networks."

R. R. Rajbhandari (1998), " Optimization of Automated High Speed Modular Placement  Machines Using Knowledge-Based Systems."

Weisong Xu (1998),  "An Object-Oriented Evolutionary Optimizer for a Turret-Based Chip Shooter."

Parthiv Sheth (1998), "An Intelligent Forecasting System for the Federal Reserve Bank of Chicago."

Jose Afonso B. Pinto (1997), "SNMP Network Management Expert System Java Package."

Lauren L. Willming (1997), "Simul Graphical User Interface."

Y. Zou (1996), "An Intelligent Automated Restriction Mapping Tool."

S.M Chung (1995), "Analysis and Simulation of Selected Database Restoration Techniques."

**M.S. Projects Completed (continued)**

Jing Zhang (1995), "An Economic Occupational Forecasting Tool."

V. Shah (1990), "Globular Dynamics: An Implementation of Physically Modeled Soft Objects."

P. Z. Kokan (1994), "Fuzzy Implementation of Proportional Integral Derivative (PID) Controllers."

J. Warpinski (1992), "Expert Systems for Network Fault Detection."

A. Mazurkiewicz (1992), "An Empirical Study of the Convergence Rate of the Back Propagation Learning Algorithm for Artificial Neural Networks."

M. Managheb (1990), "Knowledge-Based Planning and Scheduling with CLIPS."

**Post-Doctoral Fellows Supervised:**
Dr. Virginia Sisiopiku, 1/1/94 - 12/31/94.

Dr. Anestis Toptsis, Summer 1991.

**Direction of Research Associates and Technicians:**

| Name | Highest Degree | Employment Dates |
|---|---|---|
| A. Cai | M.S. | 7/25/92 - 12/31/93 |
| K. Dicke | M.S. | 7/25/92 - 12/31/93 |
| J. Dillenburg | Ph.D. | 8/23/93 – Current |
| C. Drake | M.S. | 5/1/02 – Current |
| C. Lain | M.S. | 8/23/93 - 12/31/94 |
| D. Rorem | M.S. | 9/1/91 - Current |
| M. Rosheim | M.S. | 7/15/91 - 7/31/93 |

**Selected Popular Media Quotes, Interviews and Op-Ed Pieces:**

Chicago Sun-Times, January 31, 2007, "UIC team ready to get medieval on spammers," by technology columnist Sandra Guy.

First Business (appears daily on over 150 television stations around the U.S. and overseas), January 11, 2007, Interviewed to discuss Apple's new iPhone.

New York Times, September 17, 2006, Editorial – "Legacy Admissions," by Peter C. Nelson.

Pioneer Press (appeared in 57 suburban Pioneer Press newspapers), August 3, 2006, "Computer Science study falls in U.S.," by Karen Shoffner.

26

Chicago Tribune, May 15, 2005, Letter to Editor – "Remain Competitive," by Pete Nelson.

Chicago Sun-Times, April 1, 2006, Commentary Essay – "Don't Overlook Diversity When It's Time to Pick a College," by Pete Nelson.

Redeye, February 6, 2004, Inside Cover, "Honoring the Crash Test Genius," by Chris McNamera.

Daily Herald, January 21, 2002, "Illinois gets top rating for tech use," by Daschell M. Phillips.

Chicago Sun-Times, January 8, 2002, SECTION: FINANCIAL; Pg. 12, "Dot-com crash victims flocking back to college," by Brenda Warner Rotzoll.

**Selected Popular Media Quotes, Interviews and Op-Ed Pieces: (continued)**

Chicago Tribune, November 26, 2001, SECTION: BUSINESS; Pg. 3, " Wireless connections touted as DSL alternative," by Jon Van.

CBS Channel 2 10pm News, July 30, 2001, "Code Red Virus Alert."

San Diego Union-Tribune, July 8, 2001, Sunday, Pg. A-1, "Artificial intelligence is alive in laboratories, works on Web; Computers thinking like humans nothing like movie," by Jeff Meredith.

Chicago Tribune, July 2, 2001, Monday, SECTION: BUSINESS; Pg. 3, "A.I. forms already in use; Northwestern, UIC labs focus on convenience," by Jeff Meredith.

Chicago Tribune, July 29, 1999, Thursday, Frontpage Headline: "GAME WARY; RETAILERS ARE REFUSING TO SELL SOME TITLES AS CONCERN ABOUT THE EFFECTS OF VIOLENCE GROWS.; STORES OPPOSE CHECKING IDS," by Susan Chandler..

Crain's Chicago Business, November 8, 1993, Pg. R5, "Smart car technology heads into suburbs," by Bill McDowel.

**Professional Activities and Awards:**

Referee and session moderator for IJCAI - 89.

Head Site Judge for 1989 ACM Midwest Regional Programming Contest.

Referee for 1989 International Parallel Processing Conference.

27

1990 University of Illinois at Chicago Silver Circle Teaching Award Finalist.

Invited Speaker at the 1991 International Conference on Computing and Information (Toronto), "Software Engineering Challenges of the Advanced Traveller Information System ADVANCE," May 1991.

SAE 1993 Location Coding Workshop Participant (San Francisco).

Invited Speaker for the Communication Society of the Chicago Chapter of IEEE, "The ADVANCE Project," January 1994.

Organizing committee member of the 1994 Intelligent Vehicle Symposium (Paris).

Member of the Board of Examiners (1994), Indian Institute of Technology (Kharagpur).

**Professional Activities and Awards: (continued)**

Invited Panel Member representing the U.S. at the 1994 Intelligent Vehicle Symposium (Paris), "What is the Future of IVHS in the United States?" October 1994.

Invited Speaker (joint presentation with Martin Monahan of FHWA) at the 1995 Pacific Rim Transportation Technology Conference (Seattle), "An Update on the ADVANCE Project," July 1995.

Invited Speaker at the 1995 International Federation of Operational Research Societies 4th Specialized Conference - Operations Research and Engineering Design (St. Louis), "The ADVANCE Dynamic Route Guidance Project," October 1995.

Invited Speaker at the 1995 UIC Engineering Alumni Association Dinner, "Smart Cars, Smart Factories, and Beyond," November 1995.

Member of (USDOT sponsored) GCM Priority Corridor Architecture, Communications and Infrastructure Committee (1996-00).

Invited Speaker at Argonne National Laboratory, "Intelligent Transportation Systems Research at the University of Illinois at Chicago," February 1996.

1999 UIC College of Engineering Research Award.

Invited Speaker at Drexel University, "Optimization of High-Speed SMT Placement Machines Using Evolutionary Algorithms," June 2000.

Invited Speaker at University of Alberta, "Optimization of High-Speed SMT Placement Machines Using Evolutionary Algorithms," June 2000.

Keynote Speaker for the Intelligent Transportation Systems Workshop held at Academia Sinica's Institute of Information Science (Taipei, Taiwan). The following two talks were presented: "An Overview of ITS in North America" and "ITS: Lessons Learned and Future Research Directions," September 2000.

Invited participant for a jointly sponsored NSF and USDOT workshop held at UIC to formulate a ten-year basic research program in transportation (October 2000).

Expert witness consulting for Fitch, Even, Tabin & Flannery, which served as legal counsel to Brian Tyler regarding U.S. Patent 4,992,939, September 2002.

Program Committee Member for IEEE 5th International Conference on Intelligent Transportation Systems (Singapore, September 2002).

**Professional Activities and Awards: (continued)**
2002 Federal Highway Administration National Award for Traveler Information Web Sites for our Gateway System GCMTravel.org (four awards nationally).

Invited speaker for Motorola Labs Technology Seminar Series (webcast to Motorola's 3000 scientists and engineers around the world), "Domain Knowledge Discovery and Management for Electronics Manufacturing and Design," December 2002.

Expert Witness Testimony, United States District Court (Judge John Darrah), Catalina vs. Coolsavings.com, April 2003.

Invited Speaker at Illinois Institute of Technology, "Applied AI and Electronics Manufacturing Optimization," November 2003.

2003 Federal Highway Administration National Award for Traveler Information Web Sites for our Gateway System GCMTravel.org.

Member of the IEEE Intelligent Transportation Systems Council, 2004.

Program Committee Member for 2004 IEEE International Conference on Networking, Sensing, and Control (ICNSC 2004), March 21-23, 2004, Taipei, Taiwan.

Expert witness consulting for Kelley Drye & Warren LLP, which served as legal counsel to a telecommunications firm, August 2004 - June 2005.

Program Committee Member for 2005 IEEE International Conference on Networking, Sensing and Control (ICNSC 2004), March 19-22, 2005, Tucson, AZ, USA.

2005 ACM/IEEE Conference on Supercomputing HPC Analytics Challenge Award for "Real Time Change Detection and Alerts from Highway Traffic Data."

Program Committee Member for 2006 IEEE International Conference on Systems, Man, and Cybernetics, October 8-11, 2006, Taipei, Taiwan.

Editorial Board Member 2006-07, *Journal of Decision Making in Manufacturing and Services*, published by AGH University of Science and Technology, Kraków, Poland.

Program Committee Member for 2007 IEEE International Conference on Systems, Man and Cybernetics (SMC 2007), October 7-10, 2007, Montreal, Canada.

Program Committee Member for the Fifth ACM International Workshop on VehiculAr Inter-NETworking (VANET) 2008, September 2008, San Francisco, CA, USA.

General Chair for 2008 International Workshop on Computational Transportation Science (in collaboration with The Fifth Annual International Conference on Mobile and Ubiquitous Systems: Computing, Networking and Services - MobiQuitous 2008), July 2008, Dublin, Ireland.

**Professional Activities and Awards: (continued)**

Referee for *IEEE Software*.

Referee for *IEEE Transactions on Robotics and Automation*.

Referee for *Information Processing Letters*.

Referee for *Journal of Experimental and Theoretical Artificial Intelligence*.

Referee for *Journal of Parallel and Distributed Computing*.

Referee for *Transportation Research – Part C*.

Referee for the National Science Foundation.

Member of the Association of Computing Machinery.

Member of the IEEE Computer Society

Member of the American Society of Engineering Education

Lifetime member of the American Association of Artificial Intelligence.
**University of Illinois at Chicago Service Activities (partial list):**

<u>**Campus Level Activities**</u>
WISEST Executive Committee, 2007-2015.

Chair, Search Committee for Vice Provost and Associate Chancellor for Budgeting, Resources Planning, 2013.

30

Chair, Search Committee for Dean of the College of Business Administration, 2011-2012.

Co-Chair, UIC Information Technology Governance Committee, 2011-2014.

Co-Chair, UIC Administrative Review and Restructuring Task Force, 2010-2011.

Board Member, Chicago Biomedical Consortium Proteomics and Informatics Scientific Board, 2006-2007.

Provost's Committee for Institutional Peer Assessment and Selection, 2005.

Fellow, Committee on Institutional Cooperation (CIC) Academic Leadership Program, 2004-2005.

Co-PI for UIC Workplace Climate Survey, 2004.

Vice-Chancellor for Research's Health Informatics Task Force, 2001-2004.

Honors College Admissions Task Force Member 2004-05.

Steering Committee Member for UIC/UIUC Symposium on Bioinformatics in Medicine and Biology, April 13, 2002.

Health Informatics Summit Program Committee Member, February 26, 2002.

Department of Physics Head Review Committee Member, 2002-03

Faculty Advisory Committee for External Education (online programs, summer session, continuing education, Tutorium In Intensive English), 2002-present.

Urban Transportation Center Faculty Advisory Committee, 2001 – present.

Intellectual Property Advisory Committee, 2000-2004.

Mentor, Office of Academic Affairs Faculty Mentoring Program, 1999-2002.

**College of Engineering and Departmental Activities:**
EECS Computer Science Division Chair, 2000-2001.

Director, Engineering Office of Transportation Research, 2000- 2001.

College of Engineering Research Awards Committee Member, 2000.

Member, EECS Ph.D. Program Self-Study Review Committee, 1999.

Chair, EECS Computer Committee, 1996-1998.

Member, EECS Reorganization Steering Committee, 1999-2000.


**College of Engineering and Departmental Activities (continued):**
Member, EECS Advisory Committee 1996-1997

Member, EECS Faculty Search Committee 1995-1997

Member, EECS Undergraduate Committee 1994-1996

Member, EECS Advisory Committee 1996-1997

Member, EECS Department Scholarship Committee 1991-1993

Member, EECS Department Computer Committee 1988-1993.

Member, EECS Department Library and Grievance Committee 1988-1991.

Honors College Advisor 1989-1990.

Expert Witness and Trial Preparation Consulting (after June 15, 2005 – only cases in which I have testified or provided affidavits are listed.)

> Nordstrom Consulting Inc. and Innova Systems Inc., Plaintiffs, v. M&S Technologies, Inc. and J. Anthony and Associates, Inc., Mr. Joseph Marino, and Mr. Kevin Butler, Defendants, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION Civil Action No. 06 C 3234 Honorable Judge John W. Darrah (hired by Defendants' Counsel) 2006 – 2008.

> SP Technologies, Plaintiff, v. Garmin Limited, Garmin International, INC., TomTom, INC., and Magellan Navigation, INC.,Defendants, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF **ILLINOIS Civil**

Action No. 08 CV 3248 Honorable Judge Pallmeyer (hired by Plaintiffs' Counsel) 2008 – 2010.

List of law firms I have consulted for on patent and copyright litigation cases; approximately 8-10 patent cases and one copyright case.

Cloudigy Law, PLLC
Nixon Peabody, LLP
Niro, Scavone, Haller & Niro
FAY, SHARPE, FAGAN, MINNICH & McKEE, LLP
Fitch, Even, Tabin & Flannery LLP
Kelley Drye & Warren LLP
Jenkens & Gilchrist

EXHIBIT 2

**Materials Considered:**

My primary materials considered are specificed or cited in the body of my Rebuttal Report and are incorporated by reference herein.

List of Materials Consulted by Dr. Peter C. Nelson  in preparation of Expert Rebuttal Report of Peter Nelson Concerning Alleged Invalidity of U.S. Patent 7,447,713:

a. The '713 Patent;

b. The '713 Patent File History;

c.  Provisional Application No. 60/240,179, filed 10/13/2000;

d. The parties' Proposed Claim Terms to Be Construed and corresponding claim construction positions submitted pursuant to the local patent rules;

e. The parties' Preliminary and Final Invalidity  / Validity Contentions;

f.  HP's Preliminary and Final Unenforceabilty and Invalidity Contentions dated April 17, 2015;

g.  The *Markman* claim construction ruling of Judge John Z. Lee entitled MEMORANDUM OPINION AND ORDER filed 8/21/2015 as document #123;

h. The Deposition Transcripts of the September 26, 2014 Deposition of Steven E. Berkheimer;

i.  US. Patent No 5,623,679 to Kevin G. Rivette, et al.;

j.  U.S. Patent No 5,893,131 to William Kornfield;

k. U.S. Patent No. 7,178,105 to David Ferrucci, et al.;

l.  U.S. Patent No. 5,652,884 to Jack Palevich;

m. WIPO Publication No. 97/34240 (PCT/US97/04574);

n. "Personalized & Database Printing," by David Broady & Frank Romano;

o. "Exstream Learning Guide," Release 1.0 dated September 1, 1999, and the

corresponding Exstream executable system;

p. "Intelligent Offices: Object-Oriented Multi-Media Information Management in Client/Server Architectures," ISBN-13: 978-0471547006 by Wiley Professional Computing;

q. "Acrobat PDF and Workflow In Detail" by Frank Romano;

r.   Appendix 5A to Schonfeld Report – Invalidity Chart of the '713 Patent over US. Patent No 5,623,679 to Kevin G. Rivette, et al.;

s.   Appendix 5B to Schonfeld Report – Invalidity Chart of the '713 Patent over U.S. Patent No 5,893,131 to William Kornfield;

t.   Appendix 5C to Schonfeld Report – Invalidity Chart of the '713 Patent over U.S. Patent No. 7,178,105 to David Ferrucci, et al.;

u.   Appendix 5D to Schonfeld Report – Invalidity Chart of the '713 Patent over WIPO Publication No. 97/34240 (PCT/US97/04574) to Buford;

v.   Appendix 5E to Schonfeld Report – Invalidity Chart of the '713 Patent over "Personalized & Database Printing," by David Broady & Frank Romano;

w.   Appendix 5F to Schonfeld Report – Invalidity Chart of the '713 Patent over the Exstream Version 1 System, as confirmed by the Exstream Learning Guide, and the Exstream version 1 demo software.

x.   Screenshots 1, 2, and 3 of the  Exstream version 1 demo software attached hereto.

y.    The Exstream version 1 demo software executables string found in the "Exstream.exe" and Designer.exe" binaries (v1.0).

z.   Software Development And Licensing Agreement No. 70000205 signed April 7, 2000 by Exstream Software and signed April 24, 2000 by FMR Corporation ("Fidelity") as HP-B00003350 to HP-B00003366.

aa.  The legal opinions of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); and *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

bb.  The Expert Report of Melissa C. Snelson Concerning Economic Damages of U.S. Patent 7,447,713 and the cited underlying evidentiary support for her analysis of the Georgia-Pacific factors 6, 9, 10 and 13 discussed in my Rebuttal Report.

Screenshot 1







Screenshot 2



Screenshot 3



User Logon

Exstream Version 1.01.200 Demonstration
Copyright (C) 1998, 1999 Exstream Software, Inc.

Warning: This computer program is protected by
copyright law and international treaties.
Unauthorized reproduction or distribution of this
program, or any portion of it, may result in severe
civil and criminal penalties.